NATIONAL BANK OF COMMERCE (OF EL DORADO, ARKANSAS), Guardian of the Estate (only) of Ashley Marie Smits, a Minor, and William J. Smits, Jr., Individually, Plaintiffs,

v.

DOW CHEMICAL CO. et al., Defendants.

No. LR–C–94–0064.

United States District Court,
E.D. Arkansas,
Western Division.

Dec. 30, 1996.

Bernard P. Whetstone, Whetstone Law Firm, Little Rock, AR, Bobby Dean Davidson, Davidson & Associates, Little Rock, AR, for plaintiffs.

Sammye L. Taylor, Wright, Lindsey & Jennings, Little Rock, AR, Joseph G. Eaton, Robert D. MacGill, Barnes & Thornburg, Indianapolis, IN, Louis C. Woolf, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, for defendants.

### MEMORANDUM AND ORDER

EISELE, Senior District Judge.

Before the Court is the Pesticide Defendants'[1] Motion to Exclude Opinion Testimony of Plaintiffs' Expert Witnesses; the Pesticide Defendants' Motion for Summary Judgment; and the Plaintiffs' *Daubert* Motion and their response to all of the above. This Order will address the admissibility of plaintiffs' expert testimony as it relates to the pesticide known as Dursban LO.

The Pesticide Defendants seek to strike the causation testimony of the following plaintiffs' expert witnesses: Morris Cranmer, Gunnar Heuser, Robert Laird, Jesse Bidanset, Janette Sherman, and Jane Miers.[2] The Court will attempt to evaluate each of said experts and his or her contested testimony but only to the extent necessary to determine if their proffered testimony meets the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which focuses primarily on Federal Rules of Evidence 702 and 703. From the pre–September 12, 1996, submissions of the plaintiffs the Court has prepared a rough summary of the key testimony expected of these witnesses, which summary is attached hereto as Appendix A. The Court will separately deal with the "live" testimony of Dr. Sherman at the September 12, 1996, hearing.

When a serious challenge is made to the admissibility of expert scientific evidence, the Court will ordinarily hold an *in limine* hearing or conference to consider the disputed evidence and then make the findings required by *Daubert.* Here, the Pesticide Defendants, through their filings and submissions, have raised such a challenge to plaintiffs' expert causation evidence. Therefore, an on-the-record conference and argument was held on March 27, 1996. A second hearing was held on September 12, 1996, at which the plaintiffs put on the testimony of Dr. Sherman. After the testimony of Dr. Sherman, further oral arguments were made by the parties. This Memorandum and Order will deal with the issues raised by the pending motions and by the

1. Throughout the course of this litigation the defendants Dow Chemical Company, Rofan Services, Inc., and Epco Incorporated of Indiana have been referred to as the Pesticide Defendants.

2. Plaintiffs' other experts, Norman Pitt and Leslie Ball, express opinions that are not directly related to the issues of causation and are not included in the Pesticide Defendants' motion to strike.

arguments made by the parties orally and in their written submissions.

On May 16, 1996, this Court entered a written order granting separate defendant Steam Services' Motion to Strike Plaintiffs' Expert Witnesses and for Summary judgment. That order reviewed at some length the *Daubert* decision and its progeny.[3] Much of what was said there will be repeated here (with very few changes) so that this opinion can better stand on its own.

## I. FACTS

According to the plaintiffs' submissions, Mrs. Maria Smits was employed at the Eagle Bank in Sherwood, Arkansas, during the early months of 1991. The date of conception of Ashley Smits was on or about January 16, 1991. Ashley was born on September 20, 1991, with multiple birth defects. On October 4, 1993, Maria Smits and her husband, William Smits, had a son who is perfectly normal.

On February 5, 1991, Maria Smits first learned that she was pregnant. On February 6, 1991, the Adams Pest Control Company made a "crack and crevice" application of a 0.5%[4] solution of Dursban LO in water around the baseboards in the interior of the Eagle Bank Building. This work began around 4:00 p.m. Mrs. Smits states that she worked there that day until 6:00 p.m.

On February 11, 1991, there was a small electrical fire at the Bank. On the same day (after the fire was put out) Steam Services applied Firefog 404, a reorderant. Mrs. Smits worked that day from 12:00 noon until 6:30 p.m. and, indeed, continued to work at the Eagle Bank in Sherwood until the first part of April, 1991, a period of approximately two months.

Plaintiffs allege that Mrs. Smits was continuously exposed to Firefog and Dursban while she worked at the bank since those chemical agents remained in the Bank and continued to be volatilized into the air and inhaled by her and that she was also exposed to the chemicals through skin exposure since those chemicals were left on the various surfaces in the Bank.

Plaintiffs state that Maria Smits became nauseated after her exposure to Dursban LO on February 6, 1991, and that she vomited that night. It is also claimed that after exposure to the Firefog 404 Mrs. Smits could taste the chemicals (a sweet taste) in her mouth and that she could smell the odor of the chemicals.

Plaintiffs allege that Mrs. Maria Smits was a young and healthy, woman, well-nourished, a non-smoker, a non-user of alcohol and that she did not take any known teratogenic drugs during her pregnancy. Plaintiffs also allege that Mrs. Smits had no family history of birth defects and had no detectible genetic defects and that Ashley's blood lead was normal at birth. Plaintiffs allege that Maria Smits was exposed to Dursban LO during a critical time in Ashley's development—that is, during the period of time when her nervous and other developing systems were most sensitive to such chemical agents. It is important, in the evaluation of plaintiffs' expert testimony, to have some knowledge of Dursban's ingredients. Although defendants' experts do not fully agree, the Court will accept the plaintiffs' expert's description of the Dursban[5] Ingredients:[6]

**\* Chlorpyrifos**[7]

---

3. Some of the Court's observations here, particularly those dealing with exposure and dose, apply with equal force to issues relating to Firefog. Such observations in this opinion should therefore be deemed supplementary to views expressed in that earlier opinion.

4. The plaintiffs erroneously believed that they were dealing with a 5% solution rather than a 0.5% solution. Dr. Cranmer made certain exposure estimates based on that erroneous assumption. The record makes clear that the proper figure is 0.5%, and this was conceded by plaintiffs counsel during the September 12, 1996, hearing.

5. According to Cranmer, Dursban was originally marketed in 1965. Cranmer Report, p. 2.

6. These ingredients are a compilation of Dr. Sherman's list of the ingredients in chlorpyrifos and Cranmer's report, p. 12, which provides that Dow's CSF lists the ingredients of Dursban LO as Dursban R (the chlorpyrifos) plus the five listed ingredients.

7. Chlorpyrifos is an organophosphate insecticide. In Dr. Sherman's article, she reviewed U.S. patents and used "general principles of chemistry" to conclude that the product contained a number

(NOTE: The formula and ingredients are filed with this opinion Under Seal because of defendants' assertion that same constitutes a trade secret or confidential proprietary information. The footnotes to same are not deleted.)

## II. STANDARD OF ADMISSIBILITY

We start with Justice Blackmun's opinion in *Daubert*. After concluding that the *Frye* Rule[11] ("that austere standard") should not be applied in federal trials, *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794, Justice Blackmun went on to discuss the proper test for admissibility of scientific evidence. He pointed out that Rule 702 nowhere refers to the "general acceptance" test of *Frye*. He then explained as follows:

That the *Frye* test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. *"If scientific, technical, or other specialized knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue" an expert "may testify *thereto.*" The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any

body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.

\* · \* \* \* \* \*

But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert*, 509 U.S. at 589–90, 113 S.Ct. at 2794–95 (emphasis in original). It is important also to consider Justice Blackmun's footnote to this observation:

We note that scientists typically distinguish between "validity" (does the principle support what it purports to show?) and "reliability" (does application of the principle produce consistent results?).

\* \* \* \* \* \*

... our reference here is to *evidentiary* reliability—that is, trustworthiness.

\* \* \* \* \* \*

In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity.*

*Id.,* at n. 9. The majority opinion then goes on to state that:

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes pri-

---

of chemicals. Dow's analysis of Chlorpyrifos was shown to include detectable levels of the chemicals listed.

**8.** A.k.a. Trichloropyridinol (TCP). This is an "impurity" during the manufacturing of Dursban and is a "metabolite" of chlorpyrifos. Supplement to Plaintiffs' *Daubert* Motion, p. 2. Dr. Sherman's article states that Chlorpyrifos is metabolized into Trichloropyridinol (TCP). This is the ingredient that is the subject of the MSDS

which states that it "has been reported to cause birth defects in laboratory animals."

**9.** This is an "impurity" during the manufacturing of Dursban, Supplement to Plaintiffs' *Daubert* Motion, p. 11.

**10.** This is the organic solvent base for Dursban.

**11.** *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923).

marily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."

\*   \*   \*   \*   \*   \*

Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

That these requirements are embodied in Rule 702 is not surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge—a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,'" Advisory Committee's Notes on Fed.Rule Evid. 602 (citation omitted)—is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

*Daubert,* 509 U.S. at 591–92, 113 S.Ct. at 2796.

With this doctrinal background in mind, Justice Blackmun then provides the trial judge with practical instructions on how to proceed when expert scientific testimony is challenged:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier to fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Green* at 645. See also C. Hempel, *Philosophy of Natural Science* 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper, *Conjectures and Refutations: The Growth of Scientific Knowledge* 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").

Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, see S. Jasanoff, *The Fifth Branch: Science Advisors as Policymakers* 61–76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, The *Philosophical Basis of Peer Review and the Suppression of Innovation,* 263 *J.Am. Med.Assn.* 1438 (1990). Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. See J. Ziman, *Reliable Knowledge: An Exploration of the Grounds of Belief in Science* 130–133 (1978); Relman and Angell, *How Good Is Peer Review?,* 321 *New Eng.J.Med.* 827 (1989). The fact of publication (or lack thereof) in a peer-reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised. Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential

rate of error, see, *e.g., United States v. Smith,* 869 F.2d 348, 353–354 (7th Cir. 1989) (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation. See *United States v. Williams,* 583 F.2d 1194, 1198 (2d Cir.1978) (noting professional organization's standard governing spectrographic analysis), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *United States v. Downing,* 753 F.2d [1224] at 1238 [(3d Cir.1985)] See also 3 Weinstein & Berger ¶ 702[03], pp. 702–41 to 702–42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique that has been able to attract only minimal support within the community," *Downing, supra,* at 1238, may properly be viewed with skepticism.

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Daubert,* 509 U.S. at 592–95, 113 S.Ct. at 2796–97. The *Daubert* opinion also instructs the trial judge to be mindful of the provisions of Rules 703, 706 and 403. Finally, the trial judge is admonished that if she or he con-

cludes that a scintilla of evidence supporting a position is insufficient to allow a reasonable jury to conclude that the position is more likely than not true, the court remains free to direct a judgment, *see* Fed. Rule Civ. Proc. 50(a), and likewise to grant summary judgment, Fed. Rule Civ. Proc. 56. This is to remind us that scientific evidence may raise questions not only as to admissibility but also as to sufficiency. It is interesting to note that Justice Blackmun cites the case of *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307 (5th Cir.1989), *modified,* 884 F.2d 166 (5th Cir.1989), in support of this proposition. In summary, Justice Blackmun states that the rules of evidence (especially Rule 702),

> ... do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

*Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799.

*Daubert* holds that admissibility under Rule 702 is governed by Rule 104(a), which requires the judge to conduct "preliminary fact-finding, to make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." [12] *Id.,* at 592–93, 113 S.Ct. at 2796. Thus, before admitting scientific evidence, the Court must, *inter alia,* determine whether the theory advanced by the expert has been subjected to the "scientific method." *Id.* at 590, 593–95, 113 S.Ct. at 2795, 2797. [13] And the focus of this inquiry must be on "principles and methodology, not on the con-

---

**12.** Rule 104(a) states that, "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)."

"Rule 104(b) concerns evidence that is relevant only if certain facts are true. It directs the judge to admit such evidence provided a party provides prima facie evidence of the truth of those facts." *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 743 n. 9, (3rd Cir.1994). "By holding that the admissibility of scientific testimony is governed

by Rule 104(a), *Daubert* clearly holds that the party seeking admissibility must make out more than a prima facie case of reliability." *Id.*

**13.** The party presenting the expert must show that the expert's findings are based on sound science. This requires some objective, independent validation of the expert's methodology, not simply the expert's assurances that he or she utilized generally accepted methodology. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995).

clusions that they generate." *Daubert*, at 595, 113 S.Ct. at 2797.

"Scientific validity" and "fit" inquiries may overlap. For example, if published theories and studies purport to prove A, yet from those studies an expert concludes B, it may be that the expert's reasoning process is not valid, although the studies or theories she relies upon are. In sum, there may be a lack of "fit" between the studies and theories and the conclusion the expert draws from them.

Each step of the experts' methodology must be scientifically valid. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir.1994). For example, in a situation where an expert relies on studies of the effects of animal exposure to a particular chemical to prove similar effects in humans, "[c]ourts must assess the scientific validity of the hypothesis proffered to justify such an extrapolation." *Developments in the Law— Confronting the New Challenges of Scientific Evidence*, 108 Harv. L. Rev. 1481, 1536 (1995).

When *Daubert* was remanded back to the Ninth Circuit by the Supreme Court, it became necessary for the judges of the Ninth Circuit to apply the new standard for the admissibility of expert scientific testimony. Circuit Judge Kozinski wrote the opinion for the panel and introduced his analysis with the following background:

> Two minors brought suit against Merrell Dow Pharmaceuticals, claiming they suffered limb reduction birth defects because their mothers had taken Bendectin, a drug prescribed for morning sickness to about 17.5 million pregnant women in the United States between 1957 and 1982. *See* Rsp't's Br. on Writ of Cert. at 2; *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1350 (6th Cir.1992). This appeal deals with an evidentiary question: whether certain expert scientific testimony is admissible to prove that Bendectin caused the plaintiffs' birth defects.

> For the most part, we don't know how birth defects come about. We do know they occur in 2–3% of births, whether or not the expectant mother has taken Bendectin. *See* Jose F. Cordero & Godfrey P. Oakley, Jr., *Drug Exposure During Preg-nancy: Some Epidemiologic Considerations*, 26 Clinical Obstetrics & Gynecology 418, 424–25 (June 1983). Limb defects are even rarer, occurring in fewer than one birth out of every 1000. *Turpin*, 959 F.2d at 1353. But scientists simply do not know how teratogens (chemicals known to cause limb reduction defects) do their damage: They cannot reconstruct the biological chain of events that leads from an expectant mother's ingestion of a teratogenic substance to the stunted development of a baby's limbs. Nor do they know what it is about teratogens that causes them to have this effect. No doubt, someday we will have this knowledge, and then we will be able to tell precisely whether and how Bendectin (or any other suspected teratogen) interferes with limb development; in the current state of scientific knowledge, however, we are ignorant.

> Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*. One method of proving causation in these circumstances is to use statistical evidence. If 50 people who eat at a restaurant one evening come down with food poisoning during the night, we can infer that the restaurant's food probably contained something unwholesome, even if none of the dishes is available for analysis. This inference is based on the fact that, in our health-conscious society, it is highly unlikely that 50 people who have nothing in common except that they ate at the same restaurant would get food poisoning from independent sources.

> It is by such means that plaintiffs here seek to establish that Bendectin is responsible for their injuries. They rely on the testimony of three groups of scientific experts. One group proposes to testify that there is a statistical link between the ingestion of Bendectin during pregnancy and limb reduction defects. These experts have not themselves conducted epidemiological (human statistical) studies on the

effects of Bendectin; rather, they have reanalyzed studies published by other scientists, none of whom reported a statistical association between Bendectin and birth defects. Other experts proffered by plaintiffs propose to testify that Bendectin causes limb reduction defects in humans because it causes such defects in laboratory animals. A third group of experts sees a link between Bendectin and birth defects because Bendectin has a chemical structure that is similar to other drugs suspected of causing birth defects.

The opinions proffered by plaintiffs' experts do not, to understate the point, reflect the consensus within the scientific community. The FDA—an agency not known for its promiscuity in approving drugs—continues to approve Bendectin for use by pregnant women because "available data do not demonstrate an association between birth defects and Bendectin." U.S. Department of Health and Human Services News, No. P. 80–45 (Oct. 7, 1980). Every published study here and abroad—and there have been many—concludes that Bendectin is not a teratogen. *Turpin*, 959 F.2d at 1353–56. In fact, apart from the small but determined group of scientists testifying on behalf of the Bendectin plaintiffs in this and many other cases, there doesn't appear to be a single scientist who has concluded that Bendectin causes limb reduction defects.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1313–1314 (9th Cir.1995). After reexamining the challenged expert opinions under the Supreme Court's new standards, the Ninth Circuit concluded that the plaintiffs had not met that standard.

In the context of the *Smits* case, the plaintiffs must establish by a preponderance of the evidence that their expert testimony meets the *Daubert* standards of scientific reliability. This issue is different from the one that will be submitted to the jury if the plaintiffs' evidence satisfies those standards. In the latter case, the plaintiffs will have to establish by a preponderance of the evidence to the jury's satisfaction that Dursban LO caused the birth defects sustained by Ashley Smits. By contrast, the trial judge, when passing upon the admissibility of testimony under *Daubert*, does not deal directly with the causation issue. Rather the judge asks whether it is more likely true than not true that plaintiffs' expert testimony meets the *Daubert* standard of admissibility, *i.e.* evidentiary reliability based upon scientific validity.

Justice Blackmun concluded his opinion in *Daubert* by pointing out that the law's interest in ascertaining the truth differs from that in the scientific community. "Scientific conclusions are subject to perpetual revisions" whereas the need to "resolve disputes fairly and quickly" in a courtroom "inevitably on occasion will prevent the jury from learning from authentic insight and innovation." The law simply cannot wait upon the results of future scientific investigation and research. Cases pending in our courts must be resolved on the basis of scientific knowledge currently available.

## III. DURSBAN LO—DEFENDANTS' CHALLENGE

The Pesticide Defendants move the Court to exclude from evidence plaintiffs' expert opinion testimony on general and specific causation. The ultimate opinions of these plaintiffs' experts are (1) that Dursban LO is capable of causing birth defects in humans (general causation) and (2) that Maria Smits' exposure to Dursban during her pregnancy caused Ashley Smits' birth defects (specific causation). Of course, adequate satisfactory proof of the latter proposition would also establish the former.

The Pesticide Defendants make the following main points:

1. The Pesticide Defendants assert that none of the challenged experts has the "education, experience, or expertise in the fields of science dealing with determination of causes of birth defects (teratology and medical genetics) ... [and] they are not qualified to give expert opinions on this subject." Pesticide Defendants' Motion to Exclude, p. 2.

2. The Pesticide Defendants argue that plaintiffs' experts have not done any independent research in an effort to determine if Dursban LO is capable of causing human

birth defects. Indeed, the Pesticide Defendants assert that four of plaintiffs' six experts have not, heretofore, been involved in the field of birth defects, while the other two have done no research in such field independent of litigation.

3. The methodologies used by plaintiffs' experts are not reliable and are not used by experts in the relevant scientific field. The Pesticide Defendants argue that the methodology that should be utilized is that which teratologists use to determine whether a substance is a teratogen.[14]

4. Dr. Sherman's published case report of four birth defect cases allegedly due to Dursban is unreliable because

1. case reports are not relied on by the scientific community to establish general causation;

2. the article stems from, and arises out of, litigation;

3. Dr. Sherman was plaintiffs' expert in all three cases (one case involved brother/sister);

4. the article does not reveal the litigation connection or her personal financial interest in such litigation;

5. the children's defects were diagnosed as being genetic in origin;

6. the defects in two cases have been diagnosed as COFS/Micro syndrome and one case has been identified as CHARGE association;

7. the fourth case is distinguishable because exposure occurred in the second trimester; and

8. seventy to eighty percent of all birth defect cases are due to unknown causes.

## IV. PLAINTIFFS' RESPONSE

Plaintiffs assert that they have presented reliable and relevant evidence. They point to evidence which they assert demonstrates that Dursban LO and/or its components and metabolites are known teratogens. They rely, *inter alia*, on the Hanley study [15] which reported that

> Administration of Trichloropyridinol, to pregnant rabbits was considered teratogenic at a dose level of 250 mg/kg/day, a level which also depressed maternal weight gain. Indications of a teratogenic potential were also observed at 100 mg/kg/day in the absence of any measured maternal toxicity. No adverse effects were observed in either maternal or fetal rabbits at 25 mg/kg/day.

They also cite a letter from Dow to the EPA dated July 24, 1992, which summarized the Hanley study as follows: the incidence of central nervous system (CNS) anomalies (hydrocephaly and severely dilated cerebral ventricles) has increased in both the 100 and 250 mg/kg day base groups.

And the plaintiffs point to the MSDS for tricholorpyridinol ("TCP"), the active ingredient of Dursban LO, which states as follows:

> Teratology (Birth Defects): Has been reported to cause birth defects in laboratory animals at doses non-toxic to the mother.

The plaintiffs argue:

> The Court should know that Dr. Chris Cunniff, former geneticist at Arkansas Children's Hospital, now at the University of Arizona Medical Center, told Dr. Miers,

14. The Pesticide Defendants assert that the following are the acceptable criteria for recognizing a new teratogenic agent in humans: 1. Epidemiological studies must consistently or repeatedly demonstrate a statistical association between exposure of the agent and an increase in the suspect congenital malformations, either a unique syndrome or a group of malformations. Secular trend data should also be consistent with the allegation, providing the alleged agent is in common use. 2. A bona fide mammalian animal model of the teratogenesis must exist or can be developed, utilizing exposures comparable with those in the human. 3. The animal model should demonstrate a dose-response curve within the exposure range of concern. 4. A plausible mechanism of teratogenesis can be, and is, established, so the teratogenic result makes biological sense. J.S. Schardein, *Chemically Induced Birth Defects*, Table 1–18, p. 39 (2d ed.1993); John M. Graham, Jr., M.S., Declaration, ¶ 4; E. Marshall Johnson, Ph.D. Report, pp. 8–9.

15. The Hanley study was a study commissioned by Dow Chemical. Its full citation is T.R. Hanley, Jr., G.J. Zielke and L.G. Lomax, *3, 5, 6—Trichloro—2–Pyridinol: Oral Teratology Study in New Zealand White Rabbits* (unpublished, July 23, 1987), ("Hanley Study").

a pediatrician, that he did not know what caused Ashley's constellation of defects but that he did not think it was a genetic disorder. Also Dr. Barbara Crandall, geneticist at the U.C.L.A. Medical Center, ruled out several syndromes that she considered, including: Craniosynostosis, Antley–Bixler syndrome, Crouzon syndrome, and she also considered an association of defects called CHARGE (which is not a syndrome at all). Her final diagnosis was that Ashley's symptoms are suggestive of CHARGE association but that was not a definite diagnosis, and she went on further, and stated that she could not rule out a teratogen as the etiologic cause of Ashley's birth defects. Only Defense witness, Dr. John Graham, geneticist at the Cedars–Sinai Medical Center in Los Angeles, California, a former witness for the Dow defendants in another Dursban case (*Burke*), stated in his report that Ashley's problems *appear* to be CHARGE association, a pattern of birth defects which is *thought* to be due to a fresh dominant genetic mutation, a limited transmission to offspring due to the associated hypogonadotropic hypogonadis. These statements by Dr. Graham are speculative and should carry no weight in this court's decision regarding the Defendants' Motions for Summary Judgement.

Plaintiffs emphasize Dr. Sherman's "peer reviewed" articles: *Chlorpyrifos (Dursban)—Associated Birth Defects: A Proposed Syndrome, Report of Four Cases, and Discussion of the Toxicology*, International Journal of Occupational Medicine and Toxicology, Vol.4, No. 4 (1995); and *Chlorpyrifos (Dursban)—Associated Birth Defects: Report of Four Cases*, Archives of Environmental Health, Vol 51, No. 1, (Jan./Feb. 1996). Plaintiffs also note that, since the publication of those articles, Dr. Sherman has "discovered two more children who were exposed to Dursban LO which resulted in birth defects." Plaintiffs' Supplement, p. 22–23.[16]

## V. SUBSEQUENT PROCEEDINGS

As stated above, on March 29, 1996, the Court held an in-court conference on the

*Daubert* motions and heard argument from all parties. In addition, the Court was the beneficiary of lengthy and detailed pre-hearing and post-hearing submissions from all parties addressing the *Daubert* issue. On May 16, 1996, the Court issued an Order granting Steam Services' motion to strike the proffered causation testimony of plaintiffs' expert witnesses. And, because plaintiffs then had no evidence which could establish causation with respect to the chemical agent Firefog 404, Steam Services' motion for summary judgment was also granted.

After summary judgment was entered in favor of Steam Services, the Court scheduled a further hearing and further argument on the *Daubert* issues for September 12, 1996. In anticipation thereof the Court wrote three letters to the parties in an attempt to give some focus and guidance to that proceeding. Two of those letters were sent on August 14 and the third on August 16, 1996. They are attached hereto as Appendices B, C and D to this opinion.

The plaintiffs requested that they be permitted to bring the live testimony of Dr. Sherman before the Court at the hearing. At a telephone conference held on September 5, 1996, the Court agreed to permit the plaintiffs to put on the testimony of Dr. Sherman. On that same day, the Court mailed to the parties a copy of its "Notes Regarding Major Studies" dealing with the Muto, Hanley and Deacon studies. Those notes are attached hereto as Appendix E. More importantly the Court sent to the parties its "Notes and Comments" setting forth its tentative views on many of the important issues. Those "Notes and Comments" are attached hereto as Appendix F and are incorporated herein in their entirety by reference. It will be seen therefrom that the Court had concluded from the record, prior to the September 12, 1996, hearing, that the defendants were correct in stating that there is a consensus in the relevant scientific community (composed of teratologists and medical geneticists) concerning the protocol and methodology that must be followed in order to establish a

---

**16.** When she testified at the hearing on September 12, 1996, Dr. Sherman stated that she has become aware of additional such children, bringing her current total to eight.

particular chemical agent as a human teratogen. Through the use of that methodology and the reasoning it adopts, some forty chemical agents have been established as human teratogens. Dursban LO is *not* one of them. The Court stated that the defendants had satisfied it that they are correct on their general causation arguments. But the Court was not ready to agree at that time that that conclusion alone was enough to require it to grant the defendant's *Daubert* motion by excluding all of the plaintiffs' causation evidence. The Court stated its view that in some cases a plaintiff's proof would be sufficient to go to a jury without having first established the suspect chemical agent as a human teratogen by the use of the accepted protocol.

The Court concluded its "Notes and Comments" as follows:

> From my own examination of Dr. Sherman's articles, from the critiques thereof by Drs. Graham and Johnson, and from the written and oral arguments of defendants' counsel, I have come to the tentative conclusion that Dr. Sherman's analysis and causation opinions are not derived from any accepted scientific methodology (i.e., are not grounded in the methods and procedures of science), are not scientifically valid and, ergo, do not possess the evidentiary reliability required by *Daubert.* This is not to say that Dursban LO is not a teratogen or that it did not cause Ashley's birth defects. It is to say that Dr. Sherman's submissions and opinions are not derived from scientific methods and are nothing more than an invitation to the jury to speculate (rather than a reliable basis upon which the jury could find that it is more likely true than not true that Dursban LO caused the birth defects suffered by Ashley.) Therefore the views and opinions expressed would not assist the trier of fact to determine the cause of those defects.

My tentative view is that Dr. Sherman's case studies do nothing more scientifically than to suggest a causal relation. That hypothesis has not to date been legitimized by further research and studies. In sum, there have been no epidemiological studies, no repeatable dose-response animal studies, no other studies which would connect Dr. Sherman's speculative hypothesis to a scientific proposition having acceptance in at least a segment of the pertinent scientific community. (Note: Dr. Bidanset's *in vitro* and *in vivo* studies will be discussed later.)

The defendants state that Dr. Sherman's article relies, inter alia, on the reasoning that the exposure of each of the mothers to Dursban occurred in the first trimester of pregnancy. In her deposition at pages 689–691 she affirms that her theory requires exposure to the chemical agent during the first trimester which she identifies as "this critical point in development when these key structures are formed ..." Defendants then point out that Sherman's own report in the case of child # 2 (Daniel Gillespie) and the medical records for that pregnancy confirm that the application of Dursban occurred *after* the first trimester. The Court will ask the plaintiffs at the September 12 conference if they agree or disagree that child # 2 should be eliminated when evaluating Dr. Sherman's article and, if so, what effect that might have on the remainder of that study.

The defendants then state that the patterns of symptoms described by Dr. Sherman in her article are not really present and that the children do not in fact show any concordance of symptoms. Then defendants state:

> Moreover, it is not scientifically acceptable to collectively analyze children with multiple anomalies and recognized birth defect syndromes as Sherman has done because by definition the children have patterns of defects which can only be combined if the defects have the same pathogenetic basis. (Graham Decl. ¶ 23). That is not present here.

To evaluate the legitimacy of Dr. Sherman's statistical analysis it is necessary for the Court to resolve the issue raised by the defendants' response. Did the children suffer from the same complex or pattern of defects?

To give further guidance to the parties with regard to the issues of concern, the Court stated in its August 14, 1996, letter:

> The first issue relates to exposure and dosage both of Mrs. Smits and Ashley while *in utero*. After plaintiffs detail all of the evidence in the record on these issues and argue its medical and scientific adequacy, defendants' attorneys will respond. The second phase of the argument will relate to specific causation. Here again plaintiffs' attorneys will open and then defendants' attorneys will respond.

## VI. IMPORTANT ADDITIONAL LEGAL AUTHORITY

After hearing the testimony of Dr. Sherman at the September 12, 1996, proceeding, the Court quoted at some length from the article "Scientific Evidence After *Daubert*" by David M. Levy, which appeared in the fall 1995 edition of the ABA journal, *Litigation.* It then brought the parties' attention to the case of *Wright v. Willamette Industries, Inc.,* 91 F.3d 1105 (8th Cir.1996) which was decided by a panel of the Eighth Circuit Court of Appeals on August 2, 1996. The Court, stating that this was an extremely important case, noted that an application for rehearing and a suggestion for rehearing en banc had been made and that, therefore, the final word on *Wright* was not in. The *Wright* case is so important that it should be quoted almost in its entirety. Judge Morris Sheppard Arnold wrote the opinion for the majority of the panel, and Judge Gerald Heaney dissented. The Court will first quote from Judge Arnold's opinion as follows:

> The most significant issue in this toxic tort case is whether members of the Wright family, plaintiffs who prevailed at trial, produced sufficient evidence to submit their negligence claim to the jury. We find that they did not and therefore reverse the judgment of the district court. Appellant Willamette Industries owns a fiberboard manufacturing plant near the town of Malvern in western Arkansas. Willamette takes pine wood shavings and pulp and refines them into a fiber, which is then dried. A resin of urea formaldehyde is mixed with the fiber just prior to drying.

> It is undisputed that the plant emits particulate matter, part of which has been treated with formaldehyde, into the air. The Wrights live a short distance from the plant and claim to have suffered from a number of afflictions (e.g., headaches, sore throats, watery eyes, running noses, dizziness, and shortness of breath) which they blame on the emissions from the plant. The Wrights brought suit on a variety of theories and prevailed on their negligence claim. The jury awarded the five plaintiffs a total of $226,250.00 in compensatory damages for their personal injuries.

> Willamette made a number of post-verdict motions for judgment as a matter of law, which the district court denied. On appeal, Willamette emphasizes, among other things, that the Wrights failed to make out a submissible case on the issue of proximate cause.

> We review a district court's denial of a motion for judgment as a matter of law by applying the same standard that the district court applied originally. *Sherbert v. Alcan Aluminum Corp.,* 66 F.3d 965, 967 (8th Cir.1995). Willamette's motion for judgment as a matter of law should not be granted unless all the evidence points its way and is susceptible of no reasonable inferences sustaining the Wrights' position (citing cases).

> The Wrights, of course, had the burden of proving proximate cause in order to recover under their negligence theory (citing cases). Proximate cause in Arkansas is defined as a " 'Cause which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred.' " *Rogers v. Armstrong World Indus., Inc.,* 744 F.Supp. 901, 904 (E.D.Ark.1990) (quoting Ark.Model Jury Instr. Civil 3d ed. 501).

> Willamette contends, among other things, that in order to shift the costs of their injuries to Willamette the Wrights had to demonstrate actual exposure to a toxic substance emitted from Willamette's plant at levels that are known to produce harms like the ones of which the Wrights complain. Willamette's emphasis on exposure levels is a reasonable one that is reflected

in a number of recent toxic tort cases (citing cases). We agree with Willamette that a plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover.

The Wrights cite two Arkansas cases, *Worthington v. Roberts*, 304 Ark. 551, 803 S.W.2d 906 (1991), and *Southwestern Bell Telephone Co. v. Smith*, 220 Ark. 223, 247 S.W.2d 16 (1952), for the proposition that Arkansas does not require proof of the level of exposure in toxic tort cases. In *Smith*, a telephone company sprayed vegetation under its telephone lines, after which Mr. Smith's cows ate the vegetation and died; and in *Roberts*, pesticides drifted in a strong wind onto Mr. Roberts's property after a crop duster sprayed nearby fields, following which Mr. Roberts's trees and vegetation appeared to have been damaged. We believe that plaintiffs' reliance on these cases is misplaced. The reports of these cases do not reveal whether the plaintiff offered any proof concerning what levels of the relevant chemical might be expected to produce appreciable harm to animals or plants. The argument that defendants make in this case was simply not advanced in these previous Arkansas cases, and they are therefore of no precedential value on the precise question which concerns us here.

A legislature might well altogether outlaw a substance on the ground that it is known to involve a risk of appreciable harm to human beings, without having precise data on the question of how much harm, or what kind of harm, some specific amount of that substance might reasonably be expected to cause to some particular kinds of persons or even to an average or an ordinary person. Such legislation would presumably, as an ordinary matter, survive judicial scrutiny as a rational exercise of the police power. (Citing case). . . .

\*　　\*　　\*　　\*　　\*　　\*

Whatever may be the considerations that ought to guide a legislature in its determination of what the general good requires, courts and juries in deciding cases traditionally make more particularized inquiries into matters of cause and effect. Actions in tort for damages focus on the question of whether to transfer money from one individual to another, and under common-law principles (like the one that Arkansas law recognizes) that transfer can take place only if one individual proves, among other things, that it is more likely than not that another individual has caused him or her harm. It is therefore not enough for a plaintiff to show that a certain chemical agent sometimes causes the kind of harm that he or she is he complaining of. At a minimum, we think that there must be evidence from which the fact finder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered. See *Abuan v. General Elec. Co.*, 3 F.3d [329] at 333 [(9th Cir.1993)]. We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complaints before there can be a recovery.

In this case, while the Wrights proved that they were exposed to defendant's emissions and that wood fibers from defendant's plant were in their house, their sputum, and their urine, they failed to produce evidence that they were exposed to a hazardous level of formaldehyde from the fibers emanating from Willamette's plant. Their experts' information on this subject was simply insufficient. Dr. Fred Fowler, an industrial hygienist, and Dr. Jimmie Valentine, a pharmacologist, did offer testimony about the levels of gaseous formaldehyde that might be expected to cause symptoms like the ones that plaintiffs claim to have experienced. But the Wrights do not claim to have been injured from breathing gaseous formaldehyde, and they make no reference to any studies that reveal the levels of exposure to wood fibers impregnated with formaldehyde that are likely to produce adverse consequences.

It is true that Dr. Frank Peretti, after a great deal of prodding, testified that the Wrights' complaints were more probably than not related to exposure to formaldehyde, but that opinion was not based on any knowledge about what amounts of wood fibers impregnated with formaldehyde involve an appreciable risk of harm to human beings who breathe them. The trial court should therefore have excluded Dr. Paired's testimony, as Willamette requested it to do, because it was not based on scientific knowledge. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–91, 113 S.Ct. 2786, 2794–96, 125 L.Ed.2d 469 (1993); Fed.R.Evid. 702; Federal Judicial Center Reference Manual on Scientific Evidence 47–48 (1994). Dr. Paired's testimony regarding the probable cause of the Wrights' claimed injuries was simply speculation.

The jury could therefore only have speculated about whether the amount of formaldehyde from Willamette's plant to which each plaintiff was exposed was sufficient to cause their injuries or, indeed, any injuries at all ... Without proving hazardous levels of exposure to Willamette's formaldehyde, the Wrights failed to carry their burden of proof at trial on the issue of causation because the evidence failed to support a reasonable inference in favor of the jury's implicit finding against Willamette on the causation issue.

Judge Heaney, in his dissenting opinion, disagrees with our characterization of this case as being about money, and expresses the view that this "fails to acknowledge the important human elements regarding the injuries at issue." But lawsuits, unless they seek only a declaratory judgment, are always either about money or some form of specific relief. Those are the only kinds of relief that a court can give and in this case all the plaintiffs asked for was money. Our characterization of the case is therefore the plaintiffs' characterization of it. Money, moreover, is not properly to be contrasted with human or humane concerns. To the contrary, the reason that we compensate people (that is, transfer money from defendants to plaintiffs) is because rights that are grounded in considerations of humanity have been violated. We believe that it is humane to monetize welfare losses associated with grief, pain and suffering, humiliation, mental anguish, and other intangible injuries so that we can make plaintiffs whole. What we do not do, again for reasons grounded in humanity, is force a defendant to compensate a plaintiff if the plaintiff does not show that the defendant has probably done something to him.

For the foregoing reasons, we reverse the judgment of the district court.

In his dissent Judge Heaney states:

It is undisputed that the Willamette plant emits minute wood fibers laced with formaldehyde. It is also undisputed that because Willamette failed to install equipment that would have significantly lowered the emissions, the levels of formaldehyde emitted from the plant exceeded levels permitted by industry and state standards.

The Wright family lives within three-quarters of a mile of the plant. There is uncontradicted evidence that emissions from the plant fell like "snow" on the Wrights' property to the extent that overnight emissions could be seen on cars. Fibers from the plant were also found in the Wrights' air conditioner. The Wright family was examined by physicians and significant levels of toxic emissions from the plant were found in their sputum and urine. The Wright family suffered from headaches, sore throats, watery eyes, runny noses, dizziness and shortness of breath which the treating physician testified were more probably than not related to their exposure to the plant emissions.

\*    \*    \*    \*    \*    \*

I do not disagree with the majority's statement that there must be evidence from which the jury could find that the Wrights were exposed to levels of formaldehyde that are known to cause the harm that the Wright family suffered. In fact, however, the required evidence was produced. The State of Arkansas has determined that no plant shall emit formaldehyde because such emissions are dangerous to the health of persons who ingest them. Willamette

failed to install available equipment to control the discharge of this particulate matter in either the solid or gaseous form. The formaldehyde emissions found their way to the Wrights' property. They were found in the family's air conditioner, and more importantly, in the family's sputum and urine. Competent medical testimony was presented that stated that it was more probable than not that their illness was caused by the formaldehyde. Thus, the circle was complete and proximate cause established. Dr. Peretti may or may not have been prodded to relate the Wrights' illnesses to formaldehyde, but he did; and the jury could have rejected his testimony if it did not believe him.

The Court has learned that the plaintiffs application for rehearing and suggestion of rehearing *en banc* was denied on September 19, 1996. Therefore, *Wright* is the latest Eighth Circuit decision in this developing area of the law. *Wright* is useful here also because it reminds us of the Arkansas law on proximate cause. See also *Southern Company, Inc. v. Graham*, 271 Ark. 223, 607 S.W.2d 677, 679 (Ark.1980) (possibility, conjecture or guess not enough).

There are other cases that deal quite directly with the issues before the Court. The Court will quote at length from one of them, the case of *Cavallo v. Star Enterprise*, 892 F.Supp. 756 (E.D.Va.1995), because of its startling relevance to this case. There Judge Ellis discusses cases dealing with the "fit" requirement, the dose-response relationship, and the limits upon extrapolations from known data:

The Third Circuit addressed this problem in *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir.1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). There, residents housed near a railcar maintenance facility that had used polychlorinated biphenyls (commonly referred to as PCBs) in its business activities for many years claimed that their continued exposure to the PCBs had caused a variety of illnesses. In reviewing the *Daubert* principles, the Third Circuit panel noted that the scientific knowledge requirement, which mandates that the expert's

conclusions be based on "good grounds," applies to each step of the expert's analysis. *Paoli R.R.*, 35 F.3d at 745. Thus, the panel emphasized that "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*" *Id.* (emphasis in original). Similarly, the *Paoli* panel remarked that "the expert's view that a particular conclusion 'fits' a particular case must itself constitute scientific knowledge—a challenge to 'fit' is very close to a challenge to the expert's ultimate conclusion about the particular case." *Id.* at 746. *Cf. Developments in the Law—Confronting the New Challenges of Scientific Evidence*, 108 Harv. L.Rev. 1481, 1536 (1995) (stating that where expert relies on studies involving animal exposure to particular chemical to prove similar effect in humans, "[c]ourts must assess the scientific validity of the hypothesis proffered to justify such an extrapolation").

This interrelationship between fit and scientific validity is illustrated by a case involving an alleged correlation between a pregnant woman's use of Retin–A, a Vitamin A derivative acne medication, and her child's birth defects. *Chikovsky v. Ortho Pharmaceutical Corp.*, 832 F.Supp. 341 (S.D.Fla.1993). Although there were no published studies on the effects of Retin–A on fetal development, the plaintiff's expert in *Chikovsky* concluded that the Retin–A absorbed by the mother had caused the child's birth defects. He based this conclusion on studies showing a correlation between birth defects and high doses of Vitamin A and certain other Vitamin A derivatives. In holding that the expert's opinion was not scientifically valid, the court cited the expert's ignorance of the amounts of Retin–A absorbed by the plaintiff, noted the absence of any established dose-response relationship for Vitamin A and birth defects, and explicitly found that his "analogies to research concerning Vitamin A and other Vitamin A derivatives is [sic] wanting." *Id.* at 346.

Similarly, in *Schmaltz v. Norfolk & Western Ry. Co.,* 878 F.Supp. 1119 (N.D.Ill. 1995), the plaintiff claimed that his exposure to certain herbicides containing atrazine caused his chronic respiratory disease. Like the situation in *Chikovsky,* the plaintiff's expert could not cite any documented cases where exposure to these chemicals caused the alleged illness. Rather, he relied on studies where high doses of atrazine caused eye irritation in rabbits. In excluding the expert's testimony under *Daubert,* the court observed that the record

> Fails to make clear why the incidence of eye irritation in rabbits exposed to high doses of atrazine could reasonably lead a doctor to conclude that an indirect exposure to atrazine could cause pulmonary or respiratory conditions in humans. "The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide" in the present case.

*Schmaltz,* 878 F.Supp. at 1122 (quoting *Conde v. Velsicol Chem. Corp.,* 24 F.3d 809, 814 (6th Cir.1994)). Thus, it is apparent that a determination regarding the scientific validity of a particular theory requires not only an examination of the trustworthiness of the tested principles on which the expert opinion rests, but also an analysis of the reliability of an expert's application of the tested principles to the particular set of facts at issue.

*Id.* at 762–763.

And while specifically analyzing the proffered testimony of Dr. Monroe, a toxicologist, Judge Ellis observed as follows:

> As Dr. Rodricks explains, all chemicals can cause health problems at some level or concentration of exposure, but they vary widely in the types of harm caused and in the levels of exposure required to trigger those harms. In addition, all chemicals have thresholds of exposure that must be exceeded before the harms will occur, and these thresholds may be identified through scientific studies and literature. The task of the toxicologist, therefore, is to identify a dose-response relationship for a particular chemical (or chemical mixture) and ill-

ness and analyze the results to determine whether the duration and concentration of exposure in a given instance could have caused the alleged harms. (Rodricks Rpt. At 2–3).

*Id.* at 764.

Footnote 12 of the *Cavallo* opinion states as follows:

> Dr. Monroe was not aware of the concentration and duration of exposure in making his initial assessment. It is fairly clear from a review of the record that in many instances, Dr. Monroe did not follow the methodology to form his opinion but rather formed his opinion and then tried to conform it to the methodology. The following dialogue is illustrative:
>
> Q: And it's your opinion that [a concentration of 61 mg/m$^3$] would be sufficient to cause sensitization in Mrs. Cavallo; is that correct?
>
> A: That's correct.
>
> Q: What concentration—First of all, let me ask you this. What was the duration of her exposure?
>
> A: Well, I'm not sure exactly.
>
> Q: Would that be important to know?
>
> A: I've not found that to be essential for my assessment.
>
>      *     *     *     *     *     *
>
> Q: Why is that, sir:
>
> A: Because the available information is sufficient to indicate that the exposure was of sufficient duration to cause an irritant effect on Mrs. Cavallo.

(Monroe Tr., Vol I, at 50–51).

Judge Ellis next turns to a discussion of the need to establish the dose-response threshold:

> The second step in the methodology requires the toxicologist to consult the published literature to ascertain a dose-response relationship for the particular chemicals at issue. Dr. Monroe agreed in his deposition that "there should be a threshold below which irritant effects do not occur," and he conceded that he did not know the specific threshold for the chemicals to which Ms. Cavallo was exposed. (Monroe Tr., Vol II, at 37). None-

theless, he stated that the literature and studies he reviewed provided ample support for his conclusion that Ms. Cavallo's one-time exposure to AvJet for a period of 5–30 minutes at a concentration of 61 mg/$m^3$ caused her chronic conjunctivitis and her heightened chemical sensitivity.

It is important here to quote a portion of Footnote 13 to this text:

> Notably, Dr. Monroe acknowledged that he could find no literature supporting the proposition that exposure to AvJet at a concentration of 61 mg/$m^3$ for 5–30 minutes could cause Ms. Cavallo's sinusitis.

Judge Ellis then deals more specifically with the inadequacies and unreliabilities of the plaintiff's proof:

> The reliability of Dr. Monroe's opinion that the AvJet spill caused Ms. Cavallo's chronic condition is further undermined by the fact that the information that *has* been gathered specifically on AvJet suggests that no ill effects would be expected from exposure to AvJet for the duration and at the concentration alleged in this case. As described by Dr. Rodricks in his report, Threshold Limit Values ("TLVs") have been established by the American Conference of Governmental Industrial Hygienists for petroleum compounds related to aviation fuel. These TLVs are based upon "the best available information from" human and animal studies as well as industrial experience, and "represent airborne concentrations of substances to which nearly all workers may be repeatedly exposed day after day without adverse health effects." (Rodricks Rpt., at 7–8). According to Dr. Rodricks' unrefuted assessment, the TLVs for aviation fuel, "which are designed to protect workers exposed 8 hours [per] day on a chronic basis," exceed the worst-case concentration to which Ms. Cavallo may have been exposed (61 mg/$m^3$) on one evening by a factor of more than 10. (Rodricks Rpt., at 8). Furthermore, Dr. Rodricks explained that he consulted the toxicology literature to determine the "no observed effect levels" ("NOELs") and "lowest observed effect level" ("LOELs") in humans for acute exposure to jet fuels, kerosene, diesel, and gasoline. This con-

sultation revealed that "[t]he worst-case air concentration for Mrs. Cavallo's exposure modeled by plaintiff's expert (61 mg/$m^3$ = 9ppm) was at least 15 times lower than the NOELs and LOELs observed in humans." (Rodricks Rpt., at 9) While Ms. Cavallo contends that these NOELs, LOELs, and TLVs are heavily biased toward industry, a proposition that may well be true, she has not produced any alternative study, literature, or source that supports her conclusion that exposure to 61 mg/$m^3$ of AvJet for a relatively short duration could produce the chronic illnesses from which she allegedly suffers. *Cf. Conde*, 24 F.3d at 814 (stating that while the plaintiffs "cite published critiques of [the defendants'] studies, the critiques only underscore the need for further studies, and do not ... establish causation").

*Id.* at 768–769.

Footnote 27 should also be noted:

> At several points in her memoranda, Ms. Cavallo resorts to evidence that AvJet is toxic, and that Star knew it to be so, in an effort to support her experts' opinions of causation. (Mem. In Opp. To Defs' Mot. In Lim., at 3–4 (citing EPA Order)) (Supp. Mem. In Opp. Of Mot. For sum. Jud., at 3–5 (citing Texaco Material Safety Data Sheet)). Yet, as noted earlier and as readily conceded by Star, there is no doubt that AvJet, as all chemicals, can be toxic. As Paracelsus taught long ago, toxicity is a function of dose. Thus the question for causation purposes is: At what levels of exposure do what kinds of harm occur?

Next the Court in *Cavallo* takes up the testimony of Dr. Bellanti who relied in forming his causation opinion primarily upon the methodology of differential diagnosis:

> Although neither party clearly explains the methodology applied by Dr. Bellanti, it appears from a review of his written report as well as his deposition testimony that he primarily applied a methodology of differential diagnosis. Thus, he determined from a review of Ms. Cavallo's medical history, from her description of the spill incident, from his initial examination of her, and from the timing of the spill in relation to her development of symptoms,

that her exposure to the petroleum hydrocarbons could have caused her chronic illnesses. Dr. Bellanti then examined other possible causes of her symptoms (such as her history of smoking 1.5 packs a day for at least 20 and as much as 40 years, possible allergies, possible MSG in the Chinese food eaten on the night of the spill, and Ms. Cavallo's exposure to a previous spill in 1960), and ruled out each one.

The process of differential diagnosis is undoubtedly important to the question of "specific causation." If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be *capable* of causing the injury. That is, the expert must "rule in the suspected cause as well as 'rule out' other possible causes. And, of course, expert opinion on the issue of "general causation" must be derived from a scientifically valid methodology."

*Id.* at 770–771.

The court then commented on Dr. Bellanti's unawareness of the duration and intensity of Ms. Cavallo to AvJet fumes:

With respect to the level of Ms. Cavallo's exposure, Dr. Bellanti concluded only that she sustained a "massive exposure." (Bellanti Tr., at 231). He candidly acknowledged that in forming his opinion, he was unaware of the duration and intensity of exposure. In addition, he repeatedly qualified his responses to deposition questions regarding levels of exposure and dose-response relationships with the reminder that he was not a toxicologist.

Even assuming that he was aware of and considered the alleged 61 mg/m$^3$ level of exposure, Dr. Bellanti could cite no studies or published literature to support adverse effects from that level of exposure to AvJet.

\*    \*    \*    \*    \*    \*

Thus, it is clear that Dr. Bellanti did not follow the accepted toxicology methodology in formulating his opinion of causation in this case. At bottom, his opinion is founded primarily on the temporal connection between the spill and the development of Ms. Cavallo's symptoms, as well as on his subjective, unverified belief that AvJet can cause the types of injuries from which Ms. Cavallo suffers. This is not the method of science. *See Schmaltz,* 878 F.Supp. at 1122 (stating that "[i]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702"). Because, like Dr. Monroe, Dr. Bellanti significantly departed from the appropriate methodology, his opinion is not based on the scientific method and is inadmissible under Rule 702.

The pertinence of *Wright* and *Cavallo v. Star* will be obvious as we proceed to discuss the issues in this case. See *infra.*

## VII. EVIDENCE OF A CAUSAL RELATIONSHIP

To resolve the causation issue, it will be helpful to examine the various types of evidence which might support a causal relationship. As pointed out in the Sanders article, cited and quoted or paraphrased below, such evidence is usually derived from and through some or all of the following five well-established methodologies:

1. *Structure–Activity Relationship.*

Substances with similar chemical structures may have similar effects on the human body. If the substance is chemically related to another substance which is a known teratogen, then plaintiffs' experts may point to this similarity, suggesting that it is reasonable to expect similar results to that obtained from a known teratogen with similar chemical structure. But the cases have pointed out the weakness of this approach. See below.

2. *In vitro Studies.*

In vitro research involves analyzing the effects of exposing cells or organs maintained

in a culture to a particular substance or agent.

### 3. *Animal Studies.*

These are frequently referred to as *in vivo* studies. Such studies examine the effect of a substance or an agent on live animals. If such studies show a relationship between the substance (or one of its ingredients) and some teratogenic effect in the exposed animals, plaintiffs might argue that such studies support their contention that the substance will have a teratogenic effect in humans.

### 4. *Epidemiological Studies.*

Epidemiological studies compare the incidence of birth defects among those exposed to, and those not exposed to, a particular agent or substance. There are two ways of making such a comparison: (a) Cohort studies: cohort studies compare the instance of defects among groups of persons exposed to a substance and groups of persons not so exposed; and (b) Case-control studies: these studies match groups of persons who have the injury (birth defects) with another group that does not have that injury. These studies then compare exposure rates for the two groups.

### 5. *Secular Trend Data.*

Secular trend data, which is similar to epidemiology, compares the total reported incidences of various types of birth defects with the volume of the sales and prescriptions of the substances or agent in question. Such studies may reveal whether increases or decreases in particular birth defects parallel the rapid increase or decrease in the sales (and therefore in the use) of the substance. Here, for instance, if we had studies of the instance of birth defects such as those found in Ashley Smits before the introduction of Dursban LO into the market, we could compare those figures with the instance of such birth defects that occurred after the introduction and wide use of the Dursban LO pesticide. Reverse comparisons can also be used when the substance or agent is taken off the market. See Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Bendectin Cases,* 46 Stan. L.Rev. 2 (1993), which discusses these five methodologies. Each of these methods has its own weaknesses. A combination of their approaches, and repetitive studies producing consistent results can reinforce the scientific validity of the inferences drawn.

Furthermore, as pointed out by Judge Kozinski in *Daubert II* and Judge Ellis in *Cavallo,* causation can sometimes be proved without the benefit of any such studies. This Court suggested a hypothetical situation which could accomplish this in its "Notes and Comments," Appendix F, p. 2.

Assume further that 25 of the women met daily thereafter in a room that had on the previous day been treated with organophosphate insecticide "X" and that these women stayed in that room for three hours each morning for the next six week period. Assume the other 25 women met in another room which had not been treated by this insecticide but that otherwise the two rooms were identical. If all 25 of the women exposed to the insecticide (manifested by low blood cholinesterase levels) had children born with the same birth defects and if none of the other 25 women (whose blood cholinesterase levels remained unchanged) had a child born with a birth defect, no one would contend that the circumstance that insecticide "X" had not previously been established as a human teratogen by using the accepted protocol would, or should, prevent the case from going to the jury upon such an evidentiary showing. Of course defendants would probably agree, pointing out that the phenomenon itself, as stated in the hypothetical, would, in effect, be the equivalent of a scientifically valid epidemiological study on human "subjects" which would obviate the need for animal studies, etc. And it is obvious that the trial of the case would not have to await "falsifiability" tests, publication and peer review, or the establishment of error rates. And even if this theory of causation had not received prior "general acceptance" within the pertinent scientific community, the "phenomenal" evidence hypothesized would surely suffice. This is because that evidence satisfies the *Daubert* admissibility standards of scientific validity

and, thus, evidentiary relevance and reliability.

The Court has concluded that, under the *Daubert* standard, plaintiffs have presented no satisfactory scientific evidence (by any of the five, indirect methods listed above) that Dursban caused or contributed to Ashley Smits' birth defects. Have they provided any substitute scientific evidence of causation that might meet the *Daubert* standards? After a complete review of the record and the arguments of the parties, the Court has concluded that they have not. See *infra.*

## VIII. METHODOLOGY

The *Daubert* inquiry requires the Court to examine the scientific methodology utilized and determine if such methodology is valid. It is no surprise that the plaintiffs and defendants differ with respect to what methodology should be utilized to determine whether a chemical agent is capable of causing birth defects.

The defendants argue that the relevant scientific community is teratology and medical genetics, while the plaintiffs assert that toxicologists, pediatricians, physicians and pharmacists are all able to identify a chemical agent as one which is capable of causing birth defects and as, in fact, actually causing such defects as those found in Ashley.

The Court agrees with the defendants on the proper methodology and the relevant scientific community when dealing with the issue of general causation and has previously so ruled. See discussion, *supra.*

## IX. DISCUSSION OF PORTIONS OF DR. SHERMAN'S TESTIMONY

■ Much of the testimony of Dr. Sherman before the Court on September 12, 1996, consisted simply of a restatement of the position she had taken earlier as reflected in the prior submissions by the plaintiffs. However, some of her September 12, 1996, testimony was new or, at least, tended to clarify her prior assertions or to put those prior assertions in doubt.

### A. *The Gillespie Child*

It will be recalled that prior to the September 12, 1996, hearing the Court advised the parties of certain issues that it wanted them to address at that hearing, among which was the following:

The defendants state that Dr. Sherman's article relies, inter alia, on the reasoning that the exposure of each of the mothers to Dursban occurred in the first trimester of pregnancy. In her deposition at pages 689–691 she affirms that her theory requires exposure to the chemical agent during the first trimester which she identifies as "this critical point in development when these key structures are formed ..." Defendants then point out that Sherman's own report in the case of child # 2 (Daniel Gillespie) and the medical records for that pregnancy confirm that the application of Dursban occurred *after* the first trimester. The Court will ask the plaintiffs at the September 12 conference if they agree or disagree that child # 2 should be eliminated when evaluating Dr. Sherman's article and, if so, what effect that might have on the remainder of that study.[17]

The manner in which Dr. Sherman addressed this question is rather typical of her approach to the serious causation issues in this case:

THE COURT: Before we leave that, let me ask, there's been some question raised about one of the four children who had

---

17. The colloquy referred to as being at pages 689–691 of Dr. Shemnan's deposition is as follows:
Q. If the Burke mother and the Gillespie mother would not have been exposed during the first trimester, would what you're characterizing as a pattern of defects have occurred in the children?
A. No, because it's during the first trimester when these key organs are forming, the brain, the eyes, the palate, the ears. It's this point, this critical point in development when these key structures are forming ...

Q. .... [I]s it your opinion that table 2 on Exhibit 64, the list of birth defects that are here, none would have occurred had there not been an exposure at least in part in the first trimester in pregnancy?
A. I believe that's correct.
Q. And the reason for that specific opinion here is the timing of tire development of the various structures that are referenced on table 2 of Exhibit 64.
A. Correct.

birth defects in your first study, when the exposure occurred, and that it was stated by the defendants at least that that exposure was not in the first trimester. Is that so, or do you know?

MR. DAVIDSON: Your Honor, I believe that was the Gillespie child, as I recall.

A. That is the Gillespie child. And, after that was raised by the defense attorney, I again called the attorney representing the family, and I again reviewed the medical records. And it was in the first trimester, at the very end of the first trimester.

THE COURT: So, when you say "end of first trimester," are you talking about end of the third month of pregnancy?

A. Toward the end of the third, toward the end of the first trimester, which would have made it about, let's see, about 11— I'm doing this in the top of my head, about 9 to 11 weeks, in there.

THE COURT: Is that consistent with your theory about the time at which these changes in the developmental patterns have to occur to produce these anomalies that you found after birth?

A. Yes, sir, because these involve the midline structures of the brain. And let me get the paper out. He had absence of the corpus callosum, if I remember correctly. This was found on his autopsy unfortunately. And let me just get the paper.

Yes. He also had absence of the corpus callosum. He had structural defects of the eye, palate abnormality, ear abnormality, heart abnormality and genital abnormality, which are all midline structures that occur, the key development occurring during the first trimester. So he fell into that same pattern. And I also have unfortunately, as I said, the benefit of having the autopsy results, which showed all of these abnormalities.

THE COURT: Well, is it your view of embryology involved with the development of the embryo that these anomalies that you've just described could originate from exposure to any drug between 9 and 11 weeks of pregnancy?

A. No, because, if you take an example of thalidomide, which occurred during the first trimester, didn't produce these kinds of anomalies of the brain. It produced limb bud abnormalities, phocomelia and absence of limbs. So it has to do with the specific agent, in other words, the chemical or pesticide or drug, and the timing during pregnancy. Those are two very specific things.

THE COURT: So it is your view it doesn't make any difference if the exposure occurs say at three weeks after pregnancy occurs or 11 weeks after.

A. Well, at three weeks it would probably kill the fetus. And you would either have—the mother would either figure she had missed a period or would have spotting and would abort. If the exposure occurs too early, before organogenesis has really begun, then the fetus doesn't survive, and the mother either is unaware of a missed pregnancy or has spotting and figures, well, she wasn't pregnant.

THE COURT: What is your understanding as to the date of the exposure of Mrs. Smits.

A. That it was during the first trimester of pregnancy.

THE COURT: Well, can you be any more specific than that? Do you know when during the first trimester, according to her own testimony about when she became pregnant?

A. Oh, yes. But I haven't memorized those data.

THE COURT: Well, I'm trying to interpret what I understand the case to be, the comment you just made, that if she were exposed, as early as I think she says she was, that the fetus would have died. I mean the embryo would have died. We know that didn't happen. So can you refresh your recollection as to when she was exposed to the Dursban?

A. Well, I don't have her deposition here.

THE COURT: You don't recall?

A. Well, that's a lot of material to remember.

THE COURT: Well, the plaintiff in this case, the child that we are dealing with here should be, it seems to me, one that

you might keep—I don't want to criticize you. But I would like you to check to find out when it was. Can someone help her?

MR. DAVIDSON: Your Honor, as I recall, it was between four and six weeks of the pregnancy, as best we could determine. I will have to get the dates for you.

A. Because she had missed a period, I believe.

Then Mr. Davidson proceeded questioning Dr. Sherman about the Gillespie issue:

BY MR. DAVIDSON:

Q. Dr. Sherman, do you want to look at your deposition and refresh your recollection on that issue?

A. If you would like me to, yes. On the Gillespie it says here—

MR. WHETSTONE: What page number?

A. Page 692. The date of the birth was he was born 9–28–87.

BY MR. DAVIDSON:

Q. Is there anything else in there that you want to use to refresh your memory to explain about the Gillespie child to the Court.

A. It says—I guess that is Mr. MacGill asking when was—when was her last period was. "Have you found it?" "Not yet. Here it is. I'm sorry. It says, 'last menstrual period indicated in this record is 12–10–86.' " "And the date of the application here is I believe Exhibit 100?" It says, "Right. I may have written that incorrectly. I have here 4–10–87. The date of the birth is what—he was born 9–28–87. Is there a date of conception that you can estimate based on these records that you have in front of you? Assuming they are true, the last menstrual period is December 10th, '86, and the birth date we have as given is correct, then two weeks before the last menstrual period would be approximately the date of conception. Would it be two weeks before or two weeks after? I beg your pardon? Two weeks after. So two weeks after roughly the two weeks after the last menstrual period would be the date of conception?" And I answered "Yes, about Christmas Eve."

THE COURT: Conception around Christmas Eve?

A. Yes, sir.

THE COURT: And the application of the Dursban was April 10?

A. I believe so, yes.

THE COURT: And the date of birth is 9–28?

A. Right.

THE COURT: And was this a full-term pregnancy?

A. Yes.

THE COURT: So, if the application was about, let's see, five and a half months before pregnancy—before birth, and let's see here. I don't know what information is in the record about the embryological development of a child. But it is obvious to me that there's a lot going on between a month and six weeks and four months. I mean three months after that the child is developed. And, if there's been no exposure to the drug at that time, I guess what I'm curious about is what's the latest date at which the chemical agent that caused these defects could have resulted in these defects?

A. Well, because once the Dursban is put into a milieu, a house or an apartment or a building, the half-life varies between 60 days and 18 years. And that's based on Dow's own data. So, once this chemical is put into a house or into a home, it is essentially there for the rest of that woman's pregnancy. The one exception to the eight cases was Mrs. Smits, who fortunately worked in a bank and then ceased working in the bank. But all the other seven cases unfortunately had the Dursban put in their homes, so they were exposed throughout their full terms of pregnancy.

THE COURT: Well, no, Gillespie was exposed, if the application occurred on 4–10 of '87, and if it continued until birth, then it continued until 9–28–87, about five and a half months?

A. That's right.

THE COURT: But the first, looks like almost three and a half months, there was no exposure. And your understanding of embryology is that these defects that you

found in the Gillespie child could have commenced after this exposure?

A. No. I really have a hard time testifying on the Gillespie case in this courtroom when the Gillespie's are not being represented. I don't think that's correct. I did check the medical records. I did check with the attorney. And it was the last part of the first trimester that he was exposed. And his defects are the same pattern as the other seven children. And, as I say, the other thing is I have the dubious benefit of having read his autopsy. And they are definitive. He follows the same pattern of the other children, and he follows the same pattern of the boys in that all the boys had undescended testicles. This is extremely uncommon to find this pattern of defects in a group of children.

THE COURT: So, let me just ask you, assuming that Dursban or no other chemical administered at the time this was, like 4–10–87, could have produced these defects you found, then something else caused it because the defects were there. The defects were there. You know the child—

A. The child has the defects, right.

THE COURT: They are very much like you say the defects that this child Ashley had.

A. But Ashley's are less—she has more functional ability than the other seven children because her exposure was much more limited because her mother stopped working in the bank. But it is the same pattern of brain, face, nose, eyes, ears, right down the midline.

THE COURT: Well, I'm really getting— let's assume the Dursban was applied in the seventh month of pregnancy.

A. Then you would more than likely see a different kind of defect, more likely learning impairment, than you would structural defects because by the seventh month the brain would have formed.

THE COURT: How about at the fourth month?

A. I am saying that the structural development, the actual organogenesis occurs essentially between the third and the ninth

to tenth week, ninth to twelfth week, third to twelfth week, when the organs are in place, and because of interference with DNA or interference with enzyme systems or interference with a proptosis, then you get a failure of development of a structure that is scheduled to be developed at that time.

THE COURT: If it should turn out it is scientifically impossible for the Gillespie child to have had these birth defects be caused by a drug applied on 4–10–87, do you know of any other explanation of those defects that could have caused it?

A. No, sir, because the mother did not smoke, did not drink. The father did not smoke or drink. There was no other exposure. The chromosomes were normal. There was no birth defects in the family.

THE COURT: Yes. But, if you assume for the moment it is impossible for this child to have suffered these defects by that late exposure, then aren't you really saying that your effort to exclude other causes has been ineffective in that some thing cause—I mean it has to be caused by something.

A. Yes, of course.

THE COURT: So, if it wasn't the drug that was applied on 4–10–87, and you've excluded you say a bunch of other alternatives, then it must be something that you haven't excluded that caused it, if that's the case.

A. If that's the case.

THE COURT: Are you an embryologist? I know you've taken embryology, I assume, in medical school.

A. I took embryology in medical school, yes, sir.

THE COURT: Beyond that, would you consider yourself an embryologist? Do you know exactly when certain organs begin to differentiate at certain points in development?

A. They are well-established. That schedule of events is well established, well-known whether it is in rats, mice or humans.[18]

18. *Compare* with Dr. Barbara Crandall's views *infra* and as found under Tab E of the defen-

THE COURT: You may continue.

Sherman Testimony, p.p. 9–19.

These colloquies reveal some of the problems with Dr. Sherman's theories. Ashley Smits was exposed to Dursban, according to the plaintiffs' view, for a period of about two months starting less than three weeks after conception. But the Gillespie child was *first* exposed some three and one half months after conception. Dr. Sherman states that "the actual organogenesis occurs essentially between the third and ninth to tenth week, ... Third to twelfth week ..." and "because of interference with the DNA or interference with enzyme systems or interference with proptosis [assumedly caused by Dursban] then you get a failure of development of a structure that is scheduled to be developed at that time." But then how does one account for the birth defects of the Gillespie child (which are claimed to be essentially the same as the defects found in Ashley and the Burke children) who, according to the plaintiffs, was first exposed to Dursban three and one half months after conception and, therefore, after the development of the structures involved according to Dr. Sherman? And there are further implications from this because the Gillespie child was one of only four cases submitted by Dr. Sherman to her statistician, Mr. J.M. Gould. See p. 8 of "Notes and Comments," Appendix F.[19] And it also undercuts Dr. Sherman's contention that she has ruled out alternative potential causes of the defects she found in the four children.

### B. *The Effect of Early Exposure*

Another problem with Dr. Sherman's theory is raised by the following question and answer:

THE COURT: So it is your view that it doesn't make any difference if the exposure occurs say at three weeks after pregnancy occurs or eleven weeks after.

A. Well, at three weeks it would probably kill the fetus. And you would either have—the mother would either figure she had missed a period or would have spot-

dants' Evidentiary Submissions.

**19.** The Court also agrees with Dr. John Graham that Dr. Sherman's method of statistical analysis

ting and abort. If the exposure occurs too early, before organogenesis has really begun, then the fetus doesn't survive, and the mother is either unaware of a missed pregnancy or has spotting and figures, well, she wasn't pregnant.

THE COURT: What is your understanding as to the date of the exposure of Mrs. Smits?

To this last question, Dr. Sherman could only state that it was during the "first trimester." But the real answer is that it was on February 6, 1991, just three weeks after conception. It appears to be Dr. Sherman's opinion that, if exposure occurred at three weeks, the chemical would probably kill the fetus. But we know that did not occur here. Ashley Smits was born on September 20, 1991.

### C. *Signature Disease Theory*

There are a few so-called "signature" defects such as the one mentioned by Mr. David Levy in his article "Scientific Evidence After *Daubert*," (see *supra*):

How much certainty in ruling out potential confounding factors is enough? The answer should depend on their plausibility. Mesothelioma, a cancer of the chest lining surrounding the lungs, is usually caused by exposure to asbestos fibers. Mesothelioma is a "signature" disease: The injury points directly to the substance that caused it. *See The Columbia University College of Physicians and Surgeons Complete Home Medical Guide* 471 (1985). Colon cancer, however, has many risk factors: diet, obesity, exposure to environmental hazards, and genetics. An expert witness who claims that a plaintiff's colon cancer was caused by asbestos exposure must undertake a thorough "differential diagnosis," performed by a qualified expert, to rule out other potential causes. In [*In re Joint] Eastern & Southern District Asbestos Litigation, supra,* 827 F.Supp. [1014] at 1048–49 [(S.D.N.Y.1993)], the court dismissed a claim for colon cancer for failure to perform an adequate differential diagno-

of the combined pattern of defects is "unsupported by any recognized scientific or medical principles." See Declaration of Dr. Graham, p. 23.

sis even though the plaintiff was only 40 at his death, had no family history of cancer, suffered from no special disease or syndrome, and did not fact an abnormal risk from his diet.

So the Court questioned Dr. Sherman about this possibility:

THE COURT: Isn't your view that this is what's sometimes referred to as a signature defect in the sense that it is one that is caused by Dursban and, if you know—not anything else causes it, you could not have these defects caused by any other chemical agent or by genetics but only by Dursban. Is that your view?

A. Yes, sir. That is my view. And I believe this falls into the same situation as the DES children, who by the way there were only seven that formed the signature cases for the DES cases. The daughters who had the vaginal cancers and vaginal autognoses, that their mothers had been given DES, and this was a birth defect that was not expressed until the girls reached menarche. I believe this is like the signature cases of the vinyl chloride caused hemangiosarcoma of the liver. That was three cases that were reported. I think these are the signature case, and I think there's a lot more than the eight that I've identified so far. But I don't know how we are going to find them except by reporting some way.

THE COURT: Do you know how long these organophosphates, insecticides or pesticides, whatever they are, have been produced?

A. Yes, sir.

THE COURT: How long?

\* \* \* \* \* \*

THE COURT: Late thirties?

A. Yes, sir.

\* \* \* \* \* \*

THE COURT: If prior to the 1930s there were children born with these defects, that would make your theory wrong; right? I mean, before there was any production of this signature insecticide, which you say causes this result, there could have been no abnormality or children born with this kind of a defect.

A. I think perhaps, sure.

THE COURT: There could have been?

A. Sure. But they would never have survived because 1930 was the days before antibiotics. They would never survive much before a few days of life.

THE COURT: What about since the drug has been available and actually used? I gather it has been used fairly heavily for some 30 years, recently more so. If there were similar anomalies and birth defects—for instance, one of the doctors talks about this CHARGE diagnosis of being genetic. Is it your view that those were caused by Dursban, I mean whether you know anything about their exposure or not, you could almost just assume, if they have the same symptoms, that they had been exposed to Dursban; is that correct?

A. I don't know.

So, while Dr. Sherman first contends that the specific birth defects she found in the children were "signature" responses to exposure to Dursban, she later equivocates.[20]

Further undercutting Dr. Sherman's opinion that Ashley's birth defects are a "signature" for Dursban exposure is her testimony about the role of Firefog. She was asked in effect (at page 321 of her deposition) if the applicator had not used Dursban, would the case proceed because of Mrs. Smits exposure to Firefog which the MSDS states is a neurotoxin. Dr. Sherman stated that in her opinion substances that are potentially neurotoxic are also teratogenic.

20. In any event it is highly improbable that a reasonable argument could be made that this particular complex of birth defects is always associated with exposure of the fetus to Dursban in the first trimester of pregnancy. The Gillespie child was, according to the plaintiffs, first exposed to Dursban three and one half *months* after conception while the Smits child was potentially first exposed less than three *weeks* after conception and last exposed some two months later. See discussion in text above. According to Dr. Sherman's explanation it appears that it would be impossible for Dursban to have caused the Gillespie child's defects. This in turn demonstrates that such defects are not, as Dr. Sherman states, always associated with exposure to Dursban. So the "signature" theory does not hold up.

It had been plaintiffs theory that Dursban was what caused the birth defects while Firefog contributed by facilitating the passage of Dursban across the placental barrier. But under that theory there would be no birth defects *without exposure to Dursban.* Yet, Dr. Sherman was willing to suggest that Firefog, in the absence of Dursban, would cause the defects found in Ashley. Of course, there is no scientific proof in the record to support such an assertion, and it is contrary to the plaintiffs' theory of the role of Firefog. And, as stated, her testimony contradicts her "signature disease" theory by pointing to another chemical as a possible cause of Ashley's defects.

D. *The Hanley Studies and the MSDS for TCP*

Plaintiffs rely heavily on the MSDS for TCP. Dr. Sherman was questioned about that:

Q. So there's actually two Hanley studies on TCP. Is that correct?

A. That's correct.

Q. One of them was on TCP with rabbits in 1987. And one was with rats in 1987.

A. That's correct.

Q. You've reviewed those?

A. Yes.

Q. Have you reviewed the MSDS sheet for TCP also?

A. Yes, I have.

Q. Does that MSDS sheet say anything about the fact that TCP is a teratogen or can cause birth defects?

A. Yes, it does.

Q. What does it say about it?

A. Let me get it.

Q. What do you recall it says? What do you recall that it says?

A. It says that it causes birth defects. And it is teratogenic, yes.

THE COURT: Doesn't it say it is reported? Why don't you read it.

A. I have to find it. Just a second. Do you have a copy?

MR. DAVIDSON: Your Honor, we have a copy here that was marked in the past I think. We will make it Plaintiff's Exhibit

Number 2. This is a Material Safety Data Sheet for 3, 5, 6–Trichloro–2 pyridinol, Plaintiffs Exhibit Number 2.

(Plaintiff's Exhibit 2 identified.)

THE COURT: It is short, isn't it?

MR. DAVIDSON: Well, it is a long one. I can read it to you.

THE COURT: The language that she's relying on, that's the part.

MR. DAVIDSON: Your honor, the language she's relying on is the section I think it says, "Teratology: Birth defects: Has been reported to cause birth defects in laboratory animals at doses nontoxic to the mother."

THE COURT: Has been reported to.

MR. DAVIDSON: Yes, Your Honor.

THE COURT: All right.

BY MR. DAVIDSON:

Q. Have you also personally looked at the Hanley study, not just the MSDS sheet?

A. Yes, I have.

Q. Have you reviewed that?

A. Yes, I did.

THE COURT: You understand the MSDS is based on the Hanley study, when it says has been reported.

A. I am not sure what it is based on because the Hanley study came out in '87. This was not issued until 1991, so I don't know what was going on in those five years. There may be other studies that I'm not aware of. It wasn't until Wednesday that I was able to get a printout of that rat study because I wasn't aware that there was a rat study. And the rabbit study was withheld from me after it was given to me in the *Burke* case. And I was required to return it because the attorney had agreed to a confidentiality agreement, and I had not. So I had to wait until I could get a copy under a Freedom of Information Act from EPA. That took two and a half months. So I don't know how many other studies there are out there indicating teratogenicity.

THE COURT: So you don't know what they are referring to when they say it has been reported.

A. Well, I assume it has to be the two Hanley studies.

The Court accepts the statements made in Appendix A to the defendants pre-hearing brief captioned "Errors and Misrepresentations in Case Reports Published by Janette Sherman" as a fair summation of such errors. The Court also accepts the explanation of this MSDS found at p.p. 24–27 of defendants' Post–Hearing Memorandum. It also finds persuasive most of the critique of Dr. Sherman's 1995 article set forth in Subsection C of Appendix F to Dr. Johnson's Declaration. See Tab C to defendants' Evidentiary Submission.

Dr. Sherman, in her testimony and even in her written articles, comes across as an advocate. Of course, good and careful scientists may also end up as strong advocates of their scientific opinions. But candor should be a hallmark of a good scientists. The Court cannot avoid the conclusion on this entire record that Dr. Sherman's advocacy is based on suspicion and conjecture and litigation animus rather than science.

Other courts have commented on Dr. Sherman or her expert testimony. See *In re Paoli RR Yard PCB Litigation,* 1992 WL 323493 (E.D.Pa) *rev'd in part* 35 F.3d 717. She has essentially been a litigation consultant and expert witness for the past twenty years. She estimates that she has participated in some 8,000 cases (many, it must be said, being Workman's Compensation Cases) in that period and given some 800 depositions. Her research and study on the four cases she has written about was all litigation connected. This is not immaterial in a *Daubert* proceeding because the expert's motivation for his/her study and research is important. While the usual credibility of an expert is not so important, in a *Daubert* hearing the expert's scientific credibility cannot be avoided. The Ninth Circuit in *Daubert II* makes the point thusly:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for the purposes of testify-

ing ... [I]n determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal work place is the lab or field, not the courtroom or the lawyer's office.

That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science. See Huber, Galileo's Revenge at 206–09 (describing how the prevalent practice of expert-shopping leads to bad science). For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests.

\*   \*   \*   \*   \*   \*

If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles."

\*   \*   \*   \*   \*   \*

Establishing that an expert's proffered testimony grows out of prelitigation research or that the expert's research has been subjected to peer review are the two principal ways the proponent of expert testimony can show that the evidence satisfies the first prong of Rule 702. Where such evidence is unavailable, the proponent of expert scientific testimony may attempt to satisfy its burden through the testimony of its own experts. For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like-to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

Plaintiffs claim Dr. Sherman's articles were peer reviewed. But her potential bias because of her direct involvement in litigation in the four cases on which she reported was not disclosed in her articles. Nor did she disclose the opinion of experts attributing the birth defects to genetic causes. And the opinions she expressed in the articles do not go to the same extent as the opinions she would put before the jury. So the court discounts the value of any peer review that might have occurred with respect to those articles.

Most of plaintiff's expert witnesses are highly respected and highly credentialed doctors and scientists. The Court's difficulties with Dr. Sherman and to a lesser extent with Dr. Bidanset, see below, should not be interpreted as indicating any such problems with those other experts. Nevertheless, Dr. Sherman has clearly been the plaintiffs' lead expert and most of plaintiffs' other experts have relied to some degree upon her studies and opinions in reaching their own conclusions. And to the extent that plaintiffs other experts opine that Ashley Smits' birth defects were caused by her mother's exposure to Dursban, such opinions simply do not meet the *Daubert* standards. As stated by Judge Ellis in the *Cavallo* case, supra:

> In sum, neither Dr. Monroe nor Dr. Bellanti sufficiently adhered to the established toxicology methodology in forming their conclusions that Ms. Cavallo's exposure to AvJet vapors from the December 1991 spill caused her various chronic illnesses. Their testimony, therefore is not "supported by appropriate validation" as required by *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795, and is ultimately unreliable. In the final analysis, the opinions of Drs. Monroe and Bellanti are based largely on hypothesis and speculation. This is not to say that the doctors are insincere in their opinions, or that their opinions may not some day be validated through scientific research and experiment. It may well be that the AvJet spill forever "sensitized" Ms. Cavallo to petroleum vapors and various other household chemicals. But the

published scientific literature and test results simply do not support that conclusion at this time. And the price paid for this seemingly stringent standard of reliability is that, unavoidably, some legitimate injuries will be left unredressed. *See Daubert,* 509 U.S. at 597, 113 S.Ct. at 2798–99 (recognizing that "in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations").

## X. THE BIDANSET STUDIES

■ Dr. Bidanset has a Ph.D. in organic chemistry. Like other of the plaintiffs' experts he has impressive credentials in certain areas. He is presently a Professor of Pharmaceutical Sciences at St. Johns in New York. He is board certified in forensic toxicology. He has worked in a medical examiner's office. He has done alcohol, drug abuse and urine drug testing in criminal cases. He has prepared and analyzed tissues and tested for the presence of chemical agents in humans. He does not claim to be an expert in epidemiology, biostatistics or medical genetics. He is not a medical doctor. He is not board certified in any field dealing with the diagnosis or treatment of birth defects such as teratology or dysmorphology. (He has studied in the field of teratology for years but does not claim to be an expert in that field.) He published his first article on reproductive processes in animals in 1988, but that study was not related to birth defects or to the effects of Dursban. He has never been employed to consult on a birth defects case outside of the litigation context.

A summary of Dr. Bidanset's writings and opinions will be found in Appendix A, attached hereto. He is listed as the author or co-author of what are referred to as the Muto Study, the Cosenza Study, and the Nimphius Study, all of which deal with the effects of Dursban on animals.[21] The Muto Study was published in 1992. The Cosenza Study was published in 1995. The Nimphius Study was written in 1995 but is unpublished.

---

**21.** Another study from Dr. Bidanset's laboratory by Wurfel, et al. in 1993 involved injecting young rats (16 or 17 days of age) with chlorpyrifos

and/or xylene. Such postnatal tests, although important for other reasons, cannot be considered birth defect studies.

It appears that Muto, Cosenza and Nimphius were graduate students working with and under the direction of Dr. Bidanset on their master degree theses. Dr. Bidanset provided chlorpyrifos as the topic for those studies. Each of the studies was prepared after Dr. Bidanset was employed as an expert for the plaintiffs in the *Burke* case. In that case it was claimed that the mother of Mary Ellen Burke and Keven Burke had been exposed to Dursban as a component of a flea spray called "Rid–A–Bug" which had been applied by Mr. Burke to the Burke home during Mrs. Burke's pregnancy, and that this exposure resulted in the birth defects sustained by the children [22] Dr. Bidanset acknowledges that the *Burke* case was the force in directing his research. Dr. Bidanset has done no research on Dursban independent of litigation.

The Court finds persuasive the criticisms of the Muto and Bidanset study (published in 1992) and the Cosenza–Bidanset Study (1995) as set forth in Appendix F to Dr. Marshall Johnson's Declaration. See Tab C of the defendants' Evidentiary Submission. There are no adequate exposure, dose or NOEL predicates for Dr. Bidanset's causation opinions, and he is not qualified to rule out possible genetic causes of Ashley Smits' birth defects. See below.

## XI. REAFFIRMATION OF PREVIOUS FINDINGS AND THE FINALIZATION OF PRIOR TENTATIVE FINDINGS.

### A. *Plaintiffs Have Failed to Establish General Causation*

■ As previously stated the most relevant scientific community to deal with issues related to the cause and/or the prevention of birth defects is teratology and medical genetics. This is not to say that no other fields of scientific study have anything to contribute to an understanding of birth defects. Obviously many do. But it is clear to the court

that the parents of a child with a significant birth defect will eventually be referred "up the chain," so to speak, to a teratologist or a medical geneticist specializing in birth defects. Indeed, that is what happened in this case. It is this specialized medical community which establishes the scientific standards and protocols to determine, inter alia, if a given chemical agent is a human teratogen. The people who train in the areas of teratology and medical genetics may come from a variety of other disciplines such as pediatrics, reproductive toxicology, clinical genetics, embryology, obstetrics, and epidemiology. But to be a teratologist a person from such other discipline must specialize in, study, and/or do research into the causes and prevention of birth defects. Such specialists, although few in number (some 600 in the United States), are well known throughout the medical and scientific community.

The defendants rely heavily on the submissions of Dr. Lewis Holmes, Chief of the Genetics and Teratology Unit of the Massachusetts General Hospital in Boston (the expert relied upon by the Court in the *Wade–Greaux* case); Dr. Marshall Johnson, PhD., a reproductive toxicologist specializing in the effects of chemicals on *in utero* development; Dr. John Graham, pediatrician and medical geneticist with 20 years of clinical experience in genetics, dysmorphology and teratology; and Dr. Christopher Cunnif, board certified in pediatrics and clinical genetics. Dr. Cunniff was previously the Director of the teratogen counseling service at the Arkansas Childrens' Hospital. He treated and provided medical care to Ashley Smits. They also rely on a medical text written by Dr. Schardein, who has 30 years experience as a researcher on the teratogenic potential of drugs and chemical agents. These submissions have contributed to the factual conclusions reached by the Court earlier and conveyed to the parties as part of its "Notes and Comments" (see Appendix F):

---

**22.** Judge Jack Weinstein required the experts to file reports. The plaintiffs filed reports by Dr. Sherman and Dr. Bidanser. Dow filed reports by Dr. John Graham and Dr. Marshall Johnson. Two hearings were held. At one point Judge Weinstein ordered Dr. Bidanset to produce the underlying data for the Muto Study but that data could not be found. When the case was set for consideration of summary judgment, plaintiffs' counsel dismissed the case with prejudice. The defendant states no compensation was paid to the plaintiffs.

Defendants make the point that there is a consensus in the relevant scientific community (composed of teratologists and medical geneticists) concerning the appropriate protocol and methodology that must be followed in order to establish and classify a particular chemical agent as a human teratogen. The submissions of the parties have persuaded me that they are correct in this regard. Through the use of this protocol and the methodology and reasoning it adopts, some 40 chemical agents have apparently been established as human teratogens. See above. Dursban LO is not on this list. Defendants have essentially satisfied the court that they are correct on their general causation arguments. They would then go on to argue that this conclusion by the Court requires it to grant their *Daubert* motion by excluding all of plaintiffs causation evidence. The Court is not ready to agree. Such a conclusion would have the effect of denying the claims of all plaintiffs who contend that their birth defects were caused by a chemical agent that had not been established as a teratogen through the use of the accepted protocol. While it would undoubtedly be extremely helpful to such plaintiffs to have the challenged chemical agent firmly established (through the use of such protocol) as a human teratogen, the absence of such a determination should not, alone, prove fatal to their claim. Indeed, it is clear to the Court that the facts and circumstances of particular cases might provide evidence of specific causation sufficient to go to a jury. After having the benefit of further argument on September 12, 1996, the Court reaffirms its general causation conclusion.

B. *The Only Epidemiological Study in This Record Undercuts Plaintiffs' Causation Opinions*

In its "Notes and Comments" (Appendix F, p.p. 3–7) submitted to parties before the September 12, 1996, hearing, the Court also carefully reviewed the "Willis Study" which appears to be the only epidemiological study ever conducted on Dursban. And the Court also reviewed the analysis of that study by Dr. Marshall Johnson which concluded that the study revealed no indication of any developmental defects in the women who were exposed. Then the Court states:

> At the last oral argument plaintiffs' lawyers contended that the Willis study was not reliable and should be given no weight. They pointed out that Dursban was just one of many pesticides to which the subject women might have been exposed. If the plaintiffs believe that the Willis study is subject to other defects or inadequacies which could undermine its validity, they should point same out at the September 12 conference. Of course, it certainly would be better if several, or many, epidemiological studies were done on Dursban LO, its contaminants, impurities and metabolites. But the Willis study is the only such study we have. So it is critical to carefully assess its importance.

Nothing that occurred at the September 12 hearing or thereafter has changed the Court's view. The Willis study, while it has its inadequacies, clearly supports the defendants' position. More important, plaintiffs have no epidemiology study supporting their theory of causation, and it is the plaintiffs who have the burden of proof on the *Daubert* issues.

C. *Dr. Sherman's Articles on Four Cases*

In its "Notes and Comments," the Court discussed Dr. Sherman's 1995 article on four cases, Appendix F, pp. 7–8, and pointed out that it had also read Dr. John Graham's and Dr. Marshall Johnson's critiques thereof. It then stated:

> Overall, Dr. Sherman bases her opinion on her analysis of the human case reports, animal studies, biochemistry and the structural activity relationship of the chemical agent.

> From my own examination of Dr. Sherman's articles, from the critiques thereof by Drs. Graham and Johnson, and from the written and oral arguments of defendants' counsel, I have come to the tentative conclusion that Dr. Sherman's analysis and causation opinions are not derived from any accepted scientific methodology (i.e., are not grounded in the methods and procedures of science), are not scientifically valid and, ergo, do not possess the eviden-

tiary reliability required by *Daubert*. This is not to say that Dursban LO is not a teratogen or that it did not cause Ashley's birth defects. It is to say that Dr. Sherman's submissions and opinions are not derived from scientific methods and are nothing more than an invitation to the jury to speculate (rather than a reliable basis upon which the jury could find that it is more likely true than not true that Dursban LO caused the birth defects suffered by Ashley.) Therefore the views and opinions expressed would not assist the trier of fact to determine the cause of those defects.

My tentative view is that Dr. Sherman's case studies do nothing more scientifically than to suggest a causal relation. That hypothesis has not to date been legitimized by further research and studies. In sum, there have been no epidemiological studies, no repeatable dose-response animal studies, no other studies which would connect Dr. Sherman's speculative hypothesis to a scientific proposition having acceptance in at least a segment of the pertinent scientific community.

Those conclusions are no longer "tentative." After a thorough review of the record the court adopts that view of Dr. Sherman's case studies as final. For further support of this conclusion see Section IX, above, "Discussion of Portions of Dr. Sherman's Testimony."

## XII. PLAINTIFFS HAVE FAILED TO EXCLUDE OTHER POSSIBLE CAUSES OF ASHLEY'S BIRTH DEFECTS

In determining the cause of birth defects it is necessary not only to rule in a particular possible cause but also to rule out other possible causes. The plaintiffs have failed to do either in this case.

■ Although the defendants do not have the burden in a *Daubert* proceeding to prove that the harm (here birth defects) was caused by something other than their product (here Dursban), they have brought forth experts who have opined that Ashley's birth defects were caused by, probably caused by, or possibly caused by genetic factors. And there is evidence that the treating physicians for the *Burke* children (2 of the 4 dealt with in Dr. Sherman's article) believed their defects could be genetic in origin. In the face of such suggestions plaintiffs assert they have ruled out possible genetic causes. But defendants contend that none of plaintiffs experts has the skill, experience, training or education to make such a scientific judgment. The Court agrees. During Dr. Sherman's testimony on September 12, 1996, the following occurred:

Q. In the case of Ashley Smits, have you ruled out other causes of birth defects in that child?

A. Yes, I did.

Q. How did you go about doing that?

A. Taking a history from the parents and reviewing all the medical records and talking to her treating physician and found that the chromosomal studies were normal. Neither parent smoked. Mrs. Smits did not drink. There were not other medications, except for an occasional—where are we here—occasional Tylenol to give any explanation as to why this child is abnormal.

THE COURT: Were you able to rule out genetic possibilities?

A. Yes, sir. Neither the mothers nor the fathers had any genetic abnormality. Neither the maternal grandmother had any. The maternal grandfather, his medical history was unknown. The paternal grandmother and grandfather had no genetic abnormalities. There was another child born to the family. As a matter of fact, all of the families, all eight families have other children born at a time when Dursban was not used, which those children are normal.

THE COURT: When you say there was no genetic abnormality in these various generations of people, how do you know that?

A. I asked the families.

THE COURT: Just asked if there was any?

A. Any birth defects, any birth defects in your parents' families or in your grandparents' families. And the thing is, it has been suggested by the defense that this is a genetic abnormality. But you have to

look at these kids and realize that they are totally incapable of reproduction short of rape of one of the girls. They are not— the boys are certainly not ever going to reproduce because they all have undescended testicles. And two out of three have microphallus. The girls, it would be impossible for them to reproduce unless they were raped. I don't even think that would—I don't think they could ever carry a child to term. So how in the world anybody in the background could have had this collection of illnesses and reproduce is totally impossible.

THE COURT: So it is your understanding of the science that if there were not a history of similar defective children suffering the same or similar birth defects in the history, that there's no basis for concluding that this might be due to genetic problems?

A. That's correct.

\* \* \* \* \* \*

THE COURT: So let me get a little bit about your background in genetics. You had a course in genetics in college?

A. Yes. In medical school and college, undergraduate school.

THE COURT: Is that the limit of your training in genetics?

A. No.

THE COURT: What else have you had?

A. Well, I've been in practicing medicine since 1964. I read on a constant basis. My book that I published covers the effects. This is the book, the effects on chemical, the effects of chemicals and radiation on living systems, including how these interact with the DNA and cellular mechanisms, enzymes, embryological effects. I covered all of that in here on how to think about chemicals and their impact on life.

Transcript 9/12/96 hearing, Dr. Sherman, p. 21–24. Dr. Sherman testified she had "no idea" what the COSF syndrome or the CHARGE syndrome are. See her deposition, p. 113.

Dr. John Grisham who specializes in Dysmorphology, Clinical Genetics, Medical Genetics, Teratology, Developmental Disabilities, Communicative Disorders, Pediatrics and Public Health is of the opinion that the most likely diagnosis for Mary Ellen and Kevin Burks is the COFS syndrome or possibly the Micro syndrome both of which are autosomal recessive brain and eye disorders. He concludes:

"To a high degree of medical certainly I believe that the defects in these children recurred on an autosomal recessive genetic basis . . ."

Dr. Gunner Heuser referred Ashley Smits to Dr. Barbara Crandall, Professor of Psychiatry and Pediatrics, Division of Medical Genetics, for evaluation concerning prenatal exposure to possible toxic substances. See defendants' evidentiary submission, Tab E. After taking a history, including family history, and performing a physical examination, Dr. Crandall opined:

Impression: Ashley is a three year old girl who has many of the facial features of a cranio synostosis syndrome. Premature fusion would explain the facial hypoplasia and the prominent eye as well as the nose. Cleft lip and palate are quite commonly associated. Her features are most suggestive of the Antley–Bixler syndrome but also of the Crouzon syndrome. However, her features are different to this or related syndromes because of the degree of asymmetry, facial palsy, deafness and the one-side aortic arch and absence of features such as joint contractures. Since the lip fuses at 5 weeks post conception, it is likely that these abnormalities arose prior to that time. This does not exclude a genetic disorder or some factor acting early on in development affecting both of the brain and the face. Many of the cranio synostosis are inherited as autosomal dominant traits although the Antley–Bixler syndrome is inherited as an autosomal recessive disorder. In the majority of cases there is no family history so these appear to result from new dominant mutations. There is no positive family history, and the only way to be certain of a genetic basis would be to see a recurrence in a succeeding child or a child of Ashley. Although most cases of malformations affecting the brain and face probably occur early in

pregnancy, most do not have a positive history of any teratogenic exposure, but this certainly cannot be excluded in the case of Ashley Smits. Overall, I would estimate that there is a low likelihood that the exposure described in pregnancy was the cause of Ashley's problems.

On June 23, 1995, Dr. Crandall did a "follow-up" on the case. *See* Tab E. Therein she states:

I have reviewed the findings in Ashley in some depth and I now believe the abnormalities in her fit within the broad categories of the CHARGE syndrome. This association of abnormalities describes

C coloboma

H congenital heart defect

A choanal atresia

R retardation in growth and or central nervous system and mental retardation

G hypoplastic genitalia

E ear abnormalities and or deafness

My hesitation in using this designation earlier was the absence of the choanal atresia. However, it appears that choanal atresia occurs in about 65% of CHARGE syndrome patients. The type of heart abnormality includes aortic arch malformations would fit within this constellation as would the asymmetry of the face. Aberrant development or migration of neural crest cells has been suggested as a primary etiology. Most cases of CHARGE syndrome have been single ones within a family and no common etiology has been identified. I could find no report to suggest any particular type of teratogen found to be responsible for some of these cases. Nevertheless, the abnormalities would have arisen early on in gestation and certainly within the first 6 to 7 weeks from conception.[23]

My conclusion after considerable review and reevaluation suggests but does not confirm the diagnosis of the CHARGE syndrome and confirms that these malformations had their origin early on in pregnancy. I cannot exclude a teratogen as an etiologic agent.

And Dr. Christopher M. Cuniff, M.D., Assistant Professor of Pediatrics at the University of Arknasas for Medical Science, diplomat of the American Board of Medical Genetics and Director of Teratogen Counseling Services of the Arkansas Genetics Program is also of the opinion that Ashley's birth defects were caused by a genetic disorder. See p. 34 of his deposition, Tab D. And he also points out that a normal chromosome analysis does not rule out genetic factors as a cause of Ashley's birth defects:

Q. Does a normal chromosome analysis as done in the case of Ashley eliminate a genetic abnormality as the cause of her birth defects?

A. No, absolutely not. If you look at all the most common genetic disorders, think about conditions like sickle cell anemia in the African–American population or cystic fibrosis in the Caucasian population, and Tay–Sachs in the Eastern European–Jewish population, very serious genetic disorders, life-threatening, fatal in many cases their chromosomes are completely normal.

The Court has not quoted from defendants' genetic experts for the purpose of endorsing their views. Rather its purpose is to make clear that genetics is a serious, complex science. One without training or experience cannot exclude possible genetic causes by doing little more than questioning the parents of a child born with defects about the family history. Another way of looking at it is this: If parents of a child with birth defects want to learn if those defects may have been caused by genetic factors, to whom do they go? Obviously one seeks out the most knowledgeable experts on medical genetics. And that is what occurred in this case. But plaintiffs have not found any such qualified geneticist to agree with them that genetic factors have been ruled out. And it must be

---

**23.** It is interesting to note that Dr. Crandall places the development of certain defects as occurring prior to 5 weeks post-conception and the others, "certainly within the first 6 to 7 weeks from conception." Thus, Dr. Sherman's statement that the Gillespie child's defects were similar to Ashley's and both were caused by exposure to Dursban is at odds with the facts of embryological development as described by Dr. Crandall because the exposure of the Gillespie mother/fetus to Dursban occurred 3½ *months* after conception.

noted that plaintiffs' expert, Dr. Bidanset agrees that genetics has to be a part of the analysis. At page 397 of his deposition he agreed that he did not have the information needed to arrive at a conclusion that ruled in, or rule out, genetics as a cause of Ashley's birth defects.

So, once again, the Court is confronted with a serious failure of proof: plaintiffs have no qualified expert to offer an opinion to a jury which would permit that jury to conclude that genetics have been ruled out as a possible cause of Ashley's birth defects.

## XIII. PLAINTIFFS OTHER EXPERT WITNESSES

Plaintiffs four remaining causation experts will be discussed briefly.

■ A. Morris Cranmer is a toxicologist with a Ph.D. in toxin biochemistry. He does not have a medical degree and has had no formal medical training in teratology or medical genetics. He has conducted no independent research on birth defects or on Dursban. His causation opinions are not based on scientific knowledge. He relies, *inter alia*, on the Muto Study, the Deacon Study, and Dr. Sherman's published case reports. He essentially relies on the same bases as Drs. Sherman and Bidanset. Therefore, his testimony faces the same obstacles that have undercut the scientific validity of their causation opinions. Dr. Cranmer acknowledges that the Smits child's congenital malformations cannot on the basis of the animal literature be demonstrated to be caused by Dursban LO. Cranmer Dep. p. 27, 63. He also concedes that most of the mammalian studies suggest that organophosphates are not teratogenic. Dep. p. 24. He admits that there is no literature other than the articles by Dr. Sherman which suggests that Dursban causes birth defects in humans. Dep. p.p. 14–21; p.p. 126–128. The deposition testimony of Dr. Cranmer, taken after the making of his report, does not go nearly as far as his report. He speaks of Dursban as "possibly" causing the defects or that it is "plausible" that it may have caused the birth defects (Dep.p.p. 128–129) and of a "possible relationship" (Dep.p.p. 32–39) and states that animal studies provide a "suggested possibili-ty" that Ashley's birth defects were caused by Dursban (Dep. p. 119). Such speculative testimony would in no event meet the *Daubert* standard. And *see Sorensen v. Shaklee*, 31 F.3d 638, 642–51 (8th Cir.1994).

B. Dr. Robert Laird is a medical doctor but he has never practiced medicine. He specializes in clinical pharmacology. To support his opinion on causation he relies, *inter alia*, on the Muto Study, the temporal relationship between Mrs. Smits' exposure to Dursban and Ashley's embryonic development, and the circumstances that the Smits had a second child that was normal. He fails to support his theory that since large quantities of Dursban may cause neurological damage in animals and adults, it also must cause neurologic birth defects. A fair import of his report is that further research will be required to determine if Dursban causes birth defects. Dr. Laird acknowledges that a good majority of all birth defects are due to unknown causes. He has no specific information on the exposure of Mrs. Smits to Dursban or the dose that entered her body or the fetus. For the reasons stated elsewhere herein, his causation opinion does not meet the *Daubert* standards.

■ C. Dr. Gunnar Heuser is a medical doctor with an interest in neurology. He considers himself to be an expert in toxicology. He is not an expert in teratology and has no formal training in medical genetics. After examining Ashley he sent her to Dr. Barbara Crandall at UCLA to obtain her professional opinion on the cause of her birth defects. Before being retained in the case, Dr. Heuser had not studied the toxic effects of chemicals on fetuses or embryos. He relies upon what was reported to him by Dr. Barbara Crandall, Dr. Laird and Dr. Cranmer, his review of the literature, and his reading on toxic exposure. His reliance on the reports of the three doctors provides no scientific basis for his opinion. As discussed elsewhere, the opinions of Dr. Laird and Dr. Cranmer are not scientifically reliable, and Dr. Crandall believes it is unlikely that any chemical exposure caused Ashley's birth defects.

■ D. Dr. Jane Miers is a medical doctor practicing in pediatrics. She is Ashley Smits principal treating physician. She has no special training in embryology, epidemiology or teratology. She concedes that she is not an expert in toxicology. She has done no independent research of birth defects. Dr. Miers bases her causation opinion on Dr. Sherman's case report articles, the temporal relationship between the exposure and the stage of Ashley's embryonic development, her assumption that Mrs. Smits had a "significant" exposure, and her review of the literature. She does not rely on animal or human studies different from those cited by Dr. Sherman and Dr. Bidanset. Dr. Miers does not know the level of exposure or dose of Mrs. Smits or Ashley even though she is convinced that it was significant. For these reasons, including her reliance on the opinions of Dr. Sherman and Dr. Bidanset, her own opinion on the cause of Ashley's birth defects is scientifically unreliable.

## XIV. REQUIREMENTS TO ESTABLISH SPECIFIC CAUSATION

To establish specific causation in the case it was incumbent upon plaintiffs to provide evidence from which a jury could responsibly assess the level of the exposure of Mrs. Smits to Dursban while she worked at the bank. How much of the chemical got into the ambient air where it might be inhaled? What amounts of the chemical settle on surfaces which might be touched by Mrs. Smits (dermal exposure)? How long would these effects last?

The plaintiffs must also provide some evidentiary basis for the jury to assess the dose of the chemical taken in by Mrs. Smits and also the dose that reached the fetus.

Then the plaintiffs must provide evidence from which the jury could determine whether the levels of exposure and dose experienced by Mrs. Smits and the fetus were likely to produce birth defects of the type experienced by Ashley. This would require evidence of tests and research that could provide some NOEL (no observable effects level) or other scientific standard against which the jury could assess the probability of such exposure and dose causing those defects.

And, finally, to prove specific causation, the plaintiffs must provide evidence from which the jury could conclude that other possible causes of these birth defects had been ruled out. See discussion under XII., *supra*.

The Court is not willing to go as far as the defendants would like in specifying or limiting the type of proof which could be used for such purposes. That proof will vary according to the circumstances. It should not be fatal to such a claim as this that blood tests were not taken at or shortly after the exposure or that ambient air or dermal exposure tests were not made at or shortly after the exposure. The manner in which the plaintiff attempted to provide such proof here should ordinarily be satisfactory. An expert, such as Dr. Cranmer, after getting the details as to the application of the chemical at the bank, the configuration of the plaintiffs workplace, the air exchange system, and after considering the testimony of the plaintiff (here Mrs. Smits) as to her exposure, might, on the basis of published literature or simulations, using scientific procedures and reasoning, provide the jury evidence from which it could fairly and reasonably deal with such issues. Each case will depend upon its own facts and circumstances and upon the scientific validity of the steps taken.

But the third step—establishing a NOEL or other appropriate standard against which the jury could evaluate the potential hazard of such levels of exposure and dose—is much more problematical. See the *Wright* case, *supra*. If such standards do not exist, it may be impossible within the time restraint of litigation to conduct epidemiological studies or *in vivo* or *in vitro* animal studies, or otherwise, to establish the risk of harm inherent in such exposures. However, the absence of such studies will not always be fatal as this Court observed in its "Notes and Comments" Appendix F. This same view is expressed by Judge Ellis in *Cavallo* as follows:

Also worth emphasizing is that the circumstances of each case are unique, and the absence of scientific validation through published studies and tested hypotheses is not always fatal to an expert's opinion.

Specifically, there may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology. Thus, if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened. Similarly, statistical evidence can be persuasive in certain contexts. For instance, if a known chemical is accidentally introduced into a company's ventilation system, and all of the workers exposed immediately develop the same adverse reaction, then the episode itself may be sufficiently indicative of causation. This, however, is not such a case, and the failure to adhere to the applicable methodology renders inadmissible the expert opinions proffered here.

The requirement of differential diagnosis is not as difficult to establish. For instance in this case, if the plaintiffs brought forth a fully qualified medical geneticist who could and would testify on a reliable scientific basis that he/she could rule out genetics as a possible cause of Ashley Smits birth defects, that would, when added to the other "ruled out" data, have been sufficient.

As explained elsewhere herein, there has been in this case a failure of proof across the board with respect to specific causation.

## XV. MISCELLANEOUS ADDITIONAL AND SUPPLEMENTAL FINDINGS

This section contains miscellaneous, nonsequential, sometimes unrelated, sometimes repetitive, findings and conclusions. It is intended to "tie up loose ends," to make certain points differently, and to provide clarification and emphasis.

1. The evidence submitted by the plaintiffs has not convinced the Court that the birth defects sustained by the two Burke children, the Gillispie child and Ashley Smits, despite some similarities, are the same or constitute a recognized pattern of birth defects. The plaintiffs have not demonstrated that it is scientifically acceptable to equate children with multiple birth defects unless it is first established that those defects have the same pathogenetic basis. See Graham Declaration, paragraphs 23–30 of defendants Evidentiary Submissions, Tab A. And plaintiffs have failed to establish that the defects in those four children have the same pathogenetic basis.

2. The methodology described by Dr. Sherman at page 92 of her deposition is not a methodology that is accepted or followed by the relevant scientific community. Although Dr. Sherman has published reports about four cases involved in litigation, she has not published her protocols, reasoning or methodology for peer review.

3. There are no bona fide mammalian animal studies utilizing exposures comparable to those potentially experienced by Mrs. Smits which show that Dursban has a teratogenic effect.

4. The plaintiffs have failed to show by animal studies or otherwise a dose-response curve by Dursban that is within any possible exposure range experienced by Mrs. Smits as a result of the crack and crevice application in this case.

5. The reverse dose-response relationship that Dr. Bidanset describes is not supported by the pertinent scientific community and appears to be inconsistent with other animal studies dealing with the effect of Dursban.

6. Dr. Cranmer made certain exposure estimates on behalf of the plaintiffs. When those estimates are corrected to reflect a 0.5 per cent application instead of a 5.0 per cent application that estimate comes to 9.84 micrograms per kilogram per day. The defendants point to scientific literature showing that air monitoring tests have actually been done in connection with crack and crevice applications of Dursban. And that literature shows the levels of Dursban in the ambient air at the time of application and 24 hours later. The data shows that the level would be less than 1 microgram per kilogram. Even if one accepts Dr. Cranmer's estimates for exposure, those estimates are magnitudes less than the levels actually given to animals in the studies. And those studies nevertheless show no birth defects of the type sustained by Ashley Smits.

7. Drs. Laird, Heuser and Sherman testified that their opinions are not based on any knowledge of any dose experienced by Mrs. Smits or Ashley Smits. Nor did they have any idea of the level of exposure experienced by Mrs. Smits or the fetus. Dr. Bidanset at page 500 of his deposition admitted he had no information on the dose or exposure of Maria Smits. In essence, these doctors state that whatever the exposure was, it was adequate *because the defects occurred.* There is no scientific basis for such conjecture.

8. Dr. Sherman relies heavily upon structural analysis of the chemicals found in Dursban. This approach is predicated upon the theory that substances with chemically similar structures should produce the same effect. Judge Susan Borman in *DePyper v. Navarro,* 1995 WL 788828 (Mich.Cir.Ct. Nov 21, 1995) noted that certain experts in that case pointed out that using structural activity data had led to a false positive, and she also noted practical examples suggesting that the basis of the theory was inaccurate. She concluded:

The real lesson to be drawn from the above discussion is that animal studies, in vivo or in vitro, as well as structural analysis data, while providing important information on a substance's teratogenicity cannot with any accuracy, either alone or together, lead a teratologist to conclude that a substance is more likely than not a human teratogen. While such studies provide necessary and valuable data they are insufficient proof of human teratogenicity. Thus, the essential point made by the defendants' and the Court's experts is that real physical differences make it difficult to extrapolate the results of these studies to humans without some further confirmation by human epidemiological studies. The Court, therefore, finds that disinterested and impartial teratologists would not rely on these tests as the basis for an opinion regarding teratogenicity in human beings without other corroborating human data. Indeed, that is the reason why published criteria, such as Shepard's, require epidemiological data. Without human data showing a sufficiently strong association, and given the various problems identified by the defendants' and the Court's experts inherent in utilizing in vivo, in vitro, or structural activity data, (none of which were addressed squarely by plaintiffs' experts), reliance on such data to form an opinion on human teratogenicity would basically amount to no more than speculation.

The similar chemical structure theory has been compromised in this case by the tests that have been done on many different kinds of organophosphates, including chlorpyrifos. Some organophosphates are listed as teratogenic while others (including chlorpyrifos) are not. So, while chemical structure may be an important inquiry, the theoretical association can be undercut by actual testing. Once one knows that different organophosphates have teratogenic and non-teratogenic effects, their similar chemical structures can no longer be used to postulate with any degree of certainty either a teratogenic or non-teratogenic effect.

9. Plaintiffs' experts have done no independent research on whether Dursban or any of its ingredients, contaminants or metabolites are associated with human birth defects outside of the litigation context.

10. The methodologies and reasoning of plaintiffs' experts on medical causation in this case are not used or relied upon by experts in the fields of teratology or medical genetics. Their opinions do not constitute "scientific knowledge" within the meaning of *Daubert.* Those opinions are also not scientifically relevant to the determination whether Dursban caused the birth defects of Ashley Smits. Therefore, those opinions will not "assist the trier of fact to understand the evidence or to determine a fact in issue" as required by Rule 702 of the Federal Rules of Evidence.

11. The defendants' attack upon plaintiffs' experts centers upon the two experts who have published on the subject (Dr. Sherman and Dr. Bidanset). They base their opinions on Dr. Sherman's case reports, Dr. Bidanset's *in vivo* and *in vitro* animal experiments, selected data from animals studies conducted by Dow, and other animal and human studies. The plaintiffs' other four causation experts have relied to varying de-

grees upon the opinions and publications of those two.

12. There are millions of different species of animals. Each has its own physiological, biochemical and metabolic systems. One cannot scientifically conclude from a determination that a chemical agent has a teratogenic effect in one species that it will have such effect in another species. Furthermore, the results of animal studies cannot ordinarily be extrapolated to the human species because such studies usually employ quantities of the agent far in excess of any conceivable human dose. *See Wade–Greaux v. Whitehall Laboratories,* 874 F.Supp. 1441, 1453–4, (D.C.Vi. 1994) *aff'd* 46 F.3d 1120 (3rd Cir.1994). Such is the case here.

13. Because of the difference in animal species, the methods and routes of the administration of the suspect chemical agent, maternal metabolism and other factors, animal studies, taken alone, are unreliable predictors of causation in humans. *See Sorensen v. Shaklee,* 31 F.3d 638, 646 n. 12 (8th Cir.1994); *Turpin v. Merrell Dow Pharmaceuticals,* 959 F.2d 1349 (6th Cir.1992); *In re Agent Orange,* 611 F.Supp. 1223, 1241, (E.D.N.Y.1985). This is not to underestimate the importance of such studies.

14. The Court generally agrees with the defendants' analysis of the Deacon Study, the Hanley Study, and the "Other Studies" as set forth in Appendix B to the defendants' prehearing brief under the caption, "Errors and Misrepresentations By Sherman and Bidanset in Interpretation of Animal Studies."

15. The Court accepts the analysis by Dr. Johnson of the relevant Xylene Studies. *See* Appendix G to his Declaration, Tab C of defendants' Evidentiary Submissions.

16. Appendix E hereto sets forth the Court's summarization of the arguments and interpretations of the plaintiffs and the defendants with respect to the significance of the Muto Study, the Hanley Study and the Deacon Study. To not unduly lengthen this opinion the Court simply states that it finds itself generally in agreement with the scientific views stated therein under the captions "Defendants' Interpretations." More importantly the plaintiffs have not carried their burden of showing that their theories and opinions are based upon scientific knowledge which would assist the trier of fact to understand and determine the issue of medical causation in this case. Plaintiffs have not met the standard of scientific validity or reliability.

17. The Court agrees with the defendants that the methodologies of Dr. Sherman and Dr. Bidanset do not "fit" the plaintiffs' case. The defendants argue at page 59 of their rehearing brief:

> The data they rely upon have no connection to Ashley Smits. The symptoms in the other children reported by Sherman do not fit with Ashley Smits' syndrome. The animal studies they have relied on have not shown defects which fit with Ashley Smits' defects. The doses used in the animal studies do not fit with any dose conceivably received by Maria Smits or her fetus. The method of exposure in the animal studies does not fit with the method alleged by Maria Smits.

The Court agrees.

18. *Daubert* instructs that a court in evaluating the scientific reliability of a particular methodology should consider whether it can be (and has been) tested to determine the known and potential rate of error in its application. If a technique does not consistently produce accurate results, it is suspect. Plaintiffs here have not been able to show the error rate of their methodology. The defendants point out that some 1,200 teratogens have been identified in various animal species, while only some 40 have been identified as human teratogens. On this basis alone they conclude that "a prediction of human teratogenicity from a positive animal study would thus be erroneous about 96% of the time." The Court agrees generally with this observation.

19. Plaintiffs rely upon the MSDS with respect to TCP, a metabolite of chlorpyrifos, which states that TCP "has been reported to cause birth defects in lab animals at doses nontoxic to the mother." The Court finds that this report was made as a result of one of the Hanley studies. It therefore, cannot carry any more weight than the Hanley Study itself.

There were two Hanley studies, one on rabbits and the other on rats. In one, TCPs in pure form were fed to rabbits in dosages of 100 to 250 milligrams (not micrograms) per day.

The Court agrees with the scientific analysis of the developmental toxicity studies attached as Appendix E to the Declaration of E. Marshall Johnson, Ph.D. found at Tab C of defendants Evidentiary Submissions and particularly the analysis of the Hanley studies found therein.

It is evident and scientifically correct that one cannot test chlorpyrifos in animals without testing TCP, a metabolite of chlorpyrifos.

There have been some ten animal studies dealing with chlorpyrifos including eight multi-generational studies of mice and rats. In all such animal tests involving chlorpyrifos (rather than straight TCP) no teratogenic effect was found. See Declaration of Dr. Johnson.

20. To sum up, the problems with plaintiffs' causation evidence are many and manifest. They have not been able to point to epidemiological studies consistently and repeatedly demonstrating any statistical association between the exposure of pregnant women to Dursban and any increase in human birth defects. Indeed, there are no such studies supporting their theory. The corollary of this is obvious: If pregnant women exposed to Dursban in the first trimester of their pregnancies have no greater incidence of such defects than women who were not so exposed, the jury could only speculate and guess if Dursban played a role—absent some other more direct scientific proof of causation. And here there is no such other proof.

Secondly, scientists, in the absence of human studies, must turn to animal studies. They seek bona fide mammalian animal studies that either exist or can be developed utilizing exposure rates comparable to those experienced by the human subject to determine if the suspect chemical agent is possibly a human teratogen. Scientists want repeated studies demonstrating such a teratogenic effect. Such studies can be used to help confirm positive epidemiological studies.

Comparable doses are essential because given sufficiently high dosages, any chemical can cause some damage. Many chemicals are very beneficial at lower dose levels while dangerous or toxic at higher doses. Vitamin A and the common aspirin are among the many examples. Here there are no animal models in which exposure to Dursban, or its components, has resulted in any pattern of defects due to doses even remotely comparable to those humans could experience as a result of a crack and crevice application such as that made on February 6, 1991. The Hanley Study found no abnormalities at dose levels which exceeded Maria Smits estimated dose by a factor of 100,000.

Thirdly, scientists would expect an animal model to demonstrate a dose-response curve within the exposure range of concern. Here, there are no such animal studies. The Hanley Study has no dose within the range of concern. This same inadequacy undercuts the Muto and Deacon Studies and the Court accepts the analysis of the Deacon Study found at p. 18 of defendants' Post Hearing Memorandum.

Finally, scientists would want to be able to explain the mechanism of teratogenicity if a teratogenic effect is found. In other words, the teratogenic result must make biologic sense. Plaintiffs do not offer any explanation of their observations which would meet this criterion.

## XVI. THE *WRIGHT* CASE

The Court's decision on the admissibility of plaintiffs' expert causation evidence would have been the same in the absence of the *Wright* opinion. See e.g. *Wade–Greaux, Navarro* and *Cavallo* cases, *supra*. With the *Wright* case, now the law in the Eighth Circuit, this lengthy opinion probably was not required. How does this case compare with that in *Wright?*

It is this Court's opinion that this case presents stronger arguments for the exclusion of plaintiffs' causation evidence than those that persuaded the Eighth Circuit in *Wright.*

First, in the *Wright* case the evidence of exposure was much clearer. As stated by Judge Heaney in his dissent:

> The Wright family lives within three-quarters of a mile of the plant. There is uncontradicted evidence that emissions from the plant fell like "snow" on the Wrights' property to the extent that overnight emissions could be seen on cars. Fibers from the plant were also found in the Wrights' air conditioner. The Wright family was examined by physicians and significant levels of toxic emissions from the plant were found in their sputum and urine. The Wright family suffered from headaches, sore throats, watery eyes, runny noses, dizziness and shortness of breath which the treating physician testified were more probably than not related to their exposure to the plant emissions.

Here no blood tests were made. Mrs. Smits suffered nausea and vomiting but no sweating or tearing.

In *Wright* the emissions from the defendants' plant violated state standards. Again, as stated by Judge Heaney:

> It is undisputed that the Willamette plant emits minute wood fibers laced with formaldehyde. It is also undisputed that because Willamette failed to install equipment that would have significantly lowered the emissions, the levels of formaldehyde emitted from the plant exceeded levels permitted by industry and state standards.

Here no law, regulation or existing NOEL was violated in the crack and crevice application of the Dursban. The majority in *Wright* states:

> We agree with Willamette that a plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover.

> \*     \*     \*     \*     \*     \*

It is therefore not enough for a plaintiff to show that a certain chemical agent sometimes causes the kind of harm that he or she is complaining of. At a minimum, we think that there must be evidence from which the fact finder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered. See *Abuan v. General Elec. Co.*, 3 F.3d at 333. We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complaints before there can be a recovery.

In this case, while the Wrights proved that they were exposed to defendant's emissions and that wood fibers from defendant's plant were in their house, their sputum, and their urine, they failed to produce evidence that they were exposed to a hazardous level of formaldehyde from the fibers emanating from Willamette's plant. Their experts' information on this subject was simply insufficient.

The Court pointed out that the plaintiffs' expert's opinion, " . . . was not based on any knowledge about what amounts of wood fibers impregnated with formaldehyde involve an appreciable risk of harm to human beings who breathe them," and it concluded that such evidence should have been excluded "because it was not based on scientific knowledge" and "was simply speculation." In this, the Smits, case we have no evidence of studies that reveal the levels of exposure to Dursban that are likely to cause birth defects in humans. And we further know that the crack and crevice application of Dursban on February 6, 1991, did not exceed any existing NOEL for the use of such an insecticide. Such NOELs exist for acute and chronic exposure. They have been established by the American Council of Governmental Independent Hygienist (1991); OSCHA; the National Resource Council, Committee on Toxicology (1978); the U.N. and the World Health Organization. It has not been shown that the exposure of Mrs. Smits exceeded any of those standards. Indeed, the margin of safety (MOS) for Mrs. Smits appears to be measured in thousands whereas an MOS of 100 is usually deemed more than adequate protection. See Declaration of E. Marshall

Johnson, Ph.D., Tab C of defendants' Evidentiary Submissions. And plaintiffs have not shown that Dursban "sometimes causes the kind of harm" [here, birth defects] that they are complaining of—to use the words of *Wright.*

The views expressed by Judge Morris Arnold in *Wright* are echoed by Judge Ellis in *Cavallo:*

> In general, expert testimony is required to prove that exposure to a toxic substance caused a certain injury or illness. Without reliable expert testimony linking Ms. Cavallo's exposure to AvJet fumes from the spill to her subsequent development of chronic respiratory problems, the jury could only speculate, based on a loose temporal relationship and not scientific fact, that a causal relationship exists. Such an inference would be impermissible, even apart from the evidence that the TLVs, NOELs, and LOELs for AvJet all substantially exceed the maximum, "worst-case" concentration to which Ms. Cavallo was exposed on the night of the spill. Therefore, summary judgment is appropriate.

## XVII. *DAUBERT* HEARINGS—AN IMPORTANT NEW ROLE FOR U.S. DISTRICT COURTS

Judge Ellis in *Cavallo* explained how *Daubert* has changed the role of the U.S. District Court:

> Prior to *Daubert,* courts presented with this situation may have been more inclined to admit the expert testimony and allow the jury, aided by vigorous cross-examination, to sort out the relative reliability of opposing expert opinions. But *Daubert* recognized the danger in this approach. By definition, experts testify to matters beyond the common understanding of the jury, and, as a consequence, their opinions can carry great weight. Given this, *Daubert* assigned district courts a more vigorous role to play in ferreting out expert opinion not based on the scientific method. At the same time, however, courts must be cautious to avoid weighing the relative merits of opinions that *are* derived from scientifically valid methodology or assuming the role of amateur scientist. In

granting the motion in limine, thereby paving the way for summary judgment, the Court scrupulously attempted to walk this fine line: analyzing the experts' adherence to the scientific methodology, while declining to weigh the evidence before it. Significantly, nothing in the Court's review and analysis of this issue required any scientific training. Rather, the Court did nothing more than use the customary legal tools of logical reasoning to carry out its gatekeeping function.

This *Daubert* proceeding has taken an inordinate amount of time and effort solely for the purpose of determining the admissibility of the plaintiffs' proposed expert causation testimony. A review of some of the other similar cases that have arisen in the U.S. District Courts since *Daubert* reveals that this Court's experience is not atypical. Nevertheless, until the process becomes more familiar, it is likely that the trial courts will be uncomfortable in discharging their new responsibilities. Nevertheless, the Court agrees with Judge Ellis that *Daubert* requires only the use of the "customary legal tools of logical reasoning" to carry out the Court's new gatekeeping function.

This Court considered the possibility of appointing an expert (or experts) to assist it in its effort to evaluate the scientific validity and reliability of plaintiffs' proposed causation evidence. Both parties opposed the Court's overtures along this line, and the Court ultimately concluded that it could make the required *Daubert* findings without the assistance of any independent, court-appointed expert. Still, this is a potentially valuable option available to trial courts when confronted with certain complex *Daubert* motions. But before taking this course, the Court must weigh the costs in time and money to the parties and the Court.

### CONCLUSION

In sum, plaintiffs have failed to carry their burden to establish that their proffered experts' causation evidence meets the scientific admissibility standards of *Daubert.*

The defendants' motion to exclude plaintiffs' expert causation evidence under *Daubert* and its progeny will be granted. As a

direct consequence of this ruling, the defendants' motion for summary judgment must likewise be granted.

IT IS THEREFORE ORDERED that pesticide defendants' Motion to Exclude the Opinion Testimony of Plaintiffs' Experts be, and it is hereby GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that pesticide defendants' Motion for Summary Judgment be, and it is hereby GRANTED.

*Appendix "A"*

## SUMMARY OF PLAINTIFFS' EXPERT TESTIMONY CONCERNING DURSBAN LO

Initially, the Court would like to note that the plaintiffs *Daubert* motion and their response to the Pesticide Defendants' motion consists of paragraphs of information/evidence strung together with little continuity or structure. This is especially true when plaintiffs summarize the testimony of their experts. The Court is in the difficult position of having to determine the context of these excerpts.

The plaintiffs' causation evidence will be analyzed by close examination of what is, essentially, plaintiffs' offer of proof with respect to the expected testimony of each of its causation experts.

### A. Jesse Bidanset. Ph.D.,[1] clinical toxicologist

Dr. Bidanset's opinion is as follows:

Based upon a negative genetic study, and the exposure which occurred during the very sensitive period, I conclude, with reasonable scientific certainty, that Mrs. Smits' exposure in her pregnancy was a *likely* cause of Ashley's birth defects. Bidanset Depo. p. 217 (emphasis added).

\* \* \* \* \* \*

My second opinion is that the potential causes of birth defects, including genetic evaluations, were, in essence, negative. Bidanset Depo. p. 217.

\* \* \* \* \* \*

I would relate all of [Ashley's] brain defects to Chlorpyrifos exposure ... Dr. Sherman lists cleft palate ... [which] I would relate to the Dursban exposure. In facial, Dr. Sherman refers to tooth abnormality [which] I relate to Chlorpyrifos and Dursban exposure ... I did not relate the cleft lip. I have not seen [the seventh cranial nerve palsy] in any of the other cases and I am not prepared to express the opinion that it is caused by Dursban exposure. Dr. Sherman also refers to the nipples being widespread ... I would relate that to Dursban in-utero exposure. Growth retardation and low birth weight [is common] and I would indicate Dursban in-utero exposure is responsible for that. Bidanset Depo. p. 326–328.

Plaintiffs assert that Dr. Bidanset's opinion meets the *Daubert* test because he has published in the area of chlorpyrifos and has proctored graduate students conducting research in that area. Dr. Bidanset has authored or co-authored [2] the following articles relating to chlorpyrifos: (1) John D.Wurpel, *Amygdala Kindling in Immature Rats: Proconvulsant Effect of the Organophosphate Insecticide—Chlorpyrifos;* (2) *Embryo Toxicity and Neurotoxicity in Rats Associated with Prenatal Exposure to Dursban,* Vet. and Human Toxicology, (Oct., 1992); (3) Mary Ellen Cosenza and Jesse Bidanset, *Effects of Chlorpyrifos on Neuronal Development in Rats Embryo Midbrain Micromass Culture System,* Vet. and Human Toxicology, Apr. (1993); (4) M. Muto, F. Lobelle, Jr., J. Bidanset, J. Wurpel, *Embryo Toxicity and Neurotoxicity in Rats Associated with Prenatal Exposure to Dursban,* Vet. Hum. Toxicol. Vol 34, No. 6 (Dec.1992); (5) *The Effects of Chlorpyrifos and Xylene and Embryonal*

---

**1.** Professor of pharmaceutical sciences at St. John's University in New York, board certified in the field of forensic toxicology. His work as a forensic toxicologist involves alcohol, drug abuse, and urine testing for drugs.

**2.** It appears from plaintiffs' pleadings that these co-authors were graduate students under the direction of Dr. Bidanset. If an author, publication or date does not appear it is because the Court was not furnished with the complete citation.

and *Fetal Development in the Rat* (submitted for publication) (Mareen Jude Nimphius' Masters Thesis, St. John's University, New York).

Plaintiffs assert that Dr. Bidanser supports his opinions by original research that he has done with his graduate students *Muto*,[3] *Wurpel*,[4] *Cosenza*,[5] and *Nimphus*.[6] Plaintiffs Supp., p. 48. Regarding these studies, Dr. Bidanset testified as follows:

Our studies showed that the teratogenic effects of Chlorpyrifos occurred at low concentrations and did not occur at higher concentrations. This appeared to defy the dose response relationship, and the only explanation that he has is that at the higher doses, a second form of toxicity occurs that overwhelms the teratologic effect. At concentrations of Chlorpyrifos exposure that produced cholinesterase inhibition, no birth defects were observed. Bidanset Depo. p. 200–201.

Our studies were consistent with Dow studies, that is, low levels produced birth defects, higher levels failed to produce the same effects, which is a reverse of the accepted normal dose response relationship. This is also consistent with the Deacon study that states exactly the same thing; that you have teratology at low values, but do not observe effects at high values, and discounted the substance as teratogenic agent because it did not obey the normal dose response relationship. Bidanset Depo. p. 202.

\* \* \* \* \* \*

We [Ms. Nimphius and myself] were looking for more information about the total picture involving Chlorpyrifos. We wanted to know if a Chlorpyrifos/Xylene interaction was contributing in some way to the toxicity [that we were studying in the thesis]. We wanted to know if xylene itself was capable of producing some of the effects that we had seen. We actually measured the concentrations in various tissues of the body. Bidanset Depo. p. 51.

\* \* \* \* \* \*

Dr. Bidanset believes he is qualified to offer expert testimony with regard to the cause of birth defects for the following reasons:

I believe that the area of toxicology that I have been studying for more than twenty years involving birth defecting is an area that involves teratology. At the time when I did my first study on the effects of carbon monoxide on the fetus, I don't think there was a field called teratology, but there was a field called toxicology. I have continued to practice toxicology and I have continued to do birth defecting and many of those birth defects involve the first trimester and, therefore, would be considered as teratologic events, and therefore, I do feel qualified to discuss teratologic events as they are toxic events that involve the specific fetal period. Bidanset Depo. p. 125.

Dr. Bidanset asserts that toxicologist, medical doctors and geneticists all study birth defects. Bidanset Depo. p. 148.

[If] you open a general textbook in toxicology today, you will find a chapter on teratology and a chapter on fetotoxicity and there will be discussions within the general text on toxicology about all these areas.

\* \* \* \* \* \*

Dr. Bidanset has stated that his birth defects work has not been related primarily to litigation. Bidanset Depo. P. 149. "To the contrary, it has been part of my research for over 20 years. I don't believe we published

---

3. Plaintiffs argue that this study demonstrates that Dursban is an embryotoxin and a neurotoxin. Plaintiffs' Supp., p. 48.

4. Plaintiffs argue this study showed that chlorpyrifos has a convulsant effect which was enhanced by the solvent xylene. Plaintiffs' Supp., p. 48. *See* John D. Wurpel, et al., *Amygdala Kindling in Immature Rats: Proconvulsant Effect of the Organophosphate Insecticide Chlorpyrifos*, NeuroToxicology (1993).

5. Plaintiffs argue this *in vitro* study showed that chlorpyrifos is a teratogen. Plaintiffs' Supp., p. 49. *See* Mary Ellen Cosenza, *Effects of Chlorpyrifos on Neuronal Development in Rats Embryo Midbrain Micromass Culture System*, Vet. And Human Toxicity, Apr. (1995).

6. Plaintiffs assert that this thesis study demonstrates that chlorpyrifos is embryotoxic. Supp. to Plaintiffs' *Daubert* Motion, p. 57.

the work." *Id.* Dr. Bidanset has been involved in less than ten Dursban cases. Bidanset Depo. p. 198.

Dr. Bidanset asserts that Cholinesterase inhibition is an objective sign that someone has been exposed to Chlorpyrifos. Bidanset Depo. p. 138.

[Symptoms include] sweating, salivation, sometimes cramps and nausea, hyperactivity in the sense of tremors and uncontrolled movement of the extremities, usually fingers and toes ... an abnormal finding in terms of pupillary response ... Bidanset Depo. p. 139.

\*    \*    \*    \*    \*    \*

I just completed a study where I measured fetal concentrations of Chlorpyrifos, and I think that that might be one of the first times that that has been done where we would be able to compare what the pregnant dam's concentrations were with what is actually transported to the pups and to the fetuses. Bidanset Dep. p. 146.

\*    \*    \*    \*    \*    \*

My studies would establish Chlorpyrifos can produce birth defects and in the case of specific study on neuronal cells can produce nerve cell death ... and malformations. I have indicated the fetus exposed during this very sensitive period of the late embryonic and early fetal period would be at its greatest sensitivity to environmental chemicals. Bidanset Depo. p. 321.

\*    \*    \*    \*    \*    \*

There are several notations that deal with animal exposure to Chlorpyrifos and the observance of changes in genes, gene mutations and genotoxicity. We retrieved articles cited in the Hazardous Substance Data Bank, one of which is marked Exhibit 23. That would have constituted the depth of my search at that time to establish Chlorpyrifos as being able to produce birth defects. Bidanset Depo. p. 388.

\*    \*    \*    \*    \*    \*

With respect to the kindling study[7] Dr. Bidanset testified that:

We tested adults and pups and found a greater susceptibility in the pup than in the mature animal. It is a further indication of the potential for Chlorpyrifos to impact the central nervous system and produce injury. It is also an indication that the injury susceptibility is greater with the immature animal than it is with the mature animals. Bidanset Depo. p. 417.

Dr. Bidanset believes that the Muto study establishes that Chlorpyrifos has the capacity of producing fetal death and damage. Bidanset Depo. p. 420. He does not believe that the fact that the Smits' case involves crack and crevice application negates the Muto study. *Id.*

Dr. Bidanset had this to say regarding TCP:

One of the impurities in Dursban is referred to as TCP, which was studied by Dow and found to have mutagenic and teratogenic properties. I am not sure of the doses that were applied in that study. Exhibit 7 of the Sherman article refers to a research study done by Dow in July, 1987. My recollection is that the study established that TCP was a teratogen and a mutagen and that birth defects were evident in the application of this material. My opinion is that one has to deal with the commercially available product with all its impurities and side products, as well as dealing with the fact that TCP is a metabolite of Chlorpyrifos. Bidanset Depo. p. 453–456.

He also bases his conclusion on his xylene studies[8] Finally, he supports his opinion with a study (master's thesis) conducted by Maureen Nimphius, a former graduate student under his supervision. Bidanset Depo, p. 51. This was an animal study working with Chlorpyrifos and Dursban LO products suspended in peanut oil. Bidanset Depo, p. 51. He opines that Firefog's hydrocarbons redistributed the Chlorpyrifos which was stored in

---

7. *Amygdala Kindling in Immature Rats: Proconvulsant Effect of the Organophosphate Insecticide Chlorpyrifos.*

8. Dr. Bidanset has done research on the combined effects of Chlorpyrifos and aromatic hydrocarbons and their tendency to cause birth defects. Bidanset Depo, p. 50.

Mrs. Smits' fat cells, Bidanset Depo, p. 57, and resolubolized Chlorpyrifos thereby making it available by the dermal route. Bidanset Depo, p. 60. Here again, he relies on his knowledge of the chemical agent involved and its lipid soluble characteristics. *Id.*

His scientific method for determining if a chemical caused a birth defect is: (1) examine the chemical agent, its capacity to produce birth defects and the timing of exposure, (2) rule out genetic causes, (3) evaluate the extent of chemical exposure and the dose and do this for all chemicals to which the parents were exposed, and finally (4) review the treating physician's history and physical. Bidanset Depo, p. 90–100. Using this method he determined that Mrs. Smits' exposure to Dursban early in her pregnancy was a likely cause of Ashley's birth defects. Bidanset Depo, p. 217.

B. *Janette Sherman, M.D.,*[9] *internal medicine, toxicology and environmental health*

Dr. Sherman's opinion is, "based upon a reasonable degree of medical and scientific certainty that, more likely than not, the toxic chemicals, contained in the products Dursban LO and Firefog to which Ashley's mother was exposed while pregnant with Ashley, are the causative factors of Ashley's congenital malformations." Sherman Report, p. 10. Dr. Sherman bases her opinion "upon the history obtained of the Smits family; the history and physical examination of Ashley; review of Ashley's medical records; the visit to Mrs. Smits' place of exposure; the toxicology of Dursban LO and Firefog and their various components; the toxicology of the organophosphate pesticides; her experience in the field of organophosphate pesticide toxicology; as well as similar findings in three additional children, also exposed in utero." Sherman Report, p. 10. According to Dr. Sherman, Maria Smits was exposed to Dursban and Firefog 404 during a critical stage in her pregnancy with Ashley Smits (during the first trimester) and that Dursban and its components, which include chlorpyrifos and sulfotepp as a contaminant along with the breakdown products of chlorpyrifos which include trichloropyridinol (TCP) are neurotoxic and/or teratogenic and caused or contributed to the cause of the many malformations found in Ashley Smits. Dursban was either inhaled or absorbed through the skin by Maria Smits which allowed these chemicals to get into her blood stream, cross the placenta barrier, and enter the developing fetus resulting in the birth defects.

Plaintiffs' maintain that Dr. Sherman also supports her opinion with "over 100 exhibits that were attached to her deposition, plus hundreds of other documents ..." Plaintiffs Hearing Supp., p. 44. However, the Court is limited to the evidence in the record. Dr. Sherman further supports her opinion with Dow Chemical studies and others[10] M.M. Deacon, *The Effects of Orally Administered Chlorpyrifos on Embroynal and Fetal Development in Mice,* Toxicology Research Laboratory, (July 24, 1979);[11] T.R. Hanley, et al., *3/5/6–Trichloro–2–pryidinol: Oral Teratology Study in New Zealand White Rabbits,* (July 23, 1987); Maria A. Muto, *Fetotoxicity Associated with Prenatal Exposure to Dursban:* Maria A. Muto, Lobelle, Jr., Bidanset and Wurpel. *Embryotoxicity and Neurotoxicity in Rats Associated with Prenatal Exposure to Dursban,* Vet. and Human Toxicology (Oct.1992), Dow's study conducted by Susan McCollister, et al., *Results of Two-year Dietary Feeding Studies on DOWCo 179 in*

---

9. Dr. Sherman has been conducting research in occupational and environmental health and toxicology since 1970. *See* Plaintiffs' Exhibit A (Vitae of Jeanette Sherman). She does not maintain an office and only sees patients on an occasional basis. Since 1976 she has pursued consulting, original research and writing in the area of pesticides. She is a peer reviewer for the EPA's Toxic Substances and Disease Registry.

10. This list is by no means exhaustive. Dr. Sherman referenced a myriad of studies.

11. According to plaintiffs, Deacon demonstrated that mice given pure chlorpyrifos during gestation will produce decreased fetal body measurements, increased instance of minor skeletal variance, increased instance of exencephaly, delayed ossification of skull bones, and unfused sternebrae. Plaintiffs' Hearing Supp., p. 45.

*Rats,* (Sept. 20, 1971).[12]   Plaintiffs' Hearing Supp., p. 45; Whitney et al., *Developmental Neurotoxicity of Chlorpyrifos: Cellular Mechanisims,* Toxicology and Applied Pharmacology (1995).[13]

Dr. Sherman has authored a book entitled *Chemical Exposure and Disease,* Princeton Scientific Publishing Company, Inc., Vol. 2, (1994), Princeton, N.J. The plaintiffs have attached a copy of the index to the book and specifically note the chapter that pertains to chlorpyrifos.

Dr. Sherman was asked if this was a textbook. She responded as follows:

A.   Well, as a matter of fact, it is used as a textbook in several places. It can be used as a textbook. It is being used right now in a course in environmental science in New Paltz, New York.

Q.   In what discipline?

A.   Actually in the Department of Sociology.

Dr. Sherman wrote two articles[14] about Ashley and three other children. She states that these articles were "peer reviewed"[15] by EPA personnel and others. Sherman Depo, p. 466. It is important to also note, however, that Dr. Sherman did not disclose in either of her articles that the cases she was reporting on were all involved in litigation, in which she had been hired as an expert.

Dr. Sherman describes her process for identifying a chemical as a human teratogen as follows: (a) determine the existence of human case reports, (b) determine the existence of any animal studies, (c) evaluate the biochemistry of the chemical, and (d) examine the structural relationship of the chemical to other chemicals known to cause teratogenic effects. Sherman Depo, p. 92, Later in her testimony she added the following elements: (a) examine the child(ren), (b) review medical records (c) review scientific data, and (d) review animal data. Sherman Depo, p. 582. She stated that there is not just one method for determining a teratogen that is specific to the field of teratology. She answered that all scientists follow the basic scientific method which she described as: (a) theory, (b) methodology, (c) collection of data, (d) analysis of data, and (f) conclusions. Sherman Depo, p. 581. In Ashley's case, Dr. Sherman premises her finding of causation on "the products Dursban LO and Firefog, on the timing of her exposure, on the fact of Maria Smits' exposure, on similar findings in animals, and on the biochemistry." Sherman Depo, p. 528. She also relies on Dr. Pitt's deposition and her knowledge of the chemicals. Sherman Depo, p. 203.

Dr. Sherman's opinion is that "[a]ny chemical that is neurotoxic that can be absorbed into the body at a critical time in pregnancy can cause birth defects, whether it's an anesthetic gas or a solvent or an oil or gasoline." Sherman Depo, p. 331.[16] She testified that

**12.**  This study, argues plaintiffs, showed that there were changes in brain cholinesterase and histological changes in rats at low doses.

**13.**  The authors summarized this study as follows: These experiments have shown that acute exposure to apparently subtoxic doses of chlorpyrifos can cause specific inhibition of DNA and protein synthesis in the immature brain. The eventual production of abnormalities of brain development or function would not require a progressive build-up of frankly toxic levels of chlorpyrifos or its active metabolites in the body, but only that the lower levels used here be maintained, or that exposure episodes occur frequently enough, to ensure repeated or sustained inhibitory effects.

**14.**  The articles are: *Chlorpyrifos (Dursban LO)-Associated Birth Defects: A Proposed Syndrome, Report of Four Cases, and Discussion of the Toxicology,* International Journal of Occupational Medicine and Toxicology, Vol. 4, No. 4, 1995, and the second article, a shorter version of the

first, is *Chlorpyrifos (Dursban LO) Associated Birth Defects,* Archives of Environmental Health, Vol. 51, No. 1, published Jan/Feb 1996 (see Sherman Depo, p. 27). Dr. Sherman has also authored *Organophosphate Pesticides—Neurological and Respiratory Toxicity,* Toxicology and Industrial Health, Vol II, No. 1 (1995).

**15.**  It is not clear from the evidence presented whether this "peer review" was merely of an editorial nature or whether her scientific claims were evaluated by members of the relevant discipline. *See Valentine v. Pioneer Chlor Alkali Co.,* 921 F.Supp. 666, 675 (D.Nev.1996).

**16.**  In her article *Chlorpyrifos (Dursban LO):Associated Birth Defects, A Proposed Syndrome, Report of Four Cases* one reads "The Firefog label indicated petroleum distillate, which may have contributed to the birth defects via solubilizing the components of Dursban LO, and *could have* interacted with Chlorpyrifos and prolonged its toxicity by interference with paraoxonase function." Sherman Depo, p. 304 (emphasis added).

there is no evidence in the literature that Firefog can solubilize and carry chemicals into a mother's blood stream and then across the placental barrier. Sherman Depo, p. 241.

Dr. Sherman considers herself an expert in teratology with respect to Dursban LO cases. Sherman Deposition p. 149–150. She relies on the Muto study which plaintiffs argue, demonstrates that low doses of chlorpyrifos are teratogenic. She also points to the Whitney article which, plaintiffs argue, demonstrated chlorpyrifos can cause specific inhibition of DNA and protein synthesis in the immature brain at subtoxic doses. Plaintiffs Hearing Supp., p. 46. She further relies on Dow's McCollister study, which plaintiffs assert, indicates that when adult rats are fed chlorpyrifos for two years their brain cholinesterase changes and the rats experience histological changes involving the heart, liver, genital-urinary system, and various glandular changes. These changes occur at doses of 1 mg/1 kg/day and 3mg Ikg/day, respectively. Plaintiffs Hearing Supp., p. 46. Dr. Sherman makes use of the Williams study which involved fumigation of a greenhouse with Sulfotepp and indicated that trace amounts of Sulfotepp were detected in the greenhouse air for up to 18 days after fumigation. Plaintiffs Hearing Supp., p. 47.

Dr. Sherman's testimony has been the subject of judicial inquiry in another case. See *In re Paoli R.R. Yard P.C.B. Litigation,* 35 F.3d 717 (3rd Cir.1994). That case did not involve birth defects. There a claim was made that PCB's and other toxic chemicals caused high blood pressure, lung disease, asthma, elevated triglycerides, aortic sclerosis and eventual death, arthritis, respiratory infections and a history of miscarriages. Although the lower court had excluded Dr. Sherman's proposed testimony, the Third Circuit on appeal reversed stating: "We hold that Dr. Sherman, while arguably a relatively poor clinician and less than fully credible witness, qualifies as an expert." *Id.* at 753. But the court upheld the exclusion of most of Dr. Sherman's testimony and made certain comments of importance:

With respect to most plaintiffs, the district court acted within its discretion in concluding that Dr. Sherman's methodology was unreliable. She failed to examine plaintiffs or take their medical histories and offered no good explanation as to why she concluded that PCBs were the cause of plaintiff's illness.

*In re Paoli,* 35 F.3d at 771. And the court also commented upon Dr. Sherman's qualifications:

The district court held that Dr. Sherman was not qualified to testify as an expert. It explained that Dr. Sherman no longer practices general internal medicine—she does not have admitting privileges at any hospital and lacks an office where she can examine patients. Since 1976 most of her work has consisted of consulting, for litigation; she has been involved in 800 cases and has been on the plaintiff's side in all but two. According to the district court, out of fifty patients she has examined who have been exposed to PCBs, she cannot remember one instance in which she found that PCBs had not caused adverse health effects.

Moreover, the district court noted, Dr. Sherman lacks board certification in any medical specialty including internal medicine and toxicology, and admits that she is not an expert in immunology, oncology, neurology, psychiatry, dermatology, epidemiology or exposure assessment. Although Dr. Sherman represents that she became an expert in toxicology through experience, reading, writing, teaching, evaluating patients and course work, she took no courses in toxicology in medical school, and the district court concluded that it did not observe anything in her testimony to indicate that her reading was of a serious nature.

*In re Paoli,* 35 F.3d at 753. But here we are dealing with different scientific issues. Therefore, Dr. Sherman's role must be independently examined.

C. *Morris Cranmer,*[17] *Ph.D.,toxicologist*

Plaintiffs assert that Dr. Cranmer will testify that Maria Smits was exposed to both

**17.** A toxicologist who has worked for tile EPA and the FDA, and has been in charge of the

Dursban LO and Firefog 404 during the first trimester of her pregnancy with Ashley Smits and that, as a result of that exposure to those chemicals, the fetus was also exposed to levels of these chemicals that caused the defects that are now found in Ashley Smits.[18] His opinion is "within reasonable scientific certainty that Ashley's malformations and developmental delays were due to exposures to Dursban LO and Firefog 404." Cranmer's Report, April 13, 1994, p. 12. Dr. Cranmer asserts that any compound which is cytotoxic will be embryotoxic to the developing fetus. See Cranmer Report, Apr. 13, 1994. He asserts that inhalation of a toxic compound, such as Dursban, permits the toxicant to avoid detoxification by the maternal liver thus presenting a "better chance" of being absorbed by the fetus. Plaintiffs Supp. p. 5. Dr. Cranmer postulates that while all fetal tissues are sensitive, the nervous system is the most sensitive. Plaintiffs Hearing Supp., p. 37. Dr. Cranmer asserts that the functional alteration of tissue and plasma cholinesterase activity at a critical developmental period could influence cellular division and growth to produce anatomically or functionally abnormal development. Plaintiffs' Hearing Supp., p. 38. Dursban, a lipid soluble compound, is able to cross the placenta and when it does so, it is not easily detoxified by the fetal liver (as compared to the maternal liver). Dr. Cranmer supports his opinion with the following studies and other information[19] (parentheticals indicate Plaintiffs' interpretation of studies):

(1) Scheidt, J.Am.Vet. Med. Assn. 191(11) (1987), (Dursban toxic to newborn pigs); (2) Lein, et al. (1982) (residues of chlorpyrifos have been found in body fat of cattle housed in same barn as those treated with chlorpyrifos spray); Palmer, et al. (1980)

(Newborn calves more sensitive to Dursban than older calves); (3) Pope (neonatal rats are more sensitive than adults in brain cholinesterase inhibition and duration of inhibition from chlorpyrifos); (4) Deacon (chlorpyrifos has been shown to produce embryo toxicity and fetal toxicity in rats and mice); (5) *Muto* (prenatal exposure to chlorpyrifos has been shown to produce embryo toxicity, teratogenicity [increased head circumference, lack of spinal development, abnormal internal organ development], and neurotoxicity to developing rats at doses as low as 0.03 mg/kg); (6) Joubert, et al. (1954) (Dursban has been demonstrated to produce toxic effects in humans. Dursban has been shown to store it in body fat and have a biological half-life of several days. Dursban has been shown to be persistent in offices after spray application. Dursban has been demonstrated to produce toxic effects in humans when applied by exterminator. Chlorpyrifos has been demonstrated to produce extrapyramidal signs and symptoms in the form of chreo-athetosis); (7) Lottie, et al. (1986) (Chlorpyrifos has been demonstrated to induce organophosphate-induced delayed polyneuropathy in adult humans); (8) Vasilic (There is a slow excretion phase for chlorpyrifos and a half*life of from 66.5— 127.9 hours.)* (Half life is the time it takes for one half (½) of the chemical to leave the body). The authors suggested that the enzyme activity was affected not only by the amount of pesticide absorbed but also by its retention in the body; (9) Currie (Chlorpyrifos was measured in three offices and it was demonstrated that levels remained close to maximum for two days and high for six days); (10) Fenske (reported that residues on non-treated surfaces increased 200–300% over a 24 hour

toxicology program at the National Center for Toxicological Research (NCTR). He has also served as head of the toxicology department for the Arkansas Department of Health. *See* Plaintiffs' Exhibit H (Curriculum Vitae of Morris Cranmer).

**18.** Ashley Smits alleged "defects" include: absence of septum pellucidum, resulting in hydrocephalus; cleft lip and cleft palate; improper closure of left eyelid; partial paralysis of face; hearing loss; problems with balance and equi-

librium and other facial anomalies and malformations; a non-symmetrically shaped head and extended forehead on the left side. Plaintiffs' *Daubert* Motion, p. 43.

**19.** The list of information below is in substantially the same form as provided by plaintiffs. The Court finds this format unwieldy and difficult to analyze, in a meaningful manner, for *Daubert* purposes.

period after application. Air concentrations of chlorpyrifos increased during the 24 hour observation); (11) Dursban contains at least 15 impurities, two of which are Sulfotepp and Trichloropyridinol (TCP). TCP is a known teratogen as stated in the *Hanley* study and the Dow MSDS for this chemical; (12) Meir (1979) (Sulfotepp, a toxic impurity in formulations of Dursban may cause unanticipated health problems); (13) Allender (Sulfotepp has been involved in the death of 50 bulls applied by topical application); (14) El-Sebae, et al. (1978) (sulfotepp may increase toxicity of chlorpyrifos); (15) Bloom, Muscarella, Schaefer (Chlorpyrifos and two metabolites, pyridyl phosphate and pyridinol are known to be cytotoxic (causes genetic damage)); (16) Williams, et al (1980) (In fumigating greenhouses with Sulfotepp, air levels continued to rise the entire day after use if ventilation is not continued); (17) Landauer (Chlorpyrifos and metabolites have been demonstrated to cause embryotoxity when administered to chick embryos); (18) Waters (Dursban has been shown to be cytogenetic (mutagenic). It has been reported that chlorpyrifos caused reproducible dose related damage to DNA in tests conducted as part of the EPA mutagenesis battery); (19) The EPA rates sulfotepp as a "highly toxic" substance; (20) Soliman, et al. (1982) (sulfotepp contamination associated with two acute human poisoning cases); (21) Shem-

esh, et al. (1988) (Dursban associated with depression of cholinesterae in humans);

*See* Cranmer Report and plaintiffs' *Daubert* Motion p. 43–45. The above cited articles are a major sampling of the articles cited by Dr. Cranmer in his reports. However, the list is not exhaustive. Here again, the Court was faced with the daunting task of determining which articles, in particular, supported Dr. Cranmer's position. According to plaintiffs' *Daubert* Motion, they *all* did. However, few of the articles cited were provided to the Court. Dr. Cranmer also relies on the MSDS for TCP, and he believes TCP and Sulfotepp, (an ingredient in Dursban), are "highly toxic." Plaintiffs Supp., p. 22.

### D. *Gunnar Heuser,*[20] *M.D., Ph.D., toxicologist*

For this case, Dr. Heuser reviewed the medical records of Mrs. Smits and Ashley; he examined Ashley on September 17, 1994; he discussed the case with a geneticist;[21] reviewed the scientific literature on Dursban LO and Firefog and/or their component parts; reviewed the work of the other experts retained by the plaintiffs; and, reviewed the MSDS for Firefog and TCP.[22] Plaintiffs' Supplement, p. 81. Dr. Heuser's opinion is that Mrs. Smits exposure to Dursban LO and Firefog in the early first trimester of her pregnancy with Ashley caused Ashley's defects. Plaintiffs' Supplement, p. 82. Dr. Heuser applies his work in the area of Multiple Chemical Sensitivity[23] to reach his conclusions. Plaintiffs' *Daubert* Motion,

**20.** Dr. Heuser has done research in the area of chemical exposure and neurotoxicity. *See* Plaintiffs' Exhibit J (Gunnar Heuser's Curriculum Vitae). He is a medical doctor licensed to practice in California and he has earned a Ph.D. in Experimental Medicine and Surgery. Currently, he is an Assistant Clinical Professor of Medicine at U.C.L.A. Plaintiffs' Supplement, p. 80–81.

**21.** Dr. Barbara Crandall, U.C.L.A. Medical Center. Dr. Crandell wrote: "After considerable review and reevaluation suggest, but does not confirm, the diagnosis of the CHARGE syndrome and confirms that these malformations had their origin early on in pregnancy. I cannot exclude a teratogen as an etiologic agent." Crandell Report, June 26, 1995.

**22.** TCP is an acronym for trichloropyridinol which is one of the impurities in the manufactur-

ing of Dursban LO and is also one of the major metabolites of chlorpyrifos.

**23.** Dr. Heuser has published in the area of Multiple Chemical Sensitivity. Heuser, et al., *Diagnostic Markers of Multiple Chemical Sensitivity, Multiple Chemical Sensitivities, Addendum to Biological Markers in Immunotoxicology*, p. 117–138, National Academy Press, Washington, D.C. (1992) (publication not provided to the Court); Heuser, *Editorial: Diagnostic Markers in Clinical Immunotoxicology and Neurotoxicology*, Journal of Occupational Medicine and Toxicology, Vol.1, No.4. (1992). Interestingly, Dr. Heuser's editorial points out that "the claim that chemical injury (acute, prolonged, repeated) can cause chemical sensitivity is by now widely known but not yet generally accepted."

p. 49. He considers himself to be an expert with regard to the toxicological effects of certain chemicals on humans. Abstract of Dr. Heuser's Deposition of November 7, 1994, p. 1.[24] He testified that approximately one-half of his patients have a history of toxic exposure. Heuser Abstract, p. 1. Dr. Heuser describes his approach to developing an opinion in this case as follows:

> In order to understand this problem correctly, you need a number of specialties involved and also that you need a scientific approach to something that is not a easy problem. I do not feel that one single person can solve the puzzle of this particular patient. I think even a specialist would be stumped. What is really needed is to consider all the facts, all the literature, and do your reading. Yes, I am relying on the information that has been contained in the depositions and medical records, what Dr. Crandall has told me, what Dr. Cranmer and Dr. Laird have told me in writing or in person, my review of the medical literature with regard to the teratogentic effect of various chemicals of this particular case, plus my experience and reading over the years when it comes to toxic exposures. Heuser Abstract p. 2.

He testified that "there may be [a] possible interaction" between the "whole host" of chemicals involved in Mrs. Smits' case to create "potentially more toxic effects." Heuser Abstract, Plaintiffs' *Daubert* Motion, p. 50. He relies on an article by Olshan, *Medicated Developmental Toxicity: Epidemiologic Evidence*, Toxicologist (1993) (not provided to the Court). According to the plaintiffs, this article states that solvents[25] and pesticides have been associated with adverse de-

velopmental outcomes in humans. Plaintiffs' Supplement, p. 86. Dr. Heuser also relies on Cordier, et al., *Material Occupation Exposure and Congenital Malformations*, Scandinavian Journal of Work, Environment and Health, Vol. 18, No. 1 (1992) (not provided to the Court). According to the plaintiffs, this study shows that "exposure to solvents[26] before or during pregnancy was significantly associated with an increased risk of digestive system and multiple anomalies."[27] Plaintiffs' Supplement, p. 86. The plaintiffs assert that the authors suggest that maternal exposure to solvents[28] is associated with an increased risk of birth defects. Plaintiffs' Supplement, p. 86–87. Other articles cited by plaintiffs in support of Dr. Heuser's conclusions are:

> The first article by Cordier et al., showed that solvent exposure during pregnancy sufficiently increased the risk of oral clefts. (Cordier) (Supp. at p. 86); Kilburn et al., [*Effects of Neurobehavioral Performance of Chronic Exposure to Chemically Contaminated Well Water*, Tox.Ind.Health, Vol 9, No.3 (1993)] showed that occupational exposure to solvents impairs neurobehavioral performance. Both Dursban LO and Firefog 404 contain solvents. (Supp. at p. 87); Shaw et al., [Paternal Work Place Exposure to Organic Solvents and Congenital Cardiac Anomalies, Am.J. Epidemiology (Oct.1991)] showed first trimester contact with organic solvents increased risks of children being born with congenital cardiac anomalies. (Supp. at p. 87–88); Frumkin [*Toxins and Their Effects, Occupational Health, Recognizing and Preventing Work–Related Diseases*, 2d ed., Little Brown & co. (1988), reported on toxic or harmful substances that were

---

24. This abstract was provided by plaintiffs. It appears to be a line-by line summary of Dr. Heuser's deposition. The Court notes that this is not the most advantageous presentation of the evidence and, in fact, could be argued to be insufficient evidence. It would have been infinitely more helpful if the plaintiffs would have identified the portions of the deposition that support their *Daubert* argument and attaching a copy of each deposition instead of merely listing blocks of deposition text out of context. Nonetheless, the Court has made a concerted effort to understand the abstract and apply the same to this *Daubert* analysis.

25. The plaintiffs do not identify which solvents were the subject of the study. Both Firefog and Dumban LO contain solvents. However, the solvents contained in each are different (xylene in Dursban LO and petroleum naphtha in Firefog).

26. Type of solvent not identified.

27. Plaintiffs do not indicate whether this is true of the mother, the fetus, or both.

28. Type of solvent not identified.

encountered in the work place and found that chemicals in the work place may be taken up by three routes, the respiratory system, the skin, and the gastrointestinal tract. Other routes include mucus membranes and open lesions.][29] (Supp.at p. 88–89); Another article is by McDonald et al., [*Work and Pregnancy,* British Journal of Industrial Medicine, Vol. 45, No. 9, p. 577–580 (1988) ] which states there is evidence that exposure to organic solvents may cause fetal toxicity and teratogenicity. (Supp.at p. 89–90); Hemminki, et al., [*Transplacental Toxicity of Environmental Chemicals; Environmental Causes and Correlates of Spontaneous Abortions, Malformations, and Childhood Cancer, Advances in Perinatal Medicine,* vol. 5 p. 43–91 (1986) ] reported on the transplacental toxicity of environmental chemicals. Immunology studies showed that there were increased risks of malformations in offsprings of occupational workers who were exposed to solvents. (Supp.at 90–91); Ruppert, et al., [*Neurobehavioral Consequences of Postnatal Exposure to Toxicants, Govt. Reports Announcements & Index* (GRA & I), Issue 11, 1985] said that behavioral teratology studied the functional consequences of exposure to toxicants during the period of the nervous system development. The agents that have been studied include pesticides and solvents which have an adverse effect on infants born to women who were exposed to these solvents. (Supp.at p. 90–91); Holberg, et al., [General Description and Some Preliminary Results of a Case–Referent Study on Selected Congenital Defects and Environmental Exposures, Occupational Hazards and Reproduction, Hemminki, et al Editors, Hemisphere Publishing Corp., Washington D.C., p. 275–278, (1981) ] reported on development of congenital defects and environmental exposure in humans and matched mothers giving birth to a child with a central nervous system defect, cleft palate, malformation of the skeletal or cardiovascular system with mothers who gave birth to a normal baby immediately preceding the birth of the baby born with the defects. Only exposures during the first trimester of pregnancy were included in the study. The mothers of the children with congenital CNS defects or oral clefts had significantly more exposure to organic solvents than other mothers. Plaintiffs' Supp. at p. 93–94. Again, the above information is in substantially the same form as it was provided to the Court. The plaintiffs cite other "solvent" articles and draw correlations to the present case. One of the problems with these citations is the failure to designate which solvent was the solvent studied.

One "article" [30] by Dr. Heuser is cited for the proposition that pesticides and unnamed solvents are known to induce neurologic and psychiatric symptomatology. Plaintiffs' Supplement, p. 94. Dr. Heuser also relies on the report of Dr. Barbara Crandall wherein she reports that she cannot identify a specific association that matches Ashley's conditions. Heuser Abstract p. 2. He also relies on the MSDS for TCP, the Hanley study, the Sherman articles, the Muto study and the Deacon study. Plaintiffs' Hearing Supp., p. 56.

He believes that, where an individual is exposed to Dursban, concentrations of the chemicals will be higher in the brain than in other tissues. Heuser Abstract, p. 15. He asserts that Sulfotepp, which is found in Dursban LO, is a "highly toxic agent" and "has to be considered." Heuser Abstract, p. 15. Dr. Heuser testified that he has studied brains extensively and has "published in the field too. I may have testified that I do not know embryology and developmental abnormalities and have not studied those, but I have studied the adult brain over the years extensively . . ." *Id.* Dr. Heuser testified that he was "struck" by the fact that Dr. Canniff

---

**29.** According to plaintiffs this article shows that mothers exposed to chemicals at work have a higher risk of having babies with birth defects. Supp. To plaintiffs *Daubert* Motion, p. 89.

**30.** This "article" is before the Court in the form of an abstract. It is a single page document without any indication that it was ever published in a scientific journal. Instead, it looks as though it may have been submitted in conjunction with the annual meeting of the Society of Nuclear Medicine held in Chicago on March 26–28, 1993. *See* Plaintiffs' Supplement, Exhibit JJ.

was not able to match Ashley's defects with a particular syndrome or disease. Heuser Abstract, p. 18.

Dr. Heuser does not have any information as to the quantity of Firefog to which Mrs. Smits was exposed. Heuser Abstract, p. 3. He asserts that Mrs. Smits has since complained of symptoms commensurate with "chemical sensitivity." Significantly, Dr. Heuser notes that he "personally [has] no experience in terms of what happens to the fetus" after chemical exposure. Plaintiffs' Abstract, p. 16.

### E. Jane Miers. M.D.,[31] pediatrician

It is Dr. Miers' opinion that Dursban LO and Firefog "caused or contributed to the cause of Ashley's birth defects." She relies on the timing of the exposure with respect to the pregnancy, animal studies, the significant amount of exposure,[32] the MSDS for TCP, and the letter by Ron McCormick[33] to the EPA dated November 2, 1994[34] as well as an absence of causative factors such as alcohol consumption, maternal medication use, radiation exposure, family history, general chemistry tests,[35] and the fact that she could not find any constellations of signs and symp-

---

31. Dr. Miers has been Ashley Smits' pediatrician since birth. She has completed her residency in pediatrics at the University of Arkansas for Medical sciences. Currently, she is chief of pediatrics at Memorial Hospital in North Little Rock, Arkansas.

32. Here, Dr. Miers relies on the symptoms (nausea, sweet taste in mouth, vomiting) Maria Smits states that she experienced after Dursban was sprayed. Dr. Miers stated that nausea is indicative of an organophosphate poisoning. Plaintiffs' Daubert Motion, p. 67.

33. Manager of Product Stewardship for DowElanco.

34. The letter to the EPA reviews an alleged exposure and subsequent birth defect. The chemical involved was a mixture of Whitmire 270 (contains Chlorpyrifos) and Demon WP. The letter stated that the current DowElanco labels containing Chlorpyrifos state, "Hazards to Humans and Domestic Animals ... WARNING ... Harmful if swallowed. Harmful if absorbed through skin. Causes substantial but temporary eye injury. Do not get in eyes, on skin or clothing. Handle concentrate in ventilated area. Wash thoroughly with soap and water after handling

toms that fit Ashley's malformations.[36] See Abstract Deposition of Dr. Jane F. Miers, November 17, 1995 ("Miers Abstract"); see also Plaintiffs' Supplement, p. 100. Interestingly, Dr. Miers asserted that Dr. Sherman's article was a report of findings that other physicians could use as a reference, but her article was not a hypothesis or established fact. Miers Abstract, p. 2.

### F. Robert D. Laird, M.D.,[37] clinical pharmacologist

Dr. Laird attempted to rule out all other possible causes of the defects present in Ashley Smits and concluded that Maria Smits' exposure to both Dursban LO and Firefog at a critical time in her pregnancy caused Ashley's deformities. In his report, he writes, that he reached this conclusion for the following reasons:

1. The dates of exposure to these two chemicals fall within a critical period of embryologic development for Ashley. The lipophilic nature of the involved chemicals and the fat storing nature of the developing brain.

2. The medical literature indicates that there is produced neural dysfunction. Ashley Marie Smits incurred neural dys-

---

and before eating or smoking. Remove contaminated clothing and wash before reuse." Plaintiffs' Exhibit LL, DowElanco Letter to EPA, November 22, 1995.

35. Including lead, electrolytes, sodium, and thyroid function. Miers Abstract, p. 3.

36. Here, Dr. Miers appears to rely on her own knowledge as well as a conversation she had with Dr. Chris Cunniff, geneticist, who apparently informed her that he did not think there was a genetic cause for Ashley's defects although he could not rule out anything autosomal recessive. Plaintiffs' Hearing Supp., p. 56.

37. Dr. Laird is a clinical pharmacologist who has worked for Parke–Davis and the U.S. Army and has taught medicine in Michigan. Plaintiff's Supplement, p. 57–58. He has never practiced medicine. He was one of Dr. Sherman's instructors in medical school. Plaintiffs' Danbert Motion, p. 52. Dr. Laird has conducted animal testing with regard to anticholinesterase. Plaintiffs offer the testimony of Dr. Laird to show that the labeling of Dursban was inadequate. The labeling issue will not be discussed in this Order.

function and neural anatomic damage from her exposure.

3. A second child with no exposure to Dursban LO and Firefog 404 was born on October 4, 1993 to the same parents and is normal.[38]

5. There were no chromosomal abnormalities.

Laird Report of April 15, 1994, p. 2 ("Laird Report") and *Daubert* Motion, p. 62. In support of his opinions, Dr. Laird cites several articles:[39]

Smith GN, Watson BS, Fischer FS. *Investigations on Dursban Insecticide: Metabolism of [36C1] O.O–Diethyl O 3,5,6–Trichloro-2-pyridyl Phosphorothioate in Rats,* J. Agric. Food Chem., E.C. Britton Laboratory, Vol. 15, No. 1, (Jan–Feb. 1967)[40] (demonstrated that at least three metabolites of chlorpyrifos were found in urine and feces, one of which was trichloropyridinol (a known teratogen from the *Hanley* study and the MSDS for TCP)). Plaintiffs' Supp. at p. 59.

Dr. Laird relies upon E.M. Lores, et al., *Organophosphorus Pesticide Poisonings in Humans: Determination of Residence and Metabolites in Tissues and Urine,* Archieves of environmental Health (Sept.-Oct., 1978). Demonstrates the ready absorption of chlorpyrifos through mucous membranes and the lethality of chlorpyrifos. Supp. to plaintiffs *Daubert* Motion, p. 60. Another article by E.M. Lores, et al., *A New Metabolite of Chlorpyrifos: Isolation and Identification,* J. Agric. Food Chem., Vol 26 (1978).

According to plaintiffs, this study supports Dr. Laird's opinions that chlorpyrifos has not been adequately studied. Supp. to Plaintiffs' *Daubert* Motion, p. 60–61.

Also in support of this opinions, Dr. Laird refers to Palmer et al., [*Effect of Age on Tolerance of Calves to Chlorpyrifos,* Am.J. Vet. Res., Vol 1 No. 8 (1988)] which was a study of 1—2 week old and 4—6 month old calves that were treated with topical or oral chlorpyrifos. The newborn calves were severely poisoned by the topical application and the 4 to 6 month old calves had an increased tolerance to topical application of chlorpyrifos. Plaintiffs' Supp. at p. 61–62. According to plaintiffs, this article supports Dr. Laird's opinion that the topical application of chlorpyrifos is toxic to young animals and this applies to humans as well. Supp. to Plaintiffs' *Daubert* Motion, p. 63.

Dr. Laird also relies upon Lein et al., [*Chlorpyrifos dursban 44 Toxicity in Dairy Bulls,* Cornell Vet. (1982)] which showed that chlorpyrifos is rapidly absorbed by the topical route if applied to bulls and that metabolites of chlorpyrifos along with trace amounts of pure chlorpyrifos were excreted via the urine and feces and that residues of chlorpyrifos had been found mainly in body fat of cattle. Chlorpyrifos was also found in the control animals, that were exposed to Dursban 44 by aerosol contamination only, and the chlorpyrifos was found in the rumen and hair. They also showed that plasma levels of chlorpyrifos were detected within one (1) hour after application. Also, the study showed that samples taken from inside the main alley of the barn 33 days after treatment also contained detectable aerosolized chlorpyrifos. This article also showed that chlorpyrifos is very toxic to higher animals and that it remains for an extended period of time in the air and it could even be found in the hair of employees who were working in the area where Dursban (chlorpyrifos) was being sprayed. Supp. to Plaintiffs *Daubert* Motion, p. 64–67.

38. Dr. Laird asserts that this is significant because New York's Department of Health conducted a survey in 1940 which indicated that 50% of those families with a birth defected child had a second child who also had birth defects. Plaintiffs' *Daubert* Motion, p. 59.

39. The articles listed are a sampling of the 34 articles which support his opinion. Plaintiffs' *Daubert* Motion, p. 54. Again, the plaintiffs have not culled through these reports in order to highlight, for the Court, which articles are relevant to the *Daubert* analysis. They are presented in substantially the same form as received by the Court.

40. Plaintiffs assert this study is relevant because it confirms that TCP is a metabolite of chlorpyrifos. Supp. to Plaintiffs' *Daubert* Motion, p. 60.

Brennen et al., *Morbidity Among Employees Engaged in the Manufacture or Formulation of Chlorpyrifos,* Porit. J. Ind. Med. (1989).

According to plaintiff this epidemiological study indicates that exposed workers reported symptoms of dizziness, and malaise, and fatigue more often than control subjects. Plaintiffs argue it shows that Dow, which conducted this study, should have done more investigative epidemiological studies. Supp. to Plaintiffs *Daubert* Motion, p. 75.

Dr. Laird also relies upon Lottie et al., *[Inhibition of Lymphocytic Neuropathy Target Esterase Predicts the Development of Organophosphate–Induced Delayed Polyneuropathy,* Arch. Toxicol. Vol. 59 (1986) ] shows that the molecular target in the nervous system for organophosphorus esters is the Neuropathy Target Esterase (NTE) demonstrates that chlorpyrifos causes CNS symptoms. Plaintiffs' Supp. at p. 69.

The next article relied upon by Dr. Laird is Long et al., *[Age Related Susceptibility of Newborn Pigs to the Cutaneous Application of Chlorpyrifos,* Bet. Hum. Toxicol. 28(4) Aug. (1986) ] that showed 0–3 hours old pigs are highly susceptible to toxicosis through dermal (skin) absorption of chlorpyrifos. The article stated that chlorpyrifos is more toxic to younger animals than it is to older animals. This article highlights the fact that the compound would be especially toxic to the embryo with no protective skin or other barriers. Plaintiffs' Supp. at p. 70–71.

Hodgson et al., *[Organophosphate Poisoning in Office Workers,* J. of Occupational Med., Vo. 28, No. 6 (June 1986) ] showed that occupants of an office who were exposed to chlorpyrifos were poisoned by this compound.

The study also suggested that after absorption of chlorpyrifos into the body it is stored in a second compartment and that there is slow release of the chemical over a period of time. Plaintiffs' Supp. at p. 72–73.

Pope et al., *[Comparison of In Vivo Cholinesterase Inhibition in Neonatal and Adult Rats by Three Organophosphorothioat Insecticides,* Toxicology, Vol. 68 (1991) ] showed that neonatal rats were more sensitive to toxicity of chlorpyrifos and it further showed that the inhibition of the cholinesterase of the nervous system during a critical period of development of the brain may disrupt cellular processes of growth and differentiation and alter normal brain cytoarchitechture. Plaintiffs' Supp. at p. 76. The Pope study delivered the, chlorpyrifos through a subantaneous injection.

Dr. Joubert, et al., *[Acute Organophosphate Poisoning Presenting with Chorco–Athetosis,* Clinical Toxicology, 22(2)(1984) ]. Demonstrates that chlorpyrifos causes central nervous system toxicity. Supp. to Plaintiffs' *Daubert* Motion p. 68–69.

Aiuto, et al., *[Life Threatening Organophosphate Induced Delayed Polyneuropathy* in Child After Accidental Chlorpyrifos Ingestion, J. of Pediatrics, Vol 122 (Apr. 1993) ] is cited for the proposition that chlorpyrifos is especially toxic to young children. Supp. to Plaintiffs' *Daubert* Motion, p. 77–78.

Dr. Laird also relies upon the studies by *Muto*[41] and *Bidanset* for his opinions as well as the MSDS for Trichloropyridinol which shows that compound is teratogenic.

The above information is compiled from Plaintiffs' *Daubert* Motion and Plaintiffs' Supplement to their Daubert Motion.

Dr. Laird asserts that Firefog 404 more likely than not solubilized the Dursban LO that had been applied and made it more available for inhalation and more likely than not caused further toxicity to the developing embryo. Plaintiffs' Supplement, p. 80. He postulates two routes of exposure: inhalation and skin absorption. Abstract of Laird Deposition, November 8, 1994, p. 1 ("Laird Abstract").[42] He believes that Mrs. Smits

---

**41.** The *Muto* study delivered the chlorpyrifos through an intraperitoneal injection.

**42.** The plaintiffs provided the court with an abstracted deposition transcript. Plaintiffs' Exhibit O attached to Plaintiffs' *Daubert* Motion. All page number references are to the abstract only. Plaintiffs did not provide the Court with the

inhaled or absorbed enough "chemical" to produce the following clinical symptoms: nausea and a sweet taste. *Id.* Dr. Laird believes that the fact that Ashley has neurological damage evidences that the she was exposed to the chemicals. Laird Abstract, p. 10–11. Other factors Dr. Laird considered to be significant in his determination of causation are (1) there was no ventilation in the bank building, (2) that the Smits had a second child without defects,[43] Dr. Laird acknowledges that there are birth defects, the cause or causes of which are unknown. He estimates that this may be true of 70 to 80% of all birth defects.

**DOSAGE**

Dr. Cranmer calculates that Mrs. Smits was exposed to chlorpyrifos at a rate of 60 micrograms/hour by inhalation. Plaintiffs assert that Mrs. Smits worked two and a half hours the first day that the bank was sprayed with Dursban LO and worked a full eight hour day the next day. Thus, plaintiffs assert that the "least amount" Mrs. Smits was "probably" exposed to over those two days was 500 micrograms or 10 micrograms/kg of body weight. Plaintiffs Supplement to Hearing, p. 34. Plaintiffs support their argument with two articles. The first, argue plaintiffs, states that chlorpyrifos were found in air samples, after an aerosol spraying of chlorpyrifos, for up to 33 days. [44] According to the plaintiffs, the defendant expert:

> Richard Garrison, Ph.D an Industrial Hygienist did a calculation (which was not based on any studies) (See page 32 of the Defendants Brief in Support of Motion to Exclude Opinion Testimony of Jesse Bidanset and Janette Sherman). Dr. Garrison stated that he estimated Maria Smits would have been exposed during the first day for 2 hours and 8 hours for the second day after the application of Dursban; that concentrations of Chlorpyrifos in her lungs

would have been 1800 and 1700 ng for those two days, respectively, that is 36 ng/kg body weight on day one and 35 ng/kg body weight for day two. By using exposure levels experienced by applicators instead of bystanders, Dr. Garrison calculated based on actual air measurements an "upper limit worse case" air intake for Mrs. Smits to be no more than 240 mg/kg body weight for day one and 100 ng/kg body weight for day two.

Plaintiffs' Supp. p. 35. As for dosage, Dr. Bidanset had this to say:

> No, I have not done any estimate of the exposure to Ms. Smits from the ambient air, dermally or orally.

Plaintiffs argue that Dursban and its metabolites and contaminants are lipid (fat) soluble and "readily cross the placental barrier." Plaintiffs' *Daubert* Motion, p. 15.

Dr. Heuser deduces significant exposure in the following manner:

> Chemical sensitivity as it relates to this particular case is because the mother did complain to me that she had developed chemical sensitivity ... chemical sensitivity implies usually that there was an exposure in significant amounts to a given chemical and it implies that thereafter the patient becomes sensitive to other chemicals in very small amounts.

Heuser Abstract, p. __

### Appendix "B"

United States District Court

Eastern District of Arkansas

U.S. Post Office & Courthouse

P.O. Box 3684

Little Rock, Arkansas 72203

August 14, 1996

G. Thomas Eisele
Senior Judge

---

results of Dr. Laird's animal testing with regard to petroleum naptha and mineral oil.

**43.** Dr. Laird opined that if a family has one child with birth defects that family has a 50% chance that the second child will have birth defects. Laird Abstract, p. 12.

**44.** Plaintiffs cite Lein, et al., *Chlorpyrifos (Dursban 44) Toxicity in Dairy Bulls,* Cornell Veterinarian, vol. 72 (1982).

Mr. Benard P. Whetstone
124 W. Capitol Ave., Suite 850
Little Rock, Arkansas 72201

Ms. Sammye L. Taylor
Mr. Roger A. Glasgow
200 W. Capitol Ave., Suite 2200
Little Rock, AR 72201–3699

Mr. Louis C. Woolf
P.O. Box 900
Knoxville, TN 37910–0900

Mr. Bobby D. Davidson
124 W. Capitol Ave., Suite 1880
Little Rock, Arkansas 72201

Mr. Joseph G. Eaton
Mr. Robert D. MacGill
1313 Merchants Bank Bldg.
11 South Meridian St.
Indianapolis, IN 46204

RE: Smits v. Dow, No. LR–C–94–64

Dear Counsel:

As you know I have scheduled further argument on the *Daubert* issues for September 12, 1996, at 9:00 a.m. In the meantime I will provide you with some of my thinking on the issues and seek your views thereon in an attempt to narrow the focus of this second argument. In this connection you will probably receive several additional such letters from me before the September conference.

One of the defendant Dow's arguments suggests that the Court could rule in its favor by simply accepting and applying the most pertinent case law, which it identifies as *Wade–Greaux*, 874 F.Supp 1441 (D. Virgin Islands 1994), 46 F.3d 1120 (3rd Cir.1994), and *DePyper v. Navarro,* 1995 WL 788828 (Mich.Cir.Ct., Nov.27, 1995). I doubt that the issues I am dealing with here can be, or should be, resolved solely on the basis of legal precedents. Nevertheless, I think it might be helpful to the parties if I expressed my tentative views on certain of the scientific principles which are enunciated in those cases which may have relevance here.

Judge Giles' numbered "scientific" findings in *Wade–Greaux* which I am presently interested, will be found at pp. 1448–1455 of his opinion. I hereby advise counsel that I find myself, (tentatively, at least) in agreement with his findings numbered: 4, 5, 10, 12–14, 18–25, 29, 31, 32, 35–38. From prior submissions I suspect that plaintiffs' disagree with at least some of these statements, but it will be helpful if they respond *one by one* to these findings and, where they disagree, specifically identify the scientific support in the present record for their own differing views.

I also advise that I disagree with Judge Giles' finding No. 15 and have reservations about his findings 26–28, 30. Your comments on those findings will also be appreciated.

I suggest that plaintiffs' counsel file their response in letter form by August 28, 1996. Of course, a copy must be provided to defendant, Dow's attorneys. By September 9, 1996, I ask the defendants' attorneys to respond to plaintiffs' submission, item by item, bringing the Court's attention to those portions of the existing record which they contend support their responses.

Sincerely yours,
G. Thomas Eisele

### Appendix "C"

United States District Court

Eastern District of Arkansas

P.O. Box 3684

Little Rock, Arkansas 72203

August 14, 1996

G. Thomas Eisele
Senior Judge

Mr. Benard P. Whetstone
124 W. Capitol Ave., Suite 850
Little Rock, Arkansas 72201

Ms. Sammye L. Taylor
Mr. Roger A. Glasgow
200 W. Capitol Ave., Suite 2200
Little Rock, AR, 72201–3699

Mr. Louis C. Woolf
P.O. Box 900
Knoxville, TN 37910–0900

Mr. Bobby D. Davidson
124 W. Capitol Ave., Suite 1880
Little Rock, Arkansas 72201

Mr. Joseph G. Eaton
Mr. Robert D. MacGill

1313 Merchants Bank Bldg.
11 South Meridian St.
Indianapolis, IN 46204

RE: Smits v. Dow, No. LR–C–94–64

Dear Counsel:

The September conference has been scheduled in a final attempt to determine if I can resolve the *Daubert* issues without the assistance of a court designated expert (or experts). The format will be different than that used at the last conference.

In a Rule 104(a) hearing the burden is on the proponent of the challenged evidence to satisfy the Court by a preponderance of the evidence that the pre-conditions to admissibility, here established by *Daubert* have been met. So I will ask plaintiffs' attorneys to start out with respect to each of the separate issues identified below. Defendants' attorneys will then respond.

The first issue relates to exposure and dosage both of Mrs. Smits and Ashley while *in utero*. After plaintiffs detail all of the evidence in the record on these issues and argue its medical and scientific adequacy, defendants' attorneys will respond.

The second phase of the argument will relate to specific causation. Here again plaintiffs' attorneys will open and then defendants' attorneys will respond.

The Court does not contemplate just a rehash of the earlier arguments. You will receive from me shortly communications which will provide you with some further guidance.

Sincerely yours

G. Thomas Eisele

### Appendix "D"

United States District Court

Eastern District of Arkansas

U.S. Post Office & Courthouse

Little Rock, Arkansas 72203

August 16, 1996

G. Thomas Eisele
Senior Judge

Mr. Benard P. Whetstone
124 W. Capitol Ave., Suite 850
Little Rock, Arkansas 72201

Ms. Sammye L. Taylor
Mr. Roger A. Glasgow
200 W. Capitol Ave., Suite 2200
Little Rock, AR 72201–3699

Mr. Louis C. Woolf
P.O.Box 900
Knoxville, TN 37910–0900

Mr. Bobby D. Davidson
124 W. Capitol Ave., Suite 1880
Little Rock, Arkansas 72201

Mr. Joseph G. Eaton
Mr. Robert D. MacGill
1313 Merchants Bank Bldg.
11 South Meridian St.
Indianapolis, IN 46204

RE: Smits v. Dow, No. LR–C–94–64

Dear Counsel:

I am leaving town tomorrow and will be gone until September 1, 1996. I had hoped to complete a detailed summary of my views, some tentative, for your assistance in preparing for the September 12, 1996, conference. It is now apparent that I will not be able to complete that task but I am enclosing herewith the notes and comments that I have completed. You will see that some of the views, while expressed strongly, are nevertheless, labeled "tentative." And they will remain tentative at least until after the conference on September 12.

The law being established in the various circuits in the aftermath of *Daubert* is not completely consistent. For instance if the Court fully "bought" the views expressed in *Wade–Greaux* would probably feel comfortable in granting the defendants' motion and excluding the plaintiffs' causation evidence. On the other hand if the Court fully accepted the decision of the Second Circuit in *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2nd Cir.1995) it would probably over rule the defendants' motion and permit the plaintiffs to bring their evidence before the jury. I must tell the parties, however, that I do not believe that the *McCullock* case is really in sync with the *Daubert* requirements.

While I am dealing with the law I wish to advise you that I have read professor Rossi's article, "Expert Witnesses: *Daubert v. Merrell Dow,* Before and After," which our library obtained from the ABA's Section of Litigation. Prof. Rossi is with the Cornell Law School. His article deals with the developments over the years in the law relating to the admissibility of expert opinion testimony. Historically he divides those developments into, "The Era of Admissibility," "The Era of Retrenchment: Some Second Thoughts," and finally, *"Daubert* and Beyond: a Period of Uncertainty." I mention this because I do believe that the developments in such law prior to *Daubert* must be understood when dealing with the effect of *Daubert.* Prof. Rossi's article does, in my opinion, do a good job in putting the post–*Daubert* era in perspective.

When I return to the office I *hope* I have the opportunity to provide you with some additional comments that might be of assistance to you at the time of the conference.

Once again my objective in scheduling the September 12 conference is to see if I can resolve the *Daubert* issues without the appointment of an independent expert to advise me on some of the scientific issues. As you know many of the defendants' arguments are to the effect that the plaintiffs' experts' views do not find acceptance in the appropriate scientific community. The basis for some of these arguments is found in the statements or declarations of the defendants' expert witnesses. It would be helpful if, in this regard, the parties could point to something more than the opposing statements of their respective experts.

Although I took very detailed notes during the last argument and conference, it might be helpful to have a transcript of that conference available before the September 12 arguments. I leave that decision up to you. However, if either or both of you consider it might be helpful, the transcript should be

ordered early so that I will have an opportunity to read it over before September 12.

Once again, I expect to be back in touch with you shortly after September 1,

Sincerely yours

G. Thomas Eisele

### APPENDIX "E"

#### *Notes Regarding Major Studies*

Below is the Court's brief summarization of the major arguments made by the parties with respect to the following Dursban studies: M.M. Deacon, *The Effects of Orally Administered Chlorpyrifos on Embroynal and Fetal Development in Mice,* Toxicology Research Laboratory, (July 24, 1979),[1] T.R. Hanley, et al, *3/5/6–Trichloro–2–pryidinol: Oral Teratology Study in New Zealand White Rabbits,* (July 23, 1987); Maria A. Muto, *Fetotoxicity Associated with Prenatal Exposure to Dursban;* Maria A. Muto, Lobelle, Jr., Bidanset and Wurpel. *Embryotoxicity and Neurotoxiciy in Rats Associated with Prenatal Exposure to Dursban.* Vet. and Human Toxicology (Oct.1992).

The parties may disagree with the Court's impressions as to their arguments. If so, the parties are asked to clarify their arguments at the September 12–13 Hearing.

#### A. Muto [2]

*1. Plaintiff's Interpretation*

a. Prenatal exposure to Chlorpyrifos has been shown to produce embryo toxicity, teratogenicity [increased head circumference, lack of spinal development, abnormal internal organ development], and neurotoxicity to developing rats at doses as low as 0.03 mg/kg;

b. Dr. Bidanset's opinion regarding this study is that it demonstrates that Dursban is an embryotoxin and a neurotoxin. He believes that the Muto study establishes that Chlorpyrifos has the capacity of pro-

---

**1.** According to plaintiffs, Deacon demonstrated that mice given pure Chlorpyrifos during gestation will produce decreased fetal body measurements, increased instance of minor skeletal variance, increased instance of exencephaly, delayed ossification of skull bones, and unfused sternebrae. Plaintiffs' Hearing Supp., p. 45.

**2.** This study was conducted by Dr. Bidanset and his graduate student, Muto.

ducing fetal death and damage. Bidanset Depo., p. 420.

c. Dr. Bidanset has stated:

Our studies [3] showed that the teratogenic effects of Chlorpyrifos occurred at low concentrations and did not occur at higher concentrations. This appeared to defy the dose response relationship, and the only explanation that he has is that at the higher doses, a second form of toxicity occurs that overwhelms the teratologic effect. At concentrations of Chlorpyrifos exposure that produced cholinesterase inhibition, no birth defects were observed. Bidanset Depo. p. 200–201.

Our studies were consistent with Dow studies, that is, low levels produced birth defects, higher levels failed to produce the same effects; which is a reverse of the accepted normal dose response relationship. This is also consistent with the Deacon study that states exactly the same thing; that you have teratology at low values, but do not observe effects at high values, and discounted the substance as teratogenic agent because it did not obey the normal dose response relationship. Bidanset Depo. p. 202.

2. *Defendant's Interpretation*

a. Dr. Bidanset's theory of reverse does response relationship is primarily based on the 1992 Muto/Bidanset study which purportedly found a higher level of fetal death at lower dosage levels than at high levels.[4] Dr. Johnson has stated: "the theory of a reverse dose response relationship is unprecedented in developmental toxicity and is the antitheses of toxicity association wherein it is the high dose that makes the poison." Johnson Report, p. 81.

b. The methodology utilized by Bidanset in the 1992 Muto study is unreliable and fails

[3]. To be clear, it is not apparent from the testimony if he is referring only to the Muto study.

[4]. The highest exposure level with lethality in the study was 300 ug/kg/day. Dr. Bidanser conceded that the later 1995 Bidanset/Nuimphius study failed to reproduce the lethaltry effects at the highest level in the Bidanset/Muto study and found no physical abnormalities in offspring at

to follow the generally accepted protocol for determining animal teratogenicity. Johnson Report, p. 78–82. Dr. Sherman has admitted the study was "discounted by the EPA." Sherman Case Report, p. 422.

**B. Hanley [5]**

1. *Plaintiff's Interpretation*

a. Dursban contains at least 15 impurities, two of which are Sulfotepp and Trichloropyridinol (TCP). TCP is a known teratogen as stated in the Hanley study and the Dow MSDS for this chemical.

b. Plaintiffs assert that this study demonstrates that Dursban LO and/or its components and metabolites are known teratogens. They assert that the Hanley study reported:

Administration of Trichloropyridinol to pregnant rabbits was considered teratogenic at a dose level of 250 mg./kg/day, a level which also depressed maternal weight gain. Indications of a teratogenic potential were also observed at 100 mg/kg/day in the absence of any measured maternal toxicity. No adverse effects were observed in either maternal or fetal rabbits at 25 mg/kg/day.

c. A letter from Dow to the EPA dated July 24, 1992, summarized the Hanley study as follows: the incidence of central nervous system (CNS) anomalies (hydrocephaly and severely dilated cerebral ventricles) has increased in both the 100 and 250 mg/kg I day base groups.

d. Plaintiffs point to the MSDS for tricholorpyridinol ("TCP"), the active ingredient of Dursban LO, which states:

Teratology (Birth Defects): Has been reported to cause birth defects in laboratory animals at doses non-toxic to the mother.

substantially higher levels of 3,000 and 10,000 ug/kg/day. Bidanser Depo., 557–58.

[5]. The *Hanley* study was a study commissioned by Dow Chemical. Its full citation is: TR. Hanley, Jr., G.J. Zielke and L.G. Lomax, *3, 5, 6—Trichloro—2–Pyridinol: Oral Teratology Study in New Zealand White Rabbits* (unpublished, July 23, 1987), ("Hanley Study").

e. Dr. Bidanset Dr. Bidanset had this to say regarding TCP:

> One of the impurities in Dursban is referred to as TCP, which was studied by Dow and found to have mutagenic and teratogenic properties. I am not sure of the doses that were applied in that study. Exhibit 7 of the Sherman article refers to a research study done by Dow in July, 1987. My recollection is that the study established that TCP was a teratogen and a mutagen and that birth defects were evident in the application of this material. My opinion is that one has to deal with the commercially available product with all its impurities and side products, as well as dealing with the fact that TCP is a metabolite of Chlorpyrifos. Bidanset Depo. p. 453–456.

*2. Defendant's Interpretation*

a. Study does not show a positive dose-response relationship.

b. The Hanley study found no abnormalities at does levels which exceed Maria Smits' estimated dose by a factor of 100,000.[6] The Hanley study involved tests of TCP at levels of 0, 25,000, 100,000 and 250,000 ug/kg for a period of 13 days. The defendants core argument is that at levels of exposure that were massively higher than the exposure estimated for Maria Smits, there were no malformations in the animals in the Hanley study:

> The smallest total dose received by the animals in the Hanley study (25,000 ug/kg/day ' 13 days) exceeded Maria Smits' worst case dose by a factor of about 1,000,000. This dose showed no agent-relatable effect in the Hanley animals.

c. Even at the high doses in the Hanley study, the abnormalities noted were not statistically significant from the controls. Johnson Report, p. 67–69.

d. The Hanley results described in the TCP MSDS was not a statement that TCP causes birth defects in humans.

**6.** Dow's industrial hygiene expert, Richard P. Garison, Ph.D., is estimating that Mrs. Smits exposure to be 0.24ug/kg (micrograms per kilo-

e. Hanley reported that TCP was "considered teratogenic" at 250,000 ug/kg/day where maternal toxicity was evident and had indications of teratogenetic potential at 100,000 ug/kg/day. This inference of teratogenic potential is impeded by the existence of similar CNS anomalies in studies of rabbit control groups. Johnson Report, p. 69. The control rate of spontaneous malformations and the control's variability limit any inferences of causation that could be properly drawn for the Hanley data. Johnson Report, p. 69.

f. In another study done by Hanley in 1987 [TCP in rats] no agent relatable congenital malformations were reported at any dosage. Johnson Report, p. 67.

## C. Deacon

*1. Plaintiff's Interpretation*

a. Chlorpyrifos has been shown to produce embryo toxicity and fetal toxicity in rats and mice.

b. Malformations occurred only in the lower exposure levels, supporting Dr. Bidanset's reverse dose response theory. Bidanset Depo., p. 537.

*2. Defendant's Interpretation*

a. Study does not show a positive dose-response relationship.

b. In Deacon, the first phase of the study involved exposure levels of 0, 1,000, 100,000 and 25,000 ug/kg/day of Chlorpyrifos and resulted in incidents of excencephaly of 1,5,1 and 4 respectively. The incidence of excencephaly was considered statistically significant in the 1,000 ug/kg/day groups compared to the controls but not in the higher exposure intensities. Johnson Report, p. 63–64, 87. A second phase involving exposure levels of 0, 100, 1,000 and 10,000 ug/kg/day was conducted resulting in the following incidents of excencephaly: 1,1,0,1. The repeat study revealed zero incidence of excencephaly at 1,000 ug/kg and confirmed an absence of a true agent-relatable effect in the first phase.

gram of body weight) on day one and 0.1 ug/kg on day two.

Johnson Report, p. 88. Thus, Deacon fails to support plaintiff's reverse dose response theory.

### Appendix "F"

### Notes and Comments

Dr. T. Shepard, in his *Catalog of Teratogenic Agents*, (8th Ed.1995) states that approximately 3% of all newborn humans have a congenital anomaly. He states that about one-third of these (i.e. 1% of the total) can be regarded as life threatening. He also states that, with increasing age, more than twice as many congenital defects are detected. This suggests that the total may exceed 6% of all humans born. He then makes the following important observation:

> Our knowledge about the cause and prevention of these problems is extremely limited. About 20 percent are associated with gene mutations and another 5 percent with chromosomal aberrations. About 10 percent of the remaining anomalies are known to be due to a teratogenic agent. There are more than 2,500 agents listed in this catalog. About 1,200 can produce congenital anomalies in experimental animals, but only about forty of theses are known to cause defects in the human. Therefore, there exists a wide difference between our knowledge of experimental teratology and the role that external agents play in producing human malformations.

So we see that, of the more than 2,500 identified teratogenic agents only about 40 are known to cause defects in human beings. We also must note that only about 10% of the human anomalies "are known to be due to a teratogenic agent." This in turn suggests that, of all birth defects, only about 7.5% are known to be caused by teratogenic agents. And this would further seem to suggest that only 7.5% of the 3% of all human newborns will have congenital anomalies (requiring medical attention) that can with confidence be attributed to teratogenic agents. Thus, it would seem to follow that approximately 0.225.% of such birth defects are known to be caused by teratogenic agents. However, by the same token, it appears that, at this stage of our scientific knowledge, we are not able to account for the cause of approximately 67.5% of all birth defects. So it is conceivable that further study and research will establish that a large proportion of this presently unknown group of birth defects are caused by such agents.

Defendants make the point that there is a consensus in the relevant scientific community (composed of teratologist and medical geneticists) concerning the appropriate protocol and methodology that must be followed in order to establish and classify a particular chemical agent as a human teratogen. The submissions of the parties have persuaded me that they are correct in this regard. Through the use of this protocol and the methodology and reasoning it adopts, some 40 chemical agents have apparently been established as human teratogens. See above. Dursban LO is not on this list. Defendants have essentially satisfied the court that they are correct on their general causation arguments. They would then go on to argue that this conclusion by the Court requires it to grant their *Daubert* motion by excluding all of plaintiffs causation evidence. The Court is not ready to agree. Such a conclusion would have the effect of denying the claims of all plaintiffs who contend that their birth defects were caused by a chemical agent that had not been established as a teratogen through the use of the accepted protocol. While it would undoubtedly be extremely helpful to such plaintiffs to have the challenged chemical agent firmly established (through the use of such protocol) as a human teratogen, the absence of such a determination should not, alone, prove fatal to their claim. Indeed, it is clear to the Court that the facts and circumstances of particular cases might provide evidence of specific causation sufficient to go to a jury.

As stated by Judge Kozinski of the Ninth Circuit in dealing with *Daubert* upon its remand from the Supreme Court:

> Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling

proof that the agent must have caused the damage *somehow*. One method of proving causation in these circumstances is to use statistical evidence. If 50 people who eat at a restaurant one evening come down with food poisoning during the night, we can infer that the restaurant's food probably contained something unwholesome, even if none of the dishes is available for analysis. This inference is based on the fact that, in our health-conscious society, it is highly unlikely that 50 people who have nothing in common except that they ate at the same restaurant would get food poisoning from independent sources.

Or let us take another hypothetical situation more closely related to the issue in this case. Assume that 50 young women, each from a different state, came to a fertility clinic here in Little Rock, Arkansas and each was impregnated with a fertilized ovum on the same day (the 50 eggs coming from 50 different women and the sperm from 50 different men) and then the impregnated women remained here for an additional six weeks. Assume further that 25 of the women met daily thereafter in a room that had on the previous day been treated with organophosphate insecticide "X" and that these women stayed in that room for three hours each morning for the next six week period. Assume the other 25 women met in another room which had not been treated by this insecticide but that otherwise the two rooms were identical. If all 25 of the women exposed to the insecticide (manifested by low blood cholinesterase levels) had children born with the same birth defects and if none of the other 25 women (whose blood cholinesterase levels remained unchanged) had a child born with a birth defect, no one would contend that the circumstance that insecticide "X" had not previously been established as a human teratogen by using the accepted protocol would, or should, prevent the case from going to the jury upon such an evidentiary showing. Of course defendants would probably agree, pointing out that the phenomenon itself, as stated in the hypothetical, would, in effect, be the equivalent of a scientifically valid epidemiological study on human "subjects" which would obviate the need for animal studies, etc. And it is obvious that the trial of the case would not have to await "falsifiability" tests, publication and peer review, or the establishment of error rates. And even if this theory of causation had not received prior "general acceptance" within the pertinent scientific community, the "phenomenal" evidence hypothesized would surely suffice. This is because that evidence satisfies the *Daubert* admissibility standards of scientific validity and, thus, evidentiary relevance and reliability.

Where does the evidence proffered by the plaintiffs fit into this picture? Judge Kozinski in handling the *Daubert* remand stated:

> "In fact, apart from a small but determined group of scientists testifying on behalf of the Bendectin plaintiffs in this and many other cases, there doesn't appear to be a single scientist who has concluded that Bendectin causes limb reduction defects."

*Daubert,* 43 F.3d 1311, at 1314.

To an extent the same situation appears to exist here in connection with the plaintiffs' claim that Dursban LO causes birth defects. There does not appear to be a single independent scientist (i.e. one who has not been involved in at least some litigation on behalf of plaintiffs) who has concluded that Dursban LO causes birth defects. But, by the same token, many of the scientists supporting the non-causation position of the defendants have had some financial, or other, connection with the defendants. Furthermore, by the time of the decision in *Daubert II,* an immense amount of research and study had concluded that Bendectin did not cause limb reduction birth defects. Here there has not yet been such numerous, well-prepared, broad-based, focused studies even though Dursban LO, its contaminants, its impurities and its metabolites have been studied for years. How much study and research is needed in order to confidently conclude that Dursban LO is not a teratogen and did not cause the birth defects suffered by Ashley? (The Court recognizes that that is not the question it is called upon to answer. But it is an important question, particularly when one attempts to compare this case with the histories of the

Bendectin and the silicone breast implant cases.)

Dr. Marshall Johnson, Ph.D., one of the defendants highly credentialed experts, states with respect to developmental toxicity studies done on Dursban:

Chlorpyrifos has been examined for developmental toxicity in an overly large number of studies and did not produce agent-relatable terata. Generally one makes human risk estimations based on two or three: a developmental toxicity study in rats and rabbits and a multi generation study in rats. There are more than adequate data available to evaluate the developmental hazard potential of Chlorpyrifos. Chlorpyrifos did not produce birth defects when tested by scientific methods employed routinely by investigators worldwide. If it were to pose a developmental hazard and if it were even a weak teratogen, it would have demonstrated such. It has had ample opportunity to do so. Actually, the animal testing has been overdone and, considering the uniformity of outcomes and NOAEL exposure levels, over half of the studies had no scientific necessity. Standard and state-of-the-art testing regimens employ a single developmental toxicity study in each of two laboratory animal species plus a single multi generational test. Chlorpyrifos has been tested twice in mice, twice in rats and once in rabbits for developmental toxicity and the breakdown produce (TCP) has been tested once in pregnant rats and once in pregnant rabbits. There are four multiple generation studies in rats. (See Section II.C.1 and Appendix E Sections A and B.)

Chlorpyrifos already has been tested for teratogenicity to the extent beyond scientific logic. With the data already available, it would be an imprudent application of toxicologic testing resources to conduct additional studies on this topic.

Dursban has been on the market for over 30 years. Defendants state that literally tens of millions of women have been exposed to this agent on a regular basis. But no secular trend data has been produced revealing whether increases in birth defects like those suffered by Ashley parallel the increase in sales (and, therefore, use) of Dursban.

Most significant, in contrast to the Bendectin situation, it appears that only one epidemiological study has been conducted on Dursban. So it is obviously necessary to examine that one study. It is referred to as the "Willis" study although Willis was just one of five persons who participated therein. That study, entitled "Pregnancy Outcome Among Women Exposed to Pesticides Through Work or Residence in an Agricultural Area" was published in the September, 1993, edition of The Journal of Occupational Medicine ... (See Exhibit H to defendants' evidentiary submissions).

In the Willis study the subject women were enrolled in a Southern California community clinic perinatal program. All women entering the program between January 1987 and December 1989, were asked to participate. Five hundred thirty-five women were included in the study. The women were potentially exposed to pesticides occupationally and/or environmentally because most lived and worked in an agricultural area in San Diego County. Blood samples were taken for the determination of cholinesterase activity and the women were interviewed to determine exposure history. According to the report:

"No differences between exposed and unexposed women was noted for risk of pre-term birth or toxemia. Subjects who experienced spontaneous abortion were all unexposed, and the rate of spontaneous abortion was 2.1% less than generally expected. A greater incidence of low birth weight among exposed women indicates that exposure may have had a 'protective' effect."

As stated in the report:

The purpose of the present study was to compare selected pregnancy outcomes between women who were exposed to pesticides just before and during their pregnancies and those who were not. In this case, the focus was on cholinesterase-inhibiting organophosphate and carbamate pesticides used most widely in the study area, both agriculturally and in homes. The pregnan-

cy outcomes of interest were the occurrence of: 1) spontaneous abortion, 2) pre-term labor, 3) low birth weight infants, and 4) toxemia of pregnancy. A cohort of 535 women was followed throughout their pregnancies by way of exposure history interviews, the collection of blood specimens for periodic cholinesterase activity determinations, and review of maternal and newborn medical records. One notable feature of this study was that it incorporated objective laboratory evidence of exposure with self-reported information. In addition, many potential pesticide exposure scenarios were taken into consideration. This included use by women employed in the local greenhouses, packing houses, and fields, as well as pesticide use in restaurants, beauty shops, and residences in which many of the women worked, and domestic exposures of full-term mothers using insecticides around the house or living near land used for agricultural activities.

Most of the women were Hispanic, of low income and educational levels, many of whom had recently immigrated from Mexico. Their average age was mid 20's and the majority had more than one child.

Three assessment measures were used: 1) A questionnaire for the determination of history of exposure (self-reported) and for the identification of potential confounding variables, 2) maternal and newborn patient records, and 3) Biologic assay of blood samples for cholinesterase activity in red cells and plasma.

The first interview was conducted during the intake visit or the first scheduled prenatal care visit, usually before 25 weeks gestation. Each participant had a total of three interviews, one initial and two ongoing, approximately one per trimester. Maternal blood samples for the determination of cholinesterase activity were taken at each of the three interviews. Fetal cord blood samples were collected for the purpose of maternal-fetal comparisons on a sub-sample of participants at the time of delivery.

A large number of pesticides were used in the study area. The cholinesterase inhibitor insecticides included: carbaryl, demeton, dimethoate, dursban, guthion, orthene, parathion, methyl parazthion, Black Flag and Raid. The study notes that, "because many are cholinesterase inhibitors and it is common practice to use more than one agent, exposure to pesticides was considered to mean exposure to cholinesterase-inhibitor pesticides." The study notes that "few women were able to name the actual pesticides to which they were exposed."

The study used standard statistical measurements and confounding variables such as drugs, alcohol or smoking habits, and other environmental factors were controlled in the analysis where sample size permitted. Although there were slightly more cases of toxemia than the expected rate (10.7% v. 7%), the risk ratio did not show a difference between the exposed versus the non-exposed subjects. The instances of pre-term birth was 5.6% as compared with an expected rate of 8.9% but, here again no difference was detected between the risk for exposed versus non-exposed women. Most importantly the study states:

"Analysis of the association between exposure status and newborn neurologic symptoms, skeletal defects, neonatal intensive care for 24 hours or more, and the length of hospital stay for both mother and newborn were done. No significant associations were found."

Marshal Johnson, Ph.D., one of the defendants' experts analyzes the Willis Study as follows:

In the Journal of Occupational Medicine (*35:* 943–949), Willis, et al., reported an evaluation of a population consisting of over 500 women living and/or working in agricultural areas of San Diego County. The women in the study were members of a perinatal program of the county health services. The study focuses on organophosphate pesticides. The study is well designed in that it avoided self-reporting of reproductive problems, and instead relied on the clinical records and, since many of the chemicals involved were cholinesterase inhibitors, assays of cholinesterase activity in maternal blood (and fetal cord blood at delivery). Determined by blood samples

assayed in each pregnancy trimester, low blood cholinesterase levels (a biologic marker of exposure to this class of chemical) constituted one of the bases of separating the women into exposed and unexposed populations while simultaneously compensating for normal variation in pregnant (and non-pregnant) persons. A person was designated "exposed" based on (a) potential for exposure (self-reported—responses from a National Institute of Occupational Health and Safety questionnaire) *and* (b) blood cholinesterase levels in the lowest third of the cholinesterase levels for the entire group in at least two of three pregnancy trimesters. Chlorpyrifos is a cholinesterase inhibitor (Ware 1978) and its suppression would be a biologic marker of exposure to this type chemical—markedly enhancing exposure/effect considerations (Khoury, et al. 1992), since depressed enzyme levels in the "exposed" women establish that they really had been exposed to this type chemical.

The cholinesterase inhibiting insecticides used in the study area were Carbaryl, Demeton, Dimethoate, *Dursban*, Guthion, Orthene, Parathion, Methyl Parathion, Black Flag and Raid. The women reported at least one of: 1) an agricultural occupation 2) handling of pesticide on their job, 3) pesticide used around themselves at work, or 4) resident within 100 yards of agriculturally-used land. If they had at least two low blood cholinesterase levels (determined by a state-certified laboratory) in addition to one or more of the subjective criteria, they were classified as having been exposed to at least one of the above-listed cholinesterase-inhibiting pesticides.

*No malformed offspring were reported in this study. Preterm deliveries occurred in 5.6% of exposed women. The expected ("normal") incidence was 8.9%. Analysis of birth weight data (sensitive continuous variable) as well as preterm deliveries found no adverse effect among these cholinesterase-inhibited (i.e., low blood assays) women.* Actually, birthweights were higher in exposed than in unexposed pregnancies. (No protective connotation should be inferred.) (Emphasis in original.)

Clearly there was no indication of any developmental toxicity or pattern of developmental defects detected in these women who had experienced exposures to cholinesterase inhibitors (including non-ascertained Dursban exposures).

At the last oral argument plaintiffs' lawyers contended that the Willis study was not reliable and should be given no weight. They pointed out that Dursban was just one of many pesticides to which the subject women might have been exposed. If the plaintiffs believe that the Willis study is subject to other defects or inadequacies which could undermine its validity, they should point same out at the September 12 conference. Of course, it certainly would be better if several, or many, epidemiological studies were done on Dursban LO, its contaminants, impurities and metabolites. But the Willis study is the only such study we have. So it is critical to carefully assess its importance.

Dr. Jeanette Sherman of the Department of Sociology of Eastern Michigan University in 1995 published an article in Volume 4, No. 4 of the *International Journal of Occupational Medicine and Toxicology* entitled "Chlorpyrifos (Dursban)—Associated Birth Defects: a Proposed Syndrome, Report of Four Cases, and Discussion of the Toxicology." Ashley Smits was one of the four cases reviewed in that article. The other three cases have also been involved in litigation.

The defendants dismiss Dr. Sherman's study as being merely anecdotal case reports which prove nothing. The Court agrees that, generally, such "small number" case reports do not scientifically establish a cause and effect relationship. Such case studies are important because the perceived or suspected association may alert the scientific community to the importance of further scientific studies which, in turn, can validate or undermine the hypothesis. So the pathway to important scientific discoveries well may start with the observations reported in such case studies. And, as pointed out above in connection with the Courts' hypothetical involving the 50 women impregnated through the use of *in vitro* fertilization, anecdotal

"case" studies can merge into valid scientific proof causation where the associations compelled by the facts of those separate cases become so strong as to negate mere chance as an explanation.

Under the section of her article, see Supra, captioned "Statistical Analysis," Dr. Sherman states:

> According to K.L. Moore, "to prove that a given agent is teratogenic, one must show either that the frequency of malformations is increased above the 'spontaneous' rate in pregnancies in which the mother is exposed to the agent (the prospective approach), or the malformed children have a history of maternal exposure to the agent more often than normal children (the retrospective approach). Both types of data are hard to get in an unbiased form. *Individual case reports are not convincing unless both the agent and type of malformations are so rare that their association in several cases can be judged not coincidental*" (Moore, 1973) (emphasis added).

These general propositions coincide to an extent with observations just made by the Court. But then Dr. Sherman attempts to make the case as follows:

> The data on the four children discussed here were submitted to J.M. Gould of the Radiation and Public Health Project for statistical analysis. Sixteen individual birth defects were exhibited in three of the four children. Given that the probability of any single live birth weighing less than 5.5 pounds is less than one in ten, Gould reported "it is equally conservative to assume that the probability of any 1 of the other 16 birth defects is less than one in ten, or ten to the minus one power. Since all four children share 6 defects, and three or more children share 15 defects, the chance of this happening is 10 to the minus 45th power, or 10 followed by 45 zeros. This is a staggeringly large number." One can state, therefore, based on probability, that the chance of two independent occurrences is the product of the chance probability of each event. Therefore, in the absence of any other plausible alternative explanation, it is impossible that the birth

defects found in these four children is due to chance; the abnormalities must be attributed instead to their *in utero* exposure to Dursban.

The parties are advised that I have read Dr. John Graham, Jr.'s critique of Dr. Sherman's article (See Exhibit A to the defendants evidentiary submissions) and particularly paragraph 19–31 of his Declaration. And I have read Dr. Marshall Johnson's critique of Dr. Sherman's paper under the caption, "Sherman's Article Published 1995," see pp. 84–91 of the Declaration of Dr. Johnson.

Overall, Dr. Sherman bases her opinion on her analysis of the human case reports, animal studies, biochemistry and the structural activity relationship of the chemical agent.

From my own examination of Dr. Sherman's articles, from the critiques thereof by Drs. Graham and Johnson, and from the written and oral arguments of defendants' counsel, I have come to the tentative conclusion that Dr. Sherman's analysis and causation opinions are not derived from any accepted scientific methodology (i.e., are not grounded in the methods and procedures of science), are not scientifically valid and, ergo, do not possess the evidentiary reliability required by *Daubert*. This is not to say that Dursban LO is not a teratogen or that it did not cause Ashley's birth defects. It is to say that Dr. Sherman's submissions and opinions are not derived from scientific methods and are nothing more than an invitation to the jury to speculate (rather than a reliable basis upon which the jury could find that it is more likely true than not true that Dursban LO caused the birth defects suffered by Ashley.) Therefore the views and opinions expressed would not assist the trier of fact to determine the cause of those defects.

My tentative view is that Dr. Sherman's case studies do nothing more scientifically than to suggest a causal relation. That hypothesis has not to date been legitimized by further research and studies. In sum, there have been no epidemiological studies, no repeatable dose-response animal studies, no other studies which would connect Dr. Sherman's speculative hypothesis to a scientific proposition having acceptance in at least a segment of the pertinent scientific communi-

ty. (Note: Dr. Bidanset's *in vitro* and *in vivo* studies will be discussed later.)

The defendants state that Dr. Sherman's article relies, inter alia, on the reasoning that the exposure of each of the mothers to Dursban occurred in the first trimester of pregnancy. In her deposition at pages 689–691 she affirms that her theory requires exposure to the chemical agent during the first trimester which she identifies as "this critical point in development when these key structures are formed ... " Defendants then point out that Sherman's own report in the case of child # 2 (Daniel Gillespie) and the medical records for the pregnancy confirm that the application of Dursban occurred *after* the first trimester. The Court will ask the plaintiffs at the September 12 conference if they agree or disagree that child # 2 should be eliminated when evaluating Dr. Sherman's article and, if so, what effect that might have on the remainder of that study.

The defendants then state that the patterns of symptoms described by Dr. Sherman in her article are not really present. And that the children do not in fact show any concordance of symptoms. Then defendants state:

"Moreover, it is not scientifically acceptable to collectively analyze children with multiple anomalies and recognized birth defect syndromes as Sherman has done because by definition the children have patterns of defects which can only be combined if the defects have the same pathogenetic basis. (Graham Decl. ¶ 23). That is not present here."

To evaluate the legitimacy of Dr. Sherman's statistical analysis it is necessary for the Court to resolve the issue raised by the defendants' response. Did the children suffer from the same complex or pattern of defects?